**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS; JEWISH FAMILY SERVICE OF WESTERN MASSACHUSETTS; INTERNATIONAL INSTITUTE OF NEW ENGLAND; AFRICAN COMMUNITIES TOGETHER; HIAS, INC.; REFUGEE COUNCIL USA; LIDA A.; ABDI B.; JULIO C.; and FIRAS D.,

*Plaintiffs*,

v.

JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security; and the DEPARTMENT OF HOMELAND SECURITY,

*Defendants*.

Case No.

## CLASS ACTION COMPLAINT FOR VACATUR, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, AND DECLARATORY RELIEF

## INTRODUCTION

1. For more than 45 years, refugees fleeing persecution who entered the United States lawfully through the United States Refugee Admissions Program ("USRAP") have been promised a path to stability and safety. But the Trump Administration has unleashed an unprecedented series of policies targeting refugees and the USRAP. These include actions placing refugees who are already resettled in the United States—after a thorough, years-long vetting process—into legal limbo by freezing their applications for lawful permanent residency, and seeking to abruptly strip them of their refugee status in order to detain and remove them. The Administration's coordinated attacks on lawfully admitted refugees hurt those refugees, their families, and the American

businesses and communities where they work and live. These attacks are also illegal and unconstitutional.

2. On November 21, 2025, Defendant Joseph Edlow, the Director of U.S. Citizenship and Immigration Services ("USCIS"), issued an internal policy memorandum directing USCIS to immediately and indefinitely hold all pending applications for lawful permanent residence filed by refugees admitted during the Biden Administration ("Adjustment of Status Hold"), while simultaneously directing the review and potential re-interview of all such refugees ("Re-vetting Policy").

3. On October 14, 2026, DHS published, without notice and comment and with immediate effect, an interim final rule ("IFR") titled "Removing 30-Day Refugee Termination Notice." 91 Fed. Reg. 65,077. The IFR (or "Refugee Status Termination IFR") cuts the time a refugee has to respond to a notice of intent to terminate refugee status from 30 days to 10, even though the 30-day notice period had remained unchanged for 45 years.

4. This lawsuit challenges these actions, which, taken together, keep refugees from obtaining lawful permanent residency—a status to which they are statutorily entitled—and place them at risk of termination of their refugee status with no meaningful opportunity to be heard. By DHS's own count, approximately 113,000 refugees have adjustment applications pending, and as many as 186,000 refugee cases admitted between fiscal years 2015 and 2025 remain unadjusted and exposed to the new termination rule. 91 Fed. Reg. at 65,088-89 & n.78.

5. The Administration's decision to indefinitely bar refugees from permanent residency, subject these already thoroughly vetted refugees to a baseless fishing expedition for purported justifications to terminate their refugee status, and slash from 30 days to 10 the time refugees have to respond before their refugee status is terminated threatens these refugees with imminent risk of harm. Refugees face being uprooted from this country and their communities and removed to the very countries in which the United States government has *already* determined they would face persecution or torture, all without basic due process and in violation of precise statutory limits and long-standing regulations implementing the Immigration and Nationality Act ("INA").

6. These actions are the latest in a systematic effort to implement policies that are hostile to refugees, with the end goal of terminating their refugee status and expelling refugees *en masse*. Consistent with that goal, Defendants the Department of Homeland Security (DHS) and USCIS, together with Immigration and Customs Enforcement (ICE), have taken multiple actions that target refugees since the first days of the second Trump Administration, when President Trump issued an executive order effectively shuttering the USRAP and then restructured the program to admit only white Afrikaners from South Africa.

7. The Adjustment of Status Hold, the Re-vetting Policy, and the Refugee Status Termination IFR violate the Administrative Procedure Act because they were issued without notice and comment procedures, are inconsistent with the statute and regulations governing refugee status, are arbitrary and capricious, and violate the Due Process Clause. Without relief from this Court, Plaintiffs—membership organizations whose members include refugees, organizations that provide services to refugees, and individual refugees—face irreparable harm. Refugees who cannot adjust their status are being deprived of the benefits of lawful permanent residence, including a path to citizenship, eligibility for the Supplemental Nutrition Assistance Program ("SNAP"), and, since October 1, 2026, Medicaid coverage. The Re-vetting Policy and the Refugee Status Termination IFR further place these refugees at risk of having their refugee status terminated, being separated from their families, and facing removal to the very dangers from which they fled when seeking (and receiving) refugee protection in this country. Organizational Plaintiffs, for their part, have been forced to divert scarce staff and resources from their core resettlement and legal services to respond to these policies, and the IFR's immediate effective date required them to do so overnight.

**JURISDICTION AND VENUE**

8. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law, including the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*. The Court may grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 703, 705, 706.

9. This case arises under the United States Constitution, the APA, and the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq*. and its implementing regulations.

10. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to this action occurred in this District, Plaintiffs International Institute of New England and Jewish Family Service of Western Massachusetts are headquartered in this District, and Plaintiff Lida A. resides in this District. *See* 28 U.S.C. § 1391(e)(1)(B)-(C).

## THE PARTIES

11. **Plaintiff Partnership for the Advancement of New Americans** ("**PANA**") is a nonprofit membership organization headquartered in San Diego, California, that is founded, led, and staffed by refugees. PANA advocates for the full economic, social, and civic inclusion of refugees and displaced people in the San Diego region, throughout California, and across the country through community organizing, civic engagement, and policy advocacy. PANA's members are concentrated in Southern California and include refugees who have not adjusted status, among them refugees from Syria, Somalia, and the Democratic Republic of Congo. PANA also helps its refugee members prepare and file applications for adjustment of status. PANA sues on behalf of its members, including PANA Member 1 and PANA Member 2, described below.

12. **Plaintiff Jewish Family Service of Western Massachusetts** ("**JFS-WMA**") is a nonprofit organization headquartered in Springfield, Massachusetts that has served newcomers, immigrants, and refugees since 1898 and has resettled refugees since the 1990s in partnership with Plaintiff HIAS. With a staff of 84, JFS-WMA serves more than 4,000 clients annually, providing resettlement, case management, behavioral health, employment, and legal services. In the four years before the USRAP was suspended, JFS-WMA resettled 1,298 refugees, and it currently serves approximately 1,062 refugees who have not adjusted status. Through its accredited representative, JFS-WMA helps refugees prepare adjustment applications at no cost. JFS-WMA sues on its own behalf.

13. **Plaintiff International Institute of New England** (“**IINE**”) is a nonprofit organization founded in 1918 and headquartered in Boston, Massachusetts, that serves refugees and immigrants across thirteen counties in Massachusetts and New Hampshire. Before the USRAP was suspended, IINE resettled between 400 and 700 refugees each year. IINE’s legal staff represents refugees, free of charge, throughout the adjustment process, and IINE currently serves approximately 860 refugees who have not adjusted status. IINE sues on its own behalf.

14. **Plaintiff African Communities Together** (“**ACT**”) is a national nonprofit membership organization of African immigrants fighting for civil rights, economic opportunity, and a better life for African immigrant families residing in the United States. ACT serves thousands of members across its chapters in New York, Virginia, Maryland, Pennsylvania and the District of Columbia, and facilitates a national network of African leaders and African immigrant-serving organizations. ACT’s members include refugees who have applied for or plan to apply for adjustment of status. ACT also provides legal services to assist refugee members to adjust their status. In addition, ACT engages in national advocacy and community “Know Your Rights” education, seeking to advance opportunities for permanent status for the more than two million African immigrants residing in the United States. ACT sues on behalf of its members, including ACT Member 1, described below.

15. **Plaintiff HIAS, Inc**. **(“HIAS”)** is a global nonprofit organization and resettlement agency headquartered in Silver Spring, Maryland, dedicated to ensuring that forcibly displaced people find welcome, safety, and freedom. Founded 140 years ago as the Hebrew Immigrant Aid Society, HIAS is the oldest refugee protection organization in the world. HIAS currently operates in eleven countries, including the United States. HIAS’ Legal Services program provides and facilitates the provision of legal services by volunteer pro bono attorneys to refugees, asylum seekers, and other forcibly displaced immigrants in the United States. HIAS’ Pro Bono team currently has 206 refugee adjustment of status cases placed with pro bono attorneys; between the Pro Bono team and the direct services team, HIAS has approximately 80 pending refugee adjustment of status cases. HIAS sues on its own behalf.

16. **Plaintiff Refugee Council USA** (“**RCUSA**”) is a 501(c)(3) organization located in Washington, D.C. RCUSA is the only national coalition devoted to forcibly displaced people in the United States and serves as the coordinating body for the refugee-serving community. RCUSA’s coalition of members includes 39 U.S.-based non-governmental organizations. Among these organizations are the historical ten national refugee resettlement organizations that, until January 2025, received federal funding to provide statutorily mandated domestic resettlement services to recently arrived refugees. RCUSA’s goals are to defend, improve, and expand refugee resettlement, asylum, humanitarian protection, and inclusion for forcibly displaced populations. RCUSA also strives to strengthen the collective power and effectiveness of its members and partners in delivering responsive policies and programs. RCUSA sues on its own behalf.

17. **Plaintiff Lida A**. is a 27-year-old refugee from Afghanistan who lives in the Eastern Division of Massachusetts. She worked for a U.S.-funded organization in Afghanistan and fled after the Taliban takeover; the U.S. government evacuated her, and she completed refugee processing at a U.S. military base in Qatar. She was admitted to the United States as a refugee in January 2024. She submitted her medical examination in November 2024 and applied to adjust status in March 2025. Her application has not been adjudicated.

18. **Plaintiff Abdi B**. is a 39-year-old refugee from Ethiopia who lives in Minnesota with his wife and two young children, one of whom is a U.S. citizen. He fled Ethiopia after government agents arrested him and abused him physically and psychologically, and he lived as a refugee in Egypt from 2015 until his admission to the United States in December 2024. In January 2026, during Operation PARRIS, he was detained without explanation after appearing for a scheduled immigration appointment, shackled, and transferred to Texas, where he was confined for about a week until a federal court ordered his release. He has since applied to adjust status. His application has not been adjudicated.

19. **Plaintiff Julio C**. is a 26-year-old refugee from Colombia who lives in Texas. He fled discrimination and persecution as a gay man living with HIV and was living in an LGBTQ+ shelter in Guatemala when he applied for resettlement. He was admitted to the United States as a

refugee in January 2025. He applied to adjust status in May 2026. His application has not been adjudicated. Since arriving, he has relied on Medicaid to obtain the medication he needs to manage his HIV.

20. **Plaintiff Firas D**. is a 23-year-old refugee from Iraq who lives in Texas. As a gay man in Iraq, he was repeatedly beaten by a family member and, in November 2023, arrested because of his sexual orientation. He was admitted to the United States as a refugee on January 8, 2025, and now works full time. He applied to adjust status in January 2026. His application has not been adjudicated.

21. **Defendant Joseph B**. **Edlow** is sued in his official capacity as the Director of USCIS. In this capacity, he is responsible for implementing policies and regulations related to immigration benefits, including adjustment of status and termination of status for refugees. Defendant Edlow issued the November 21, 2025 memorandum ordering the mass refugee Re-vetting Policy and the Adjustment of Status Hold freezing adjudication of refugees' applications for lawful permanent residence.

22. **Defendant USCIS** is the sub-agency within DHS headquartered in Camp Springs, Maryland, responsible for, among other things, adjudicating refugee adjustment applications and terminating refugee status under 8 C.F.R. § 207.9.

23. **Defendant Markwayne Mullin** is sued in his official capacity as the Secretary of DHS. In this capacity, he directs each of the component agencies within DHS, including USCIS. In his official capacity, Defendant Mullin is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103. Defendant Mullin signed the IFR.

24. **Defendant DHS** is an executive agency of the United States headquartered in Washington, D.C. DHS and its components, including USCIS, are the agencies principally charged with implementing and enforcing the immigration laws and policies of the United States.

## BACKGROUND

### VII. Refugee admissions and adjustment of status

25. Congress has enacted a comprehensive statutory scheme to regulate immigration—the INA, 8 U.S.C. §§ 1101 *et seq.*—which empowers various federal agencies to enforce and administer immigration law.

26. Congress amended the INA in 1980 by enacting the Refugee Act, which embodies the U.S. commitment to humanitarian assistance for those fleeing persecution. Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102.

27. In enacting the Refugee Act, Congress sought to "provide a permanent and systematic procedure for the admission ... of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." *Id.* § 101(b). It declares that "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands," including through resettlement of such persons to this country. *Id.* § 101(a).

28. Under U.S. law, and consistent with U.S. treaty obligations, a "refugee" is a person facing displacement from their country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1101(a)(42).

29. The Refugee Act sets out detailed policies and procedures that govern the admission and resettlement of refugees in the United States, which together create the U.S. Refugee Admissions Program (USRAP). *See* 8 U.S.C. § 1157 *et seq*.

30. The USRAP is intended to embody and effectuate the United States' commitment to offering a safe haven for people around the world fleeing persecution.

31. Individuals outside of the United States seeking admission as refugees are processed through the USRAP, which is managed by the State Department in cooperation with DHS and the Department of Health and Human Services (HHS).

32. The State Department is responsible for facilitating the overall refugee application process, while DHS is responsible for determining an applicant's eligibility for refugee admission under U.S. law.

33. Refugees are the most thoroughly screened and vetted group to enter the United States. Refugee applicants undergo rigorous background checks, as well as biometric checks for those within certain age limits. U.S. Dep't of State, DHS, & HHS, *Report to the Congress: Proposed Refugee Admissions for Fiscal Year 2025* 28 (2025), https://perma.cc/YK4A-AFXN.

34. To be considered for refugee resettlement to the United States, an individual must typically first be referred to the USRAP by either the United Nations High Commissioner for Refugees (UNHCR), a U.S. Embassy, a designated non-governmental organization, or a group of private citizens through a program known as Welcome Corps. In limited circumstances, refugees may access the USRAP directly due to their membership in a group designated by statute or by the State Department in its joint reports to Congress. The overwhelming majority of refugee applicants are referred by UNHCR based on its determination that they meet the international definition of a refugee—which is largely consistent with the definition in 8 U.S.C. § 1101(a)(42)—and require resettlement as a durable solution to protect them from harm. Of the more than 30 million refugees worldwide, UNHCR refers fewer than 1% for resettlement to any country in any given year. *See* U.S. Dep't of State, *Refugee Admissions*, https://perma.cc/W5QX-KCUH (last visited Oct. 25, 2026).

35. Prior to January 20, 2025, when President Trump issued Executive Order No. 14,163 suspending the USRAP (*Realigning the United States Refugee Admissions Program*, 90 Fed. Reg. 8,459 (Jan. 20, 2025)), the security screening process that followed a referral would typically take 18 to 36 months or longer and involve multiple federal agencies, including the National Counterterrorism Center, the FBI's Terrorist Screening Center, the Department of Defense, and multiple DHS components. Applicants' biographic information was screened against numerous databases, including the Consular Lookout and Support System, the Treasury Enforcement Communications System, the National Crime Information Center, and classified

databases. *See* USCIS, *Refugees*, https://perma.cc/VRT3-WPTB (last visited Oct. 20, 2026); *Report to the Congress: Proposed Refugee Admissions for Fiscal Year 2025* 28, https://perma.cc/YK4A-AFXN.

36. Following initial security screening, refugee applicants were interviewed under oath by a specially trained USCIS Refugee Officer who assessed the applicant's eligibility for refugee status and evaluated the credibility of the applicant's claim. The Refugee Officer had the authority to approve or deny the refugee application based on whether the applicant met the statutory definition of refugee and did not fall within any of the bars to refugee status. Individuals barred from refugee status include those who have participated in persecution, pose a danger to U.S. security, or have provided "material support" to U.S. designated terrorist organizations.

37. Applicants who were conditionally approved by USCIS would undergo a medical examination by physicians designated by the Department of State and complete a cultural orientation program. Prior to travel to the United States, all applicants would undergo additional recurrent security checks to ensure no new derogatory information had emerged.

38. Under the Refugee Act, the DHS Secretary is authorized to admit to the United States "any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States and is admissible ... as an immigrant." 8 U.S.C. § 1157(c)(1); *see* 8 C.F.R. §§ 207.1-207.7. So long as they are admissible as an immigrant, a refugee's spouse or child is entitled to admission as a refugee even without meeting the statutory definition. 8 U.S.C. § 1157(c)(2)(A).

39. Once a refugee is admitted to the country, refugees receive statutorily authorized support services—including employment training and placements, direct cash support, and English-language training—which have historically been provided by a sponsoring resettlement agency or its affiliates. *See generally* 8 U.S.C. § 1522. Those agencies use federal funding, private donations, and volunteer support to facilitate effective resettlement with the goal of placing "employable refugees ... on jobs as soon as possible after their arrival" to cultivate "economic self-sufficiency." *Id.* § 1522(a)(1)(A)-(B).

40. Once a refugee is admitted, their refugee status may be terminated only if DHS determines that the noncitizen "was not in fact a refugee within the meaning of section 1101(a)(42) of this title at the time of ... admission." 8 U.S.C. § 1157(c)(4); 8 C.F.R. § 207.9. Because derivative refugees do not need to meet the refugee definition to be admitted, their refugee status may be terminated only if the status of their refugee spouse or parent is terminated. USCIS Policy Manual, vol. 7, pt. L, ch. 6, https://perma.cc/XM5M-SZPK; 91 Fed. Reg. at 65,080 (termination "applies solely to principal refugees"). While the statutory language provides the agency with discretion to terminate refugee status, 8 U.S.C. § 1157(c)(4) (status "may be terminated"), the language of the regulation requires termination if a refugee has been found not to have met the refugee definition upon admission. 8 C.F.R. § 207.9 (status "will be terminated").

41. USCIS is required to notify a refugee in writing of its intent to terminate their refugee status through a Notice of Intent to Terminate (NOIT). Until the publication of the October 14, 2026 Refugee Status Termination IFR, the refugee would then have 30 days from the date notice was served upon them to present written or oral evidence to show why their refugee status should not be terminated. 8 C.F.R. § 207.9 (2025).

42. After providing the refugee with the opportunity to respond, if USCIS terminates the individual's refugee status, it then issues a Notice of Termination. USCIS then processes the individual for removal "under sections 235, 240, and 241 of the Act," 8 C.F.R. § 207.9, meaning USCIS issues a notice to appear and initiates removal proceedings under 8 U.S.C. § 1229a. *See, e.g.*, *Mukantagara v. DHS*, 67 F.4th 1113, 1116 (10th Cir. 2023).

43. After a refugee has "been physically present in the United States for at least one year," they are required to apply to adjust their status to that of a lawful permanent resident. 8 U.S.C. § 1159(a)(1)(B); 8 C.F.R. § 209.1.

44. The applicable regulation requires refugees to submit an adjustment application and the results of a medical exam, as well as have up-to-date biometrics results. 8 C.F.R. § 209.1(b)-(c). Then USCIS determines, on a case-by-case basis, whether an interview is necessary to determine if the refugee is admissible. *Id.* § 209.1(d).

45. As long as the applicant's refugee status has not been terminated, they meet the 1-year physical presence requirement, and they are not found to be inadmissible to the United States (subject to certain statutory exceptions), DHS *must* adjust the status of the refugee to that of a lawful permanent resident. 8 U.S.C. § 1159(a)(2); 8 C.F.R. § 209.1(e). USCIS must notify the refugee in writing of its decision on their adjustment of status application and, if approved, issue proof of lawful permanent resident status. 8 C.F.R. § 209.1(e). Upon adjustment of status, refugees are regarded as lawfully admitted as permanent residents from the date of their arrival in the United States as refugees. 8 U.S.C. § 1159(a)(2).

46. Lawful permanent resident status provides refugees with a number of benefits and protections. These include increased educational opportunities, eligibility for citizenship, the ability to travel abroad and return, the ability to petition for certain family members, eligibility for certain benefits, and protection from termination of refugee status, which DHS concedes can occur only before a refugee adjusts. 91 Fed. Reg. at 65,080; 8 U.S.C. §§ 1101(a)(13)(C), (a)(20), 1153(a)(2), 1427(a).

47. Additionally, as a result of the One Big Beautiful Bill Act (OBBA), Pub. L. No. 119-21, 139 Stat. 72 (2025), refugees who have not adjusted status—but who nevertheless maintain refugee status—have lost eligibility for Supplemental Nutrition Assistance Program (SNAP) benefits (for new applicants and at recertification), lost Medicaid and Children's Health Insurance Program (CHIP) coverage on October 1, 2026, will lose premium tax credits on January 1, 2027, and will lose Medicare eligibility on February 1, 2027. *Id.* §§ 10108, 71109, 71201, 71301. Once they become lawful permanent residents, however, refugees regain access to these benefits without the 5-year waiting period that applies to most other lawful permanent residents. *See* 7 U.S.C. § 2015(f)(1); 8 U.S.C. § 1612(a)(2)(A)(i)-(ii); 42 U.S.C. § 1396b(v)(5)(B)(ii).

48. Refugee Cash Assistance (RCA) provides cash assistance to help refugees meet basic needs and Refugee Medical Assistance (RMA) provides short-term medical coverage to refugees who are ineligible for Medicaid. In 2026, the Office of Refugee Resettlement extended RCA and RMA from 4 months to up to 12 months, but only for refugees who entered the United

States after January 1, 2026. 91 Fed. Reg. 43,107 (July 14, 2026); 91 Fed. Reg. 62,534 (Oct. 1, 2026). Refugees subject to the Adjustment of Status Hold therefore lack access to federal nutrition assistance and Medicaid unless and until they adjust.

## VIII. The government's shutdown of refugee resettlement and initial actions against refugees already resettled in the United States

49. On the first day of his second term, President Trump signed an executive order titled "Realigning the United States Refugee Admissions Program." Exec. Order No. 14163, 90 Fed. Reg. 8459 (Jan. 20, 2025) (Refugee Ban EO).

50. The Refugee Ban EO imposes an indefinite suspension of "entry into the United States of refugees under the USRAP" as well as a suspension on "decisions on applications for refugee status" until President Trump finds that decisions on refugee applications and admissions can resume. *Id.* The Refugee Ban EO did not provide any deadline by which the President will determine whether the USRAP can resume, if ever.[1]

51. Section 2 of the Refugee Ban EO details President Trump's stated policies for refugee admissions, which the Order explains will be the basis of his finding of whether "resumption of USRAP is in the interests of the United States." *Id.* at 8460. It states that "[i]t is the policy of the United States … that public safety and national security are paramount considerations in the administration of the USRAP, and to admit only those refugees who can fully and appropriately assimilate into the United States and to ensure that the United States preserves taxpayer resources for its citizens." *Id.* at 8459.

52. The requirement that refugees appear able to "fully and appropriately assimilate" before being permitted to enter appears nowhere in the statutory definition of a refugee. *See* 8 U.S.C. § 1101(a)(42).

---

[1]In February and March 2025, a federal district court in the Western District of Washington enjoined the ban on refugee entry and the freeze on refugee processing. *Pacito v. Trump*, 768 F. Supp. 3d 1199 (W.D. Wash. 2025); 772 F. Supp. 3d 1204 (W.D. Wash. 2025). The Ninth Circuit reversed the district court's injunction in relevant part. *Pacito v. Trump*, 169 F.4th 895 (9th Cir. 2026).

53. But the President's meaning became clear soon after issuing the Refugee Ban EO. Thousands of refugees from Africa, Asia, Latin America, and the Middle East with scheduled travel into the United States—including the spouses and unmarried children of refugees who had already been admitted—were barred from entering the United States as refugees under the Refugee Ban EO. But on February 7, 2025, President Trump issued a new Executive Order authorizing the establishment of a program of refugee resettlement exclusively for white Afrikaners from South Africa.[2] This group began arriving in the United States on a government-chartered jet on May 12, 2025.

54. On October 31, 2025, President Trump issued a new Presidential Determination setting forth the numbers of refugees who would be admitted in Fiscal Year 2026, without withdrawing the Refugee Ban EO. Presidential Determination No. 2025-13, 90 Fed. Reg. 49,005 (Sept. 30, 2025). The Presidential Determination set the cap for refugee admissions to a historic low of 7,500, compared to many tens of thousands in years prior, and directed that these admissions numbers "primarily be allocated among Afrikaners from South Africa." *Id*. On May 21, 2026, President Trump supplemented the Fiscal Year 2026 Presidential determination, increasing the cap by 10,000, making the maximum number of refugee admissions 17,500—all reserved primarily for white Afrikaners. Presidential Determination No. 2026-14, 91 Fed. Reg. 31,645 (May 21, 2026).

55. Trump Administration officials paired these actions with hostile rhetoric towards non-Afrikaner refugees. On December 1, 2025, former DHS Secretary Kristi Noem referred to noncitizens entering the United States as "killers, leeches, and entitlement junkies" and said "WE DON'T WANT THEM. NOT ONE."[3]

---

[2] The White House, *Addressing Egregious Actions of The Republic of South Africa* (Feb. 7, 2025), https://perma.cc/956L-HKE6.
[3] Sec'y Kristi Noem (@Sec_Noem), X (Dec. 1, 2025, at 06:52 PM), https://perma.cc/8DP3-KFS9.

56. Similar statements from the President focused primarily on those from Afghanistan and Somalia.[4] On December 2, 2025, President Trump declared at a cabinet meeting, "We're going to go the wrong way if we keep taking in garbage into our country," specifically referring to individuals from Somalia. "I don't want them in our country. I'll be honest with you…. Their country stinks. And we don't want them in our country. I could say that about other countries too."[5]

57. On December 9, 2025, President Trump praised his administration's decision to bar nationals of 19 countries—all non-white and non-European—from entering the United States, stating: "I've also announced a permanent pause on Third World migration, including from hellholes like Afghanistan, Haiti, and Somalia and many other countries."[6]

## IX. The November 2025 Memorandum announcing the refugee Adjustment of Status Hold and Re-vetting Policy

58. Although the Refugee Ban EO is applicable only to refugee applicants outside the United States, the Administration has also targeted hundreds of thousands of refugees already resettled to the United States.

59. On March 21, 2025, the USCIS Field Operations Directorate implemented a temporary adjudication pause, estimated to last no more than two weeks, on all refugee (as well as asylee) adjustment of status applications, purportedly to complete "additional screening and vetting to identify potential fraud, public safety, or national security concerns." The pause was lifted on April 10, 2025.

60. But in late 2025, the Administration resumed and ramped up its efforts to target refugees in the United States.

---

[4] Shawn McCreesh, *Trump Uses National Guard Shooting to Cast Suspicion on Refugees*, N.Y. Times (Nov. 27, 2025), https://perma.cc/T6N5-ZUDN.

[5] PBS News, WATCH: Trump says he doesn't want Somali migrants in the U.S., calls people 'garbage' (Dec. 2, 2025), https://perma.cc/6VHQ-Q62A.

[6] Alexandra Marquez, *Trump revives slur while discussing immigrants from Somalia and other 'disgusting' nations*, NBC News (Dec. 10, 2025), https://perma.cc/E3Z7-M7X7.

61. On November 21, 2025, Defendant Edlow issued a memo entitled "Reinterview of Certain Refugees Admitted to the United States and an Immediate Hold on Certain Refugees with a Pending I-485, Application to Register Permanent Residence or Adjust Status" ("the November 2025 Memo"). Ex. 1.

62. The memo, "effective immediately," placed an adjudicative hold on all pending adjustment of status applications filed by refugees admitted between January 20, 2021 and February 20, 2025 (the "Adjustment of Status Hold") and directed the agency to perform a "comprehensive review" and "potential re-interview" of all refugees admitted in that time period ("the Re-vetting Policy"). *Id.*

63. The November 2025 Memo was not issued publicly, and Defendants did not provide an opportunity for notice and comment on either the Adjustment of Status Hold or the Re-vetting Policy.

64. Unlike the March 2025 pause, the November 2025 Adjustment of Status Hold is indefinite. The November 2025 Memo states that the Adjustment of Status Hold "is in place until the USCIS Director lifts the hold in a subsequent memo." *Id.* at 2. While framed as a measure "in the interim" while USCIS conducts "a comprehensive review and a re-interview of all refugees" admitted during the Biden Administration, it does not explain why this review requires halting all refugee adjustment of status adjudications.

65. Under the memo, USCIS personnel do not have discretion to adjudicate refugee adjustment of status applications: "Any request to lift the hold for either litigation or other extreme circumstances must be approved by the USCIS Director or Deputy Director." *Id.* at 2.

66. Refugees are statutorily entitled to adjustment of status so long as they meet the 1-year physical presence requirement, have not had their refugee status terminated, and are not subject to grounds of inadmissibility that have not been waived, *see* 8 U.S.C. § 1159(a), but under the memo, refugees admitted between January 20, 2021, and February 20, 2025, are indefinitely barred from adjustment. This group consists of refugees admitted or processed during the Biden

Administration, although it includes refugees who were processed and approved as refugees during the first Trump Administration but who entered during the Biden Administration.

67. The Re-vetting Policy subjects this same group of refugees to a reassessment of their refugee claim. Specifically, the memo directs "[a]ll principal refugees admitted during this timeframe" will be subject to "a comprehensive review and a re-interview" "to determine that they met the refugee definition ... at the time of admission and to explore admissibility, including any inadmissibilities that may have existed prior to the time of admission as a refugee." Ex. 1 at 1-2. The memo states that "all derivative refugees"—that is, the spouses and unmarried children under 21 years of age of principal refugees—will also be subject to the "review and potential reinterview to fully explore admissibility and whether the persecutor bar would have applied at the time of admission." *Id.*

68. The memo also authorizes re-vetting against a larger group of refugees than those subject to the adjustment hold. Ex. 1 at 2 (authorizing re-vetting for "refugees admitted outside" the timeframe of the adjustment hold). The November 2025 Memo does not explain what procedures or standards USCIS will apply to the re-vetting.

69. As justification for the Adjustment of Status Hold and the Re-vetting Policy, the memo asserts that "from January 20, 2021, to February 20, 2025, the USRAP and USCIS potentially prioritized expediency, quantity, and admissions over quality interviews and detailed screening and vetting." *Id.* at 2. It does not cite any evidence for this assertion or explain how interviews or screening and vetting were deficient. And while the memo raises the specter that some refugees did not meet the refugee definition upon admission or may be subject to inadmissibility grounds, it cites no evidence about the scope (or existence) of such issues. Indeed, because the November 2025 Memo applies to refugees *admitted* from January 20, 2021, to February 20, 2025, it covers individuals who were initially interviewed, screened, and vetted during the first Trump Administration.

70. Nor does the memo explain why the purported need to review prior determinations that a refugee was admissible and met the refugee definition, even if taken at face value,

necessitates a blanket hold on all adjustment of status adjudications. Whether a refugee is subject to any inadmissibility grounds is the primary focus of the adjustment of status adjudication itself. *See* 8 U.S.C. § 1159(a). If evidence of fraud or other concerns regarding the original refugee claim arises in the review and adjudication of adjustment of status applications, adjustment of status adjudicators can refer the case for potential status termination under 8 U.S.C. § 1157(c)(4). The November 2025 Memo does not acknowledge, let alone explain, the agency's departure from its existing policy of considering such issues when adjudicating individual adjustment of status applications.

71. The Adjustment of Status Hold and Re-vetting Policy also apply to all derivative refugees, even though derivative refugees do not need to meet the refugee definition and may have their refugee status terminated if their principal refugee spouse or parent has their status terminated. *See* USCIS Policy Manual vol. 7, pt. L, ch. 6, https://perma.cc/XM5M-SZPK. Derivative refugees whose spouse or parent has already adjusted status or naturalized would therefore be subject to the Adjustment of Status Hold and Re-vetting Policy.

72. The memo further asserts the need to "only admit refugees who can fully and appropriately assimilate into the United States" and to ensure that refugees "warranted a favorable exercise of discretion," which it describes as one of "USCIS'[s] top priorit[ies]." Ex. 1 at 2. It does not explain why these considerations support the agency's decision to subject all refugees admitted during the prior administration to re-vetting or to indefinitely freeze refugee adjustment of status applications, given that these are legally impermissible bases to terminate refugee status or deny a refugee adjustment of status.

73. The memo provides no other explanation for the Adjustment of Status Hold or Re-vetting Policy. Nor does it explain what evidence the agency relied on or what alternative policy options, if any, were considered.

74. The memo does not even purport to consider the reliance interests of refugees, all of whom followed an arduous and often years-long process to be resettled in the United States

with the expectation that they could seek permanent residence and its attendant benefits and protections after one year.

75. As legal authority, the memo alludes only to the refugee definition under 8 U.S.C. § 1101(a)(42) (INA § 101(a)(42)), the refugee status termination provision under 8 U.S.C. § 1157(c)(4) and a related regulation (8 C.F.R. § 207.9), and the Refugee Ban EO issued pursuant to 8 U.S.C. § 1182(f) (INA § 212(f)). The memo does not address how any of these legal authorities permit the wholesale shutdown of refugee adjustment of status adjudications for hundreds of thousands of refugees. The memo's reference to the regulation governing refugee adjustment of status, 8 C.F.R. § 209.1, is limited to explaining that USCIS will evaluate admissibility and determine whether refugee status should be referred for termination *at the time of adjustment of status*. Ex. 1 at 3.

76. Nor does the memo cite any authority for requiring all refugees to re-interview or otherwise re-establish that they met the refugee definition, other than an individualized notice of intent to terminate refugee status in a particular case and the opportunity to respond required by 8 C.F.R. § 207.9.

77. And the memo fails to explain how it is consistent with the INA's requirements that any policy governing the termination of refugee status be promulgated through notice-and-comment rulemaking procedures. *See* 8 U.S.C. §§ 1157(c)(4), 1159(a)(1)(A).

78. Eleven months after the November 2025 Memo was first issued, the Adjustment of Status Hold has not been lifted and adjudication of refugee adjustment of status applications remains almost completely shut down, leaving, by DHS's own count, approximately 113,000 lawfully present, extensively vetted refugees with pending adjustment applications unable to adjust status merely because they entered the country during the Biden Administration.

79. In that time, USCIS has apparently granted a few exceptions to the adjustment of status hold for a small number of refugees subject to the hold.

80. In all, USCIS adjudicated only 121 refugee adjustment of status applications from January through March 2026, a number that would include any refugees who are not subject to the

Adjustment of Status Hold based on their date of admission to the United States.[7] In the same period in 2025, USCIS adjudicated 17,569 refugee adjustment of status applications.[8]

81. As of July 2026, more than 155,000 refugee adjustment of status applications are pending, up from 45,000 at the start of the second Trump Administration.[9]

82. After the November 2025 Memo, USCIS issued a further hold on all benefit applications, including applications to adjust status by refugees, filed by individuals "from countries listed in" Presidential Proclamation 10,998, the "travel ban" that suspended the entry of nationals from 39 countries. U.S. Citizenship and Immigr. Servs., *Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries* (Jan. 1, 2026), https://perma.cc/B6YE-M4QT (citing Pres. Proc. No. 10,998, 90 Fed. Reg. 59,717 (Dec. 19, 2025)). For refugees from these 39 countries, the travel ban hold was essentially duplicative of the Adjustment of Status Hold. The travel ban hold has since been vacated, *see Dorcas Int'l Inst. of R.I. v. USCIS*, 834 F. Supp. 3d 242 (D.R.I. 2026), but refugees still cannot have their applications adjudicated due to the Adjustment of Status Hold.

**X. The Refugee detention policy and related litigation**

83. After the release of the adjudication hold memoranda, Defendants' efforts to target the refugee community *intensified*.

---

[7] USCIS, *Number of Service-wide Forms By Quarter, Form Status, and Processing Time January 1, 2026-March 31, 2026*, https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2026_q2_v1.xlsx

[8] USCIS, *Number of Service-wide Forms By Quarter, Form Status, and Processing Time January 1, 2025-March 31, 2025*, https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2025_q2.xlsx

[9] USCIS, *Report to Congress Number of Service Wide Forms By Month, Form Status, and Processing Time For the Month of July 2026*, https://www.uscis.gov/sites/default/files/document/data/appropriation_requirement_july_2026_v1.0.csv; USCIS, *Report to Congress Number of Service-Wide Forms by Month, Form Status, and Processing Time for the Month of January 2025*, https://www.uscis.gov/sites/default/files/document/data/appropriation_requirement_january_2025.csv

84. On December 18, 2025, ICE issued a one-sentence memorandum that purported to rescind a 2010 ICE Policy that a refugee's failure to adjust status or to apply for adjustment was "not a sufficient ground to place them in removal proceedings, and therefore not a proper basis for detaining them." *See* Marcos Charles, *Rescission ICE Policy No. 11039.1: Detention of Refugees Admitted Under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status (May 10, 2010*) (Dec. 18, 2025) ("Refugee Rescission Memo").

85. In January 2026, DHS began a mass detention operation targeting refugees in Minnesota known as Operation Post-Admission Refugee Reverification and Integrity Strengthening ("PARRIS"). USCIS announced that it would be focusing on the 5,600 refugees in Minnesota who had not yet been granted lawful permanent resident status—even though refugees were prevented from obtaining such status due to the Adjustment of Status Hold. The purported purpose was to "target[]" allegedly "[f]raudulent [r]efugee [a]pplications in Minnesota" by "reexamining thousands of refugee cases through new background checks and intensive verification of refugee claims,"[10] presumably under the Re-vetting Policy announced in the November 2025 Memo.

86. Through Operation PARRIS and with the purported authority of the Refugee Rescission Memo, DHS implemented a policy of arresting refugees in Minnesota, flying them to detention facilities in Texas, and subjecting them to custodial "re-vetting" interviews that largely involved interrogating them about their original refugee resettlement applications. Even though these interviews were aimed at eliciting testimony that could potentially support termination of their refugee status, refugees were not given an opportunity to prepare for the re-vetting interviews nor provided any notice of the reasons for the interview, let alone a NOIT and the 30 days' notice required by regulation. 8 C.F.R. § 207.9. Plaintiff Abdi B., for example, was detained without explanation after appearing for a scheduled immigration appointment, shackled, and flown to Texas, where he was held for about a week until a federal court ordered his release.

[10] Press Release, USCIS, DHS Launches Landmark USCIS Fraud Investigation in Minnesota (Jan. 9, 2026), https://perma.cc/Z92V-NTP7.

87. Finding that the policy of arresting and detaining unadjusted refugees was unlawful and unconstitutional, a district court in the District of Minnesota issued a temporary restraining order and later a preliminary injunction on behalf of a putative class of refugees resident in Minnesota. *See U.H.A. v. Bondi*, No. 26-417, 2026 WL 222226 (D. Minn. Jan. 28, 2026); *U.H.A. v. Bondi*, 822 F.Supp.3d 1007 (D. Minn. 2026). The court enjoined Defendants from arresting or detaining refugees in Minnesota on the basis that they are a refugee who has not yet adjusted to lawful permanent resident status and ordered the immediate return and release of those detained under the policy.[11]

88. On February 18, 2026, despite the temporary restraining order in Minnesota, Defendant Edlow and Todd Lyons, the senior official performing the duties of the ICE Director, issued a memorandum titled "Detention of Refugees Who Have Failed to Adjust to Lawful Permanent Resident Status," (the Refugee Detention Memo). The Refugee Detention Memo purported to justify DHS's practice of arresting and detaining refugees by interpreting 8 U.S.C. § 1159(a)(1) to mandate potentially indefinite detention of all unadjusted refugees after one year. On March 23, 2026, a district court in the District of Massachusetts stayed the implementation of the Refugee Detention Policy under section 705 of the Administrative Procedure Act. *See Jean A. v. Noem*, No. 3:26-cv-30031, 2026 WL 805207, at *1 (D. Mass. Mar. 23, 2026).

89. Although Defendants' Refugee Detention Policy is stayed while the litigation continues, Defendants continue to defend it. Refugees who have not obtained adjustment of status would be at immediate risk of detention should the Refugee Detention Policy currently stayed in *Jean A. v. Noem* go back into effect.

90. Some Minnesota refugees subjected to Operation PARRIS were excepted from the Adjustment of Status Hold and granted permanent resident status. After "re-vetting" interviews, USCIS issued some other refugees NOITs and ultimately adjudicated some of their adjustment of

[11] The court later dismissed the case and vacated the preliminary injunction in light of the challenge to the nationwide detention policy pending in this District. *See U.H.A. v. Blanche*, No. 26-1482, 2026 WL 2718462 (D. Minn. Apr. 21, 2026).

status applications. However, many refugees who were subject to Operation PARRIS, including Plaintiff Abdi B., still have not had their adjustment of status applications adjudicated.

**XI. The Refugee Status Termination IFR**

91. On October 14, 2026, DHS published the Refugee Status Termination IFR, effective immediately, with comments due November 13, 2026. *Removing 30-Day Refugee Termination Notice*, 91 Fed. Reg. 65,077 (Oct. 14, 2026) (FR Doc. 2026-20956). The IFR amends 8 C.F.R. § 207.9 to reduce from 30 days to 10 the time a refugee has to present written or oral evidence in response to a NOIT. DHS counts every calendar day, including weekends and federal holidays, and adds 3 days only for mailed notices, for a total of 13 days from the date of mailing. 91 Fed. Reg. at 65,085.

92. If the deadline passes without a response, the refugee "is considered to have forfeited his or her right to rebut the allegations in the NOIT, and DHS will terminate his or her refugee status." *Id.* There is no administrative appeal, and termination immediately ends the refugee's work authorization, which DHS concedes will now occur "at least 20 days sooner." *Id.* at 65088. In the Refugee Status Termination IFR, DHS concedes that the termination process, including the 30-day notice period, "has remained substantively unchanged in the 45 years" since it was first adopted through an interim rule in 1980 and a final rule in 1981. *Id.* at 65080 & n.21.

93. The IFR rests on DHS's assertion that refugee processing during the prior administration was deficient. Its principal evidence is a "preliminary review" of an unspecified number of Minnesota refugees in an "initial pilot operation cohort," for which it cites only a press release about a different operation. *Id.* at 65078 & nn.2-3. DHS admits it cannot analyze how often NOITs fail to result in termination "because USCIS terminated so few cases." *Id.* at 65088 n.77. DHS also identifies no refugee who absconded or caused harm during a 30-day response window, and the one terminated case it describes was terminated under the 30-day rule. *Id.* at 65084.

94. DHS also concedes that termination is "not a precondition" to removal, so a refugee who poses a security or criminal risk can already be charged with removability directly. Termination is "needed" only where "no other removal grounds apply." *Id.* at 65085.

95. The Refugee Status Termination IFR's reach is not limited to refugees covered by the Re-vetting Policy. DHS estimates that about 186,000 refugee cases admitted from fiscal year 2015 through fiscal year 2025 remain unadjusted and could be subject to the rule. *Id.* at 65088.

96. DHS claims it will follow certain procedures to ensure that a refugee has time to respond to a NOIT, including using express courier delivery; dating each NOIT on the day it is mailed; treating a request for an interview as a timely response; and providing the opportunity to submit evidence after the deadline. *Id.* at 65085. But these statements appear only in the IFR's non-binding Preamble. The regulatory text still requires the refugee to "present written or oral evidence" within ten days. *Id.* at 65081 (revising 8 C.F.R. § 207.9).

97. The IFR provides no mechanism to extend the deadline for any reason, including illness, disability, detention, or the unavailability of counsel or an interpreter. In fact, the IFR does not address the impact of the reduced response timeframe on individuals with disabilities at all.

98. Neither the IFR nor § 207.9 requires USCIS to notify a derivative spouse or child that a NOIT has been issued to the principal refugee, even though the regulation provides that the status of the refugee's spouse and child "will be terminated" along with the principal's. 8 U.S.C. § 207.9. Upon information and belief, derivatives have not received the NOIT issued to their principal, and so may lose refugee status without any notice or opportunity to be heard.

99. DHS concedes that refugee status can be terminated only before a refugee adjusts, and that it "typically reviews" the underlying refugee determination during the adjustment adjudication. 91 Fed. Reg. at 65,081. Yet the IFR does not mention the Adjustment of Status Hold, which keeps refugees in refugee status, and therefore exposed to termination under the IFR, indefinitely.

100. USCIS issued NOITs affording 30 days to respond shortly before the IFR took effect. The IFR does not say whether those refugees will receive the 30 days their notices promised.

101. The interim final rule took effect immediately and was not issued using the notice-and-comment procedures, or with the delayed effective date required for legislative rules that alter the substantive rights of regulated parties.

102. In light of the IFR, all unadjusted refugees, including those subject to the Re-vetting Policy, are now at immediate risk of having their refugee status terminated in a matter of days with no meaningful opportunity to challenge USCIS's basis for termination.

103. USCIS has already begun issuing NOITs under the IFR. USCIS issued a NOIT dated October 15, 2026, to an unadjusted refugee, which was delivered by courier on October 19, 2026. Under the IFR, that refugee's deadline to respond falls between October 26 and October 28, 2026, leaving between 5 and 7 business days after receipt to find counsel, obtain records, and respond.

**XII. 10 Days is insufficient time to respond to a NOIT.**

104. Until October 14, 2026, refugees who received NOITs had 30 days to respond. Even with 30 days, newly resettled refugees who have received NOITs since 2025 have had to scramble to obtain legal assistance, gather evidence from applications that may be years old, and obtain interpretation to defend their refugee status—a difficult and complex task for anyone, let alone a newly arrived refugee. Some refugees who have already received NOITs did not have the full 30 days to respond. That is because the government has sent these notices by United States Postal Service mail, and refugees typically did not receive the NOIT until several days after the date on the NOIT that starts the 30-day clock.

105. Now, refugees have only 10 days to obtain scarce legal help and mount a defense to termination of their status, making an already daunting task nearly impossible. Since Operation PARRIS began, many NOITs have involved the government's questioning of statements that refugees may have made years ago. Some NOITs have been based on USCIS evaluations of social media postings or even "likes" that USCIS perceives to contradict an earlier refugee application, including instances where USCIS has relied on faulty translations and plain errors to attack a refugee's credibility.

106. Competently defending against spurious allegations in just 10 days will be nearly impossible for the vast majority of refugees who are new to this country, unfamiliar with U.S. legal processes, low-income, and often not fluent in English.

107. Under the IFR, the clock still starts on the date of mailing. Even using the express service DHS cites, which delivers on the third business day and not on weekends, a NOIT mailed on a Friday would not arrive until the following Wednesday, leaving a refugee roughly 6 business days, and fewer than a week with a federal holiday, to find counsel, obtain records, and respond.

108. The IFR, like the regulation it replaces, contains no avenue for administrative appeal of a termination. 8 C.F.R. § 207.9. Instead, refugees are to be referred to removal proceedings in immigration court if their refugee status is terminated. *Id.* But immigration courts do not have jurisdiction to review refugee terminations, and the government has argued that federal district courts lack jurisdiction to review terminations as well. Although the Tenth Circuit recently rejected that argument, *Mukantagara v. Mullin*, No. 24-4071, 2026 WL 2979742 (10th Cir. Oct. 5, 2026), the question remains contested. *Jama v. DHS*, 760 F.3d 490 (6th Cir. 2014).

109. Cutting the response period from 30 days to 10 thus removes a vital–and perhaps the only–opportunity for a lawfully present refugee to defend their status.

110. The ability to request an interview within 10 days is not a sufficient protection because it is not contained in the text of the revised regulation and DHS does not say how much time it will provide refugees to prepare for the interview or whether it will permit refugees to provide a written response at or after the interview. A notice of intent to terminate refugee status received after the IFR was issued said that if the refugee chose to provide an oral interview, an interview would have to be scheduled within the ten-day period provided to respond to the notice.

111. Additionally, many refugees live with disabilities that affect memory, concentration, comprehension, and communication. A 2020 systematic review and meta-analysis found that approximately 31 percent of refugees and asylum seekers experience post-traumatic stress disorder and approximately 31 percent experience depression. Rebecca Blackmore et al., *The Prevalence of Mental Illness in Refugees and Asylum Seekers: A Systematic Review and Meta-Analysis*, 17 PLOS Med. e1003337 (Sep. 21, 2020), https://perma.cc/KQK4-MPGY. Many refugees "experience mental health problems associated with past trauma, ongoing stress, or both." B. Heidi Ellis et al., *Understanding the Mental Health of Refugees: Trauma, Stress, and the*

*Cultural Context*, in The Mass. Gen. Hospital Textbook on Diversity and Cultural Sensitivity in Mental Health 253 (Ranna Parekh & Nhi-Ha T. Trinh eds., 2019).

112. USCIS's own officer training recognizes that these conditions impair a person's ability to give testimony. It instructs officers that a survivor of torture or severe trauma "may have difficulty remembering events," may experience "confusion or distortion of memory due to anxiety (e.g., mixing up names and/or dates)," and may "have difficulty following or tracking [the asylum officer's] questions" because of "severe concentration difficulties." USCIS, RAIO Directorate – Officer Training, *Interviewing Survivors of Torture and Other Severe Trauma* 22-23 (Dec. 13, 2024), https://perma.cc/7743-59XQ. The same conditions impair a refugee's ability to read and understand a NOIT, recall and document events from years earlier, and prepare a response within ten days.

113. Some refugees have cognitive, intellectual, or communication disabilities so severe that they cannot testify on their own behalf. On information and belief, when such a refugee was the principal applicant, the USCIS Refugee Officer elicited the testimony supporting the refugee claim from a family member, usually a parent or sibling, who was interviewed on the applicant's behalf, and USCIS approved the application on that basis.

114. The IFR makes no provision for these refugees. Neither the regulatory text nor the preamble provides for a NOIT to be sent to, answered by, or contested through a family member, guardian, or other representative. Nothing in the IFR indicates that USCIS will permit a family member to appear and testify on the refugee's behalf at an interview requested in response to a NOIT. On information and belief, USCIS has issued no public guidance stating that it will do so. Yet the IFR itself states that "[i]n the refugee context, testimony is a primary source of evidence," 91 Fed. Reg. at 65,078 n.1. It also contemplates NOITs based on a refugee's supposed "failure to provide credible testimony as to any or all of the elements of the refugee definition." *Id.* at 65085.

115. DHS's regulations recognize that notice to a person who is mentally incompetent must be handled differently. They require service on the person with whom the incompetent person resides and provide that, "whenever possible, service shall also be made on the near relative,

guardian, committee, or friend." 8 C.F.R. § 103.8(c)(2)(ii). The IFR does not say whether USCIS will identify refugees whose disabilities prevent them from understanding a NOIT, or whether it will serve them as § 103.8(c)(2)(ii) requires. Instead, the IFR provides that DHS will send NOITs by express courier and that the ten-day period runs from the date of mailing. 91 Fed. Reg. at 65,085.

116. On information and belief, many refugees with severe cognitive or communication disabilities live in group settings or with people who do not read English or do not understand what a NOIT is or what it requires. For these refugees, the 10-day period may expire before anyone able to respond on their behalf learns that a NOIT was issued.

117. Nor can these refugees avoid the problem by obtaining a guardian. DHS regulations permit a legal guardian to sign a benefit request for a mentally incompetent person. 8 C.F.R. § 103.2(a)(2). On information and belief, however, most adult refugees with cognitive disabilities have no court-appointed guardian, and obtaining one through state probate proceedings takes far longer than ten days.

118. Under the IFR, a refugee who does not respond within 10 days "is considered to have forfeited his or her right to rebut the allegations in the NOIT, and DHS will terminate his or her refugee status." 91 Fed. Reg. at 65,085. Refugees whose disabilities prevent them from understanding or responding to a NOIT therefore face termination of their refugee status, immediate loss of work authorization, and removal proceedings without any meaningful opportunity to be heard.

## XIII. Application of the Adjustment of Status Hold, the Re-vetting Policy and the IFR to Plaintiffs causes significant harm.

### A. Individual Plaintiffs

119. **Lida A**. has been unable to adjust status because of the Adjustment of Status Hold. She was accepted to university with a merit scholarship but cannot attend because much of the remaining funding she needs is limited to permanent residents and citizens. Without a green card, she cannot travel to visit her non-U.S. based brother, who has also left Afghanistan, and he cannot visit her because of the travel ban on Afghan nationals. The policies targeting refugees have caused

her panic attacks, and she fears that she will receive a Notice of Intent to Terminate without enough time to respond and be returned to Afghanistan, where her life would be in grave danger.

120. **Abdi B**. remains traumatized by his detention during Operation PARRIS, which also caused great fear and stress for his wife and young children. Without a green card, he and his family feel insecure and unsettled, and his children lack access to the resources and opportunities that permanent residence would provide. His family's SNAP benefits were cut off earlier this year because, under the OBBA, refugees are no longer eligible. They will not become eligible for SNAP until they become lawful permanent residents. He fears that under the IFR his refugee status could be terminated within days, and that he and his family would be returned to Ethiopia, where the government violently persecuted him.

121. **Julio C**. depends on his health coverage to obtain HIV medication, and the prospect of losing it terrifies him. He lost access to SNAP benefits earlier this year and is working 12-hour days to meet his basic needs. He fears being removed to Colombia without any chance to explain the danger he would face, a fear made more acute by the IFR's shortened response period.

122. **Firas D**. cannot enroll in flight school to pursue his goal of becoming a pilot until he obtains a green card. In June 2026, he was stopped and questioned at an immigration checkpoint because he did not have a green card, and he fears arrest and detention if his work permit expires before his application is adjudicated. He works full time and does not believe he could understand a termination notice, gather evidence, and prepare a response within 10 days. If returned to Iraq, he fears he would be arrested, beaten, tortured, or killed because he is gay.

**B. PANA**

123. PANA's members suffer direct harm from the Adjustment of Status Hold, the Re-vetting Policy, and the IFR. Some of PANA's refugee members were admitted between 2021 and 2025, and are subject to the Re-vetting Policy. Many have adjustment applications that are suspended indefinitely under the Adjustment of Status Hold. All of PANA's unadjusted refugee members are now subject to the IFR. At least two identified members have already suffered harm

that is fairly traceable to Defendants' final agency actions and would be redressed by vacatur and injunctive relief.

124. PANA Member 1 is a refugee from the Democratic Republic of Congo. She fled violence and lived in a refugee camp for nine years before she was resettled in the San Diego area in October 2024. She is a widowed mother of two children who are also refugees, and she works as a home caregiver for people with disabilities. With PANA's help, she applied to adjust status in 2026. USCIS acknowledged receipt of her application, but because of the Adjustment of Status Hold, she has received no interview or decision. She has serious medical conditions that require ongoing treatment and medication, as well as lasting physical and psychological effects of the violence she suffered before coming to the United States. Because she cannot adjust status, she and her children recently lost their Medicaid and food assistance benefits. Without health coverage, she has been unable to keep appointments with specialists. She came to the United States expecting safety and stability after more than a decade of displacement. She now fears that her refugee status will be terminated under the IFR before she has any real chance to respond.

125. PANA Member 2 is a Syrian refugee in his twenties who fled Syria as a teenager and lived in Malaysia for a decade. He was resettled in San Diego in August 2022, with his parents and siblings. He applied to adjust status in September 2023 and completed biometrics that year. Despite repeated inquiries, USCIS has told him only that his application remains in processing, and he has never been interviewed. Other refugees who arrived when he did have received their green cards, but he and his family have not. He works several jobs while attending community college, and he has been accepted to a four-year university to study. Without permanent residence, he cannot travel outside the United States, and he avoids certain places for fear that a minor mistake will lead to immigration enforcement. Because he is a derivative refugee, he could lose his own refugee status without notice or any opportunity to respond if his father were issued a NOIT under the IFR. His family's home and business in Syria are gone, and armed conflict continues there. He entered the United States through the lawful refugee process and fears losing the life he has spent years building.

126. The interests PANA seeks to protect in this case are germane to its mission of securing the full economic, social, and civic inclusion of refugees. Those interests include protection of refugee status for its members, individualized and lawful adjudication of its members' adjustment applications, and notice and a meaningful opportunity to respond to any intent to terminate refugee status. The claims and requested equitable relief do not require individualized proof or participation by members.

127. Defendants' actions also directly harm PANA. Because PANA helps its refugee members prepare and file adjustment applications, the Adjustment of Status Hold has left members' applications stalled and required staff time responding to member inquiries. The IFR has also forced PANA to conduct emergency outreach and respond to frantic member inquiries, diverting staff from its organizing and advocacy work.

**C. ACT**

128. ACT's members suffer direct harm from the Adjustment of Status Hold, the Re-vetting Policy, and the IFR. At least one identified member is currently subject to the challenged Adjustment of Status Hold and IFR and has already suffered harm, including the indefinite suspension of his adjustment application while his wife and children have received green cards. This harm is fairly traceable to Defendants' final agency actions and would be redressed by vacatur and injunctive relief.

129. ACT Member 1 is a refugee from the Democratic Republic of Congo (DRC), which he fled in 2005 amid lingering conflict in the aftermath of war. He lived in South Africa for nearly twenty years before being resettled in Georgia in August 2023 with his wife and four children, and he now works in the healthcare field. ACT Member 1's wife and children have all received their green cards, but he has not and cannot because of the Adjustment of Status Hold. Because of the Re-vetting Policy and the IFR, he could potentially face deportation and separation from his wife and children. The area where ACT Member 1 is from in the DRC is currently experiencing war, and ACT Member 1 is experiencing a lot of fear at the prospect of being deported there.

130. The interests ACT seeks to protect—protection of refugee status for its members; individualized, lawful adjudication of adjustment applications filed by its refugee members; and notice and an opportunity to respond to any intent to terminate refugee status—are germane to its mission of securing family unification, dignity, and economic opportunity for African families and communities in the United States. The claims and requested equitable relief do not require individualized proof or participation by members.

131. Defendants' actions substantially impede ACT's core mission, have already directly harmed ACT, and threaten ongoing and future harm to ACT. Obtaining lawful permanent residence for refugees is especially important for ACT's members and clients. The Adjustment of Status Hold, the Re-vetting Policy, and the IFR impact ACT's ability to provide the immigration legal services that their refugee members need to adjust their status in the United States without fear of suddenly losing their refugee status.

**D. JFS-WMA**

132. JFS-WMA currently serves approximately 1,062 refugees who have not adjusted status, many of whom have been waiting months or years for adjudication of their adjustment applications. The policies challenged here have forced JFS-WMA to divert staff and resources from its core services. Since November 2025, JFS-WMA has operated an emergency food pantry for clients, predominantly refugees, who have lost SNAP benefits because they cannot adjust status, and it has had to draw on limited emergency funds to support families who have lost access to critical benefits. The loss of Medicaid coverage among its clients has also reduced revenue for JFS-WMA's behavioral health programs.

133. JFS-WMA staff have been diverted from providing assistance like food distribution to contacting every refugee JFS-WMA resettled between January 20, 2021, and February 19, 2025, to help them prepare for contact with immigration officials. Preparing and representing a single refugee family for a re-vetting interview required dozens of hours of staff time. JFS-WMA has one accredited representative to serve more than 1,000 unadjusted refugees; to respond to NOITs under a 10-day deadline, it would need ten such staff members, along with translators, case

workers, and drivers, and would have to divert resources from other programs, including its programs for older adults and the Jewish community.

134. If its clients' refugee status is terminated, JFS-WMA staff will spend substantial time seeking low-cost or pro bono counsel for removal proceedings and habeas petitions, work that is outside the scope of its legal services, and JFS-WMA expects to expand its Know Your Rights trainings. JFS-WMA also employs refugees who are themselves subject to the challenged policies.

**E. IINE**

135. IINE currently serves approximately 860 refugees who have not adjusted status, most of whom IINE represents in their adjustment applications. Because refugees whose applications remain pending have lost access to SNAP and Medicaid, IINE has had to increase referrals to food assistance programs, emergency rental and utility assistance funds, private financial support, and behavioral health services, straining its limited resources.

136. IINE has diverted staff from regular case management to prepare clients for re-vetting and possible NOITs: researching and developing response resources, contacting clients to determine what records they have from their refugee applications, and filing, appealing, and reviewing Freedom of Information Act requests for those records. That work, once a small part of IINE's practice, has become unprecedented in volume and prevents IINE from serving clients who need other immigration legal services. The IFR compresses all of it, along with outreach, document collection, interpretation, and coordination with counsel, into a matter of days.

137. IINE has also integrated Know Your Rights information into all client-facing programming, a significant expansion from the single annual training it previously offered, and expects to conduct at least ten trainings across its three locations this fall and winter, each of which requires staff to pause other work. If clients are issued NOITs, IINE staff will also spend substantial time seeking low-cost or pro bono counsel for removal and habeas proceedings, which IINE cannot provide.

**F. RCUSA**

138. The adjudication hold, refugee re-vetting, and the IFR threaten the core of RCUSA's mission, which is to ensure that people forced to flee their homes have agency, access to safety, and opportunity to thrive — not to send them back to places where their lives may be in danger or where they face persecution. These actions also have impacted RCUSA's work.

139. In the wake of Operation PARRIS, the adjudication hold memo, and refugee re-vetting, RCUSA staff has invested substantial time in creating a playbook of resources for communities to be equipped for increased immigration enforcement against refugees. Since creating those resources, RCUSA staff have facilitated a training for national and local resettlement directors and coordination meetings among legal and refugee service providers, advocacy organizations, and refugee leaders. This work has required a significant amount of staff time to plan and conduct.

140. RCUSA also worked with national resettlement directors to create a Resource Hub on its website in response to refugee re-vetting. Creating and updating the Resource Hub has taken a considerable amount of staff time, time that RCUSA staff has not been able to devote to normal program activities. The IFR has further accelerated the need for these resources and training. RCUSA staff plans to create updated preparedness materials for refugees outlining steps to take if they receive a notice of intent to terminate and/or are placed in removal proceedings.

141. Part of RCUSA's mission is to make sure that the necessary infrastructure is in place to support resettled refugees, so RCUSA also has responded to increased enforcement against refugees by identifying needs for additional support and developing the infrastructure to respond to those needs. RCUSA has also served as an interlocutor connecting legal service providers with other organizations to ensure that refugees have the necessary support. Previously, this kind of work has not been necessary on this scale because refugees were not targeted for re-vetting, arrest, detention, termination of refugee status and removal. RCUSA staff will need to invest time and effort in expanding this infrastructure to include support for responding to notices

of intent to terminate refugee status on an accelerated time frame and assisting refugees placed in removal proceedings.

142. In response to the IFR, RCUSA has begun efforts to recruit immigration attorneys with experience handling asylum claims in immigration court who could represent refugees if they are placed in removal proceedings. Setting up the infrastructure to support refugees in this way will require creating new relationships and systems. This will be very difficult to do on such a compressed time frame given that the IFR went into effect immediately, and refugees now only get 10 days to respond to a notice of intent to terminate their status.

143. RCUSA routinely receives requests for assistance from unadjusted refugees who are experiencing food insecurity or medical needs as a result of the adjustment of status hold, which prolongs the length of time they remain ineligible for SNAP and health assistance. RCUSA also expects to be inundated with requests for assistance from refugees who receive notices of intent to terminate. RCUSA will need to stand up urgent calls with membership organizations and plan calls with legal service providers to make sure that it can help to coordinate these activities and make sure that local refugee-serving organizations have the most up-to-date and effective guidance regarding best practices. The adjustment hold, refugee re-vetting, and the IFR therefore threaten to undermine RCUSA's core function as a coordinating and collaborating organization among refugee resettlement providers and refugee-serving organizations.

144. Increased enforcement against refugees also undermines RCUSA's mission to empower forcibly displaced people to serve as leaders, experts, and advocates. Programs such as RCUSA's in-person advocacy days and its young refugee leadership training program are jeopardized by the adjustment hold, refugee re-vetting, and the IFR because they rely on refugees feeling safe to travel and meet with elected leaders, reporters, and others who hold positions of power. The prospect of re-vetting and the IFR make refugees afraid to participate in these programs.

### G. HIAS

145. In 2026, HIAS has had 7 green cards approved. During the same time period in 2025, HIAS had 91 adjustment of status grants, 84 of those before May 5, 2025. As a result of the adjudication hold, HIAS staff have had to spend a substantial amount of their capacity to support clients through the lengthened process, counsel them through new hardship, and prepare and educate themselves in order to maintain expertise.

146. HIAS' clinical case management team has had to spend a lot of time researching alternative community resources for those losing access to federally funded food and healthcare benefits due to the combination of the adjudication hold and recent changes in federal law that eliminate unadjusted refugees' eligibility for many benefits. Staff have spent time strategizing resource and referral pathways, coordinating care, and navigating complex local and state benefits' programs to determine eligibility and alternative care programs for individual clients in varying jurisdictions. This has required additional training to understand the policy changes, eligibility requirements, and access to benefits.

147. The HIAS pro bono program has diverted resources and staff capacity from its existing projects to develop a response to the growing threat of refugee re-vetting interviews, such as developing new toolkits and sample interview questions. The Pro Bono team also has had to spend more time supporting pro bono attorneys to prepare their clients for potential re-vetting.

148. The IFR also is already causing great strain on HIAS' resources. When the IFR was announced the HIAS Pro Bono and Partnerships team immediately began developing a pro bono project, in partnership with another legal service organization, to engage with pro bono attorneys to provide immediate and urgent legal counsel for refugees who receive NOITs. This will require developing new trainings and resources to ensure that pro bono attorneys are well-equipped to competently represent their clients. Due to the immediate implementation of the IFR, the Pro Bono team is diverting its capacity away from existing projects, delaying service to other existing clients, and postponing taking on new matters that would fulfill grant requirements for other funders.

149. HIAS also expects to see an influx of referrals from partner organizations, and due to HIAS' current staff and existing grant requirements, it likely will only be able to accept a fraction of those referrals. If HIAS is able to accept referrals for new refugee clients, it would be a significant undertaking, both in terms of the scope of work and the expected duration of representation, between assisting clients with preparing written responses to NOITs interviews, preparing for the NOIT interviews, understanding consequences to possible termination of refugee status, and ultimately representing clients whose status is terminated in ensuing removal proceedings. Ultimately, the IFR would result in HIAS diverting its already strapped resources and potentially committing to long-term representation of clients facing removal proceedings, without grant funding to do so, or have to refuse these cases for lack of capacity.

150. The HIAS pro bono team would also need to divert attention and capacity to ensure that pro bono attorneys are trained and prepared to respond to notices of intent to terminate refugee status for existing clients.

151. By pulling staff away from service requirements for restricted grants, and by increasingly relying on HIAS' unrestricted funds to serve this community, the rule and HIAS' ensuing representation of impacted clients would put long-term feasibility for immigration legal representation at risk. The increased demands of refugee cases also will discourage pro bono attorneys from volunteering to take on new cases through HIAS' pro bono program, because they will be less confident in HIAS' ability to support them. This, in turn, will damage HIAS' reputation, its ability to secure grants for this program, and its ability to serve clients.

152. Refugee re-vetting and the IFR also threaten the funding HIAS receives to operate programs for refugees such as the Program for Initial Resettlement, Matching Grant, and Preferred Communities. For most of the programs, most of the funding is calculated based on an estimate of the number of participants served, therefore any overall reduction to that number, as a result of re-vetting and termination of status, would have serious financial consequences for HIAS and its affiliates.

### H. All Organizational Plaintiffs

153. Defendants' promulgation of the Adjustment of Status Hold, the Re-vetting Policy, and the IFR without notice and comment deprived Organizational Plaintiffs and their members of the opportunity to provide comments before those policies took effect, detailing the extensive harms created by these agency policies.

## CLASS ALLEGATIONS

154. Individual Plaintiffs bring this action under Federal Rule of Civil Procedure 23(a) and (b)(2) on behalf of themselves and the following class (the "Class"): **All individuals admitted to the United States as refugees under 8 U.S.C. § 1157 who have not adjusted to lawful permanent resident status as of and after October 14, 2026.**

155. **Numerosity**. By DHS's own estimates, the Class includes tens of thousands of people: approximately 113,000 refugees with pending adjustment applications and as many as 186,000 unadjusted refugee cases admitted between fiscal years 2015 and 2025. 91 Fed. Reg. at 65,088-89 & n.78. Joinder is impracticable.

156. **Commonality**. This case turns on common questions of law and fact, including whether the Adjustment of Status Hold, the Re-vetting Policy, and the IFR exceed Defendants' authority, are arbitrary and capricious, were issued without the procedures required by law, and/or violate the Fifth Amendment to the United States Constitution.

157. **Typicality**. Each Individual Plaintiff is an unadjusted refugee admitted between January 20, 2021 and February 20, 2025. Each is subject to the Adjustment of Status Hold, the Re-vetting Policy, and the IFR, and asserts the same claims as the Class.

158. **Adequacy**. Individual Plaintiffs have no interests in conflict with those of the Class, and their counsel are experienced in class litigation challenging immigration policies.

159. **Rule 23(b)(2)**. Defendants have acted on grounds that apply generally to the Class, so that final injunctive and declaratory relief is appropriate with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I

### Violation of the APA, 5 U.S.C. § 706(2)(A), (C) – Contrary to Law Adjustment of Status Hold (All Plaintiffs and Class Members against All Defendants)

160. The paragraphs above are incorporated and reasserted as if fully set forth here.

161. A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law" or in "excess of statutory ... authority." 5 U.S.C. § 706(2)(A), (C).

162. The Adjustment of Status Hold is a final agency action under the APA. 5 U.S.C. § 704.

163. No section of the INA, or any other law, authorizes USCIS to indefinitely halt refugee adjustment of status adjudications.

164. To the contrary, the INA and its implementing regulation mandate that DHS adjust the status of refugees who meet the minimum eligibility requirements. 8 U.S.C. § 1159(a); 8 C.F.R. § 209.1.

165. The Adjustment of Status Hold therefore exceeds USCIS's statutory authority and is contrary to law and therefore must be set aside.

### COUNT II

### Violation of the APA, 5 U.S.C. § 706(2)(A) – Arbitrary & Capricious Adjustment of Status Hold (All Plaintiffs and Class Members against All Defendants)

166. The paragraphs above are incorporated and reasserted as if fully set forth here.

167. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

168. The Adjustment of Status Hold is a final agency action under the APA.

169. The Adjustment of Status Hold is arbitrary and capricious because, in adopting it, Defendants failed to articulate a reasoned explanation for their decision, which represents a change in the agency's longstanding policy; failed to consider important aspects of the problem and

considered irrelevant factors; failed to consider alternative options to achieve their policy goals; offered explanations for their decision that run counter to the evidence before the agency; and failed to consider reliance interests.

170. The Adjustment of Status Hold is therefore arbitrary and capricious and must be set aside.

**COUNT III**
**Violation of the APA, 5 U.S.C. §§ 553, 706(2)(D) – Notice & Comment**
**Adjustment of Status Hold**
**(All Plaintiffs and Class Members against All Defendants)**

171. The paragraphs above are incorporated and reasserted as if fully set forth here.

172. A reviewing court must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

173. The APA, 5 U.S.C. § 553, requires that agencies provide public notice of, and opportunity to comment on, legislative rules before their promulgation. *See* 5 U.S.C. § 553(b), (c).

174. The Adjustment of Status Hold is a legislative rule within the meaning of the APA because it "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (quoting *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992)).

175. Defendants did not comply with the APA's procedural requirements when they issued the Adjustment of Status Hold without issuing a notice of proposed rulemaking, without providing the public an opportunity to comment, and without otherwise following the notice-and-comment procedures required by 5 U.S.C. § 553.

176. No exception to notice-and-comment procedures applies to the Adjustment of Status Hold.

177. The Adjustment of Status Hold was therefore issued without observance of procedure required by law and must be set aside.

## COUNT IV

### Violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution; APA, 5 U.S.C. § 706(2)(B) – Procedural Due Process Adjustment of Status Hold (Plaintiffs PANA, ACT, Individual Plaintiffs and Class Members against All Defendants)

178. The paragraphs above are incorporated and reasserted as if fully set forth here.

179. The Due Process Clause of the Fifth Amendment prohibits the federal government from deprivation of a protected interest without due process of law.

180. Individual Plaintiffs and the putative class, as individuals with refugee status who have not adjusted to lawful permanent resident status, have a statutorily created entitlement to adjustment of status so long as they are not inadmissible. 8 U.S.C. § 1159(a). Defendants' indefinite and unjustified hold on adjudicating Individual Plaintiffs' and the putative class members' adjustment of status applications constitutes a deprivation of their protected interests without due process.

181. The Adjustment of Status Hold violates Individual Plaintiffs and the putative class members' due process rights protected by the Fifth Amendment to the U.S. Constitution.

182. Under the APA, a reviewing court must "hold unlawful and set aside agency action" that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

183. The Adjustment of Status Hold is therefore contrary to constitutional right and must be set aside under the APA and the Court's equitable authority.

## COUNT V

### Violation of the APA, 5 U.S.C. § 706(2)(A), (C) – Contrary to Law Re-vetting Policy (All Plaintiffs and Class Members against All Defendants)

184. The paragraphs above are incorporated and reasserted as if fully set forth here.

185. A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law" or in "excess of statutory ... authority." 5 U.S.C. § 706(2)(A), (C).

186. The Re-vetting Policy is a final agency action under the APA. 5 U.S.C. § 704.

187. No section of the INA, or any other law, authorizes USCIS to subject refugees to review and reinterview regarding their already adjudicated refugee claims on a categorical basis.

188. In addition, sections 1157 and 1159 limit Defendants' authority to issue new policies impacting termination of refugee status "to such regulations as the Secretary of Homeland Security or the Attorney General may prescribe." 8 U.S.C. § 1159(a)(1)(A); *see id.* § 1157(c)(4) (refugee status "may be terminated by the Attorney General pursuant to such regulations as the Attorney General may prescribe").

189. The Re-vetting Policy was not issued as a regulation or through any formal rulemaking process.

190. The Re-vetting Policy therefore exceeds USCIS's statutory authority and is contrary to law and therefore must be set aside.

**COUNT VI**
**Violation of the APA, 5 U.S.C. § 706(2)(A) – Arbitrary & Capricious Re-vetting Policy**
**(All Plaintiffs and Class Members against All Defendants)**

191. The paragraphs above are incorporated and reasserted as if fully set forth here.

192. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

193. The Re-vetting Policy is a final agency action under the APA.

194. The Re-vetting Policy is arbitrary and capricious because, in adopting it, Defendants failed to articulate a reasoned explanation for their decision, which represents a change in the agency's longstanding policy; failed to consider important aspects of the problem and considered irrelevant factors; failed to consider alternative options to achieve their policy goals; offered explanations for their decisions that run counter to the evidence before the agency; and failed to consider reliance interests.

195. The Re-vetting Policy is therefore arbitrary and capricious and must be set aside.

**COUNT VII**

**Violation of the APA, 5 U.S.C. §§ 553, 706(2)(D) – Notice & Comment Re-vetting Policy (All Plaintiffs and Class Members against All Defendants)**

196. The paragraphs above are incorporated and reasserted as if fully set forth here.

197. A reviewing court must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

198. The APA, 5 U.S.C. § 553, requires that agencies provide public notice of, and opportunity to comment on, legislative rules before their promulgation. *See* 5 U.S.C. § 553(b), (c).

199. The Re-vetting Policy is a legislative rule within the meaning of the APA because it "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *N.H. Hosp. Ass'n*, 887 F.3d at 70 (quoting *La Casa*, 965 F.2d at 1178).

200. In addition, sections 1157 and 1159 limit Defendants' authority to issue new policies impacting termination of refugee status "to such regulations as the Secretary of Homeland Security or the Attorney General may prescribe." 8 U.S.C. § 1159(a)(1)(A); *see id.* § 1157(c)(4) (refugee status "may be terminated by the Attorney General pursuant to such regulations as the Attorney General may prescribe").

201. Defendants did not comply with the APA's procedural requirements when they issued the Re-vetting Policy without issuing a notice of proposed rulemaking, without providing the public an opportunity to comment, and without otherwise following the notice-and-comment procedures required by 5 U.S.C. § 553.

202. No exception to notice-and-comment procedures applies to the Re-vetting Policy.

203. The Re-vetting Policy was therefore issued without observance of procedure required by law and must be set aside.

**COUNT VIII**
**Violation of the APA, 5 U.S.C. § 706(2)(A); 8 C.F.R. §§ 209.1(d), (e) and 8 C.F.R. § 103.2(b)(18) – *Accardi* Doctrine**
**Adjudication Hold and Re-vetting**
**(All Plaintiffs and Class Members Against All Defendants)**

204. The paragraphs above are incorporated and reasserted as if fully set forth here.

205. The Adjustment of Status Hold and Re-vetting Policy are contrary to the express terms of the INA and the implementing regulations described above and should therefore be set aside under the principle articulated in *U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

206. The policies conflict with 8 C.F.R. § 209.1(e), which mandates issuance of green cards to refugees unless they are found inadmissible at their inspection under section 1159(a)(1) and 8 C.F.R. § 207.9.

207. The policies also conflict with 8 C.F.R. § 209.1(d), which explicitly provides for only "case-by-case" determinations—not blanket ones—on whether interviews are needed, and even then only to assess eligibility for adjustment of status, not to re-vet for termination of refugee status.

208. The policies also conflict with 8 C.F.R. § 103.2(b)(18), which provides that "USCIS may authorize withholding adjudication of a visa petition or other application if USCIS determines that an investigation has been undertaken involving a matter relating to eligibility or the exercise of discretion, where applicable, in connection with the benefit request ...."

209. That provision "authorizes withholding of adjudication for individual benefit requests at specified intervals pending an ongoing investigation," but does not "confer authority to adopt a generally applicable policy withholding adjudication." *Doe v. Trump*, No. 25-cv-13946, 2026 WL 1170971, at *15 (D. Mass. Apr. 30, 2026).

210. Defendants' actions, as set forth above, fail to comply with the issuing agencies' regulations and are therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

**COUNT IX**

**Violation of the APA, 5 U.S.C.§§ 553, 706(2)(D) – Notice and Comment and Without Observance of Procedure Required by Law**
**IFR**
**(All Plaintiffs and Class Members against All Defendants)**

211. The paragraphs above are incorporated and reasserted as if fully set forth here.

212. A reviewing court must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

213. The APA, 5 U.S.C. § 553, requires that agencies provide public notice of, and opportunity to comment on, legislative rules before their promulgation. *See* 5 U.S.C. §§ 553(b), (c).

214. The APA also requires that any substantive rule must be published at least 30 days prior to its effective date. *See* 5 U.S.C. § 553(d).

215. The IFR is a legislative rule within the meaning of the APA.

216. DHS did not comply with the APA's procedural requirements when it made the IFR immediately effective upon publication without providing any opportunity for the public to submit comments.

217. No exception to notice-and-comment procedures applies to the IFR.

218. Defendants' failure to provide for notice and comment violates 5 U.S.C. §§ 553(b) and (c) and renders the IFR procedurally invalid.

219. Defendants' failure to publish the IFR 30 days before its effective date violates 5 U.S.C. § 553(d) and renders it procedurally invalid.

**COUNT X**

**Violation of the APA, 5 U.S.C.§ 706(2)(A) – Arbitrary & Capricious**
**IFR**
**(All Plaintiffs and Class Members against All Defendants)**

220. The paragraphs above are incorporated and reasserted as if fully set forth here.

221. The APA provides that courts "shall ... hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

222. The Refugee Status Termination IFR is a final agency action under the APA. 5 U.S.C. § 704.

223. Among other reasons, the Refugee Status Termination IFR is arbitrary and capricious because, in adopting it, Defendants have failed to articulate a reasoned explanation for their decision, which represents a change in the agency's longstanding policy; entirely failed to consider important aspects of the problem; offered explanations for their decision that run counter to the evidence before the agency; and failed to consider reliance interests.

224. Because the IFR is arbitrary and capricious, it must be set aside under 5 U.S.C. § 706(2)(A).

**COUNT XI**

**Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution IFR (Plaintiffs PANA, ACT, Individual Plaintiffs and Class Members against All Defendants)**

225. The paragraphs above are incorporated and reasserted as if fully set forth here.

226. The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law...." The Due Process Clause also requires notice and opportunity to be heard prior to a deprivation of a liberty interest. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Identifying the process due requires consideration of (1) the private interest that will be affected; (2) the risk of an erroneous deprivation through the procedures used, and the probable value of additional procedural safeguards; and (3) the Government's interest, including the function involved and the burdens that the additional or substitute procedural requirement would entail. *Id.* at 335.

227. Refugees have a protected interest in their refugee status, which entitles refugees to lawful presence, work authorization, certain statutory benefits, a right to adjust status under 8 U.S.C. § 1159 if certain conditions are met, the ability to reunite with a spouse and unmarried children who derive their own refugee status through that of the principal refugee, and protection from return to persecution.

228. Prior to the IFR, admitted refugees were entitled to written notice of DHS's intent to terminate their refugee status and 30 days to present written or oral evidence to show why their refugee status should not be terminated. 8 C.F.R. § 207.9. And if USCIS terminated refugee status, USCIS would issue a notice to appear and initiate removal proceedings under 8 U.S.C. § 1229a. *Id.; see, e.g.*, *Jama*, 760 F.3d at 492.

229. Affording lawfully admitted refugees only 10 days (13 from mailing) to respond to a NOIT denies refugees meaningful process before they can have their refugee status terminated and be removed from the country, including to countries where they face persecution on a protected ground, or torture. A meaningful process includes, among other things, an opportunity to gather the evidence necessary to establish that they met the refugee definition at the time of admission, an opportunity to consult or rely on the aid of others, including counsel, and an opportunity to meaningfully contest the termination of their refugee status or denial of their application to adjust status.

230. The risk of erroneous deprivation under the IFR is severe: the deadline counts weekends and holidays; missing it forfeits any right to respond; there is no extension mechanism and no administrative appeal; refugees often lack access to their original records, and Freedom of Information Act requests take months; and many NOITs re-weigh credibility findings made years earlier. The government's interest in saving 20 days is minimal, particularly where it can already initiate removal proceedings against removable refugees without first terminating their refugee status. Derivative spouses and children who receive no notice of the NOIT issued to their principal are deprived of any opportunity to be heard at all.

**COUNT XII**

**Violation of the APA, 5 U.S.C. § 706(2)(A), (C) – Impermissible Retroactivity IFR**

**(All Plaintiffs and Class Members against All Defendants)**

231. The paragraphs above are incorporated and reasserted as if fully set forth here.

232. A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law" or in "excess of statutory ... authority." 5 U.S.C. § 706(2)(A), (C).

233. The Refugee Status Termination IFR is a final agency action under the APA. 5 U.S.C. § 704.

234. "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).

235. Because "[r]etroactivity is not favored in the law ... congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). "By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Id.*

236. The IFR does not say whether it applies to NOITs issued before October 14, 2026, that informed refugees they had 30 days to respond. Applying the 10-day period to those refugees would attach a new legal consequence, forfeiture of the right to contest termination without sufficient time to respond, to a proceeding already underway under the prior rule. *See Landgraf*, 511 U.S. at 275 n.29.

237. Nothing in 8 U.S.C. § 1157(c)(4) expressly authorizes DHS to promulgate retroactive rules. DHS's only discussion of retroactivity cites *Landgraf*'s treatment of jurisdictional rules, 91 Fed. Reg. at 65,088 n.74, which has no bearing on a rule that shortens a response period already running.

238. To the extent the IFR applies to NOITs issued before its effective date, it exceeds Defendants' statutory authority, is contrary to law, and must be set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Certify the proposed Class, appoint Individual Plaintiffs as class representatives, and appoint their counsel as class counsel;

2. Declare that the IFR, the Re-vetting Policy, and the Adjustment of Status Hold are

unconstitutional, contrary to law and regulation, arbitrary and capricious, and procedurally defective in violation of the APA;

3. Temporarily restrain, preliminarily enjoin and/or stay the IFR, the Re-vetting Policy, and the Adjustment of Status Hold pursuant to Federal Rule of Civil Procedure 65(a) and (b) and/or 5 U.S.C. § 705 during the pendency of this suit;

4. Permanently enjoin the IFR, the Re-vetting Policy, and the Adjustment of Status Hold;

5. Enter an order vacating and setting aside the IFR, the Re-vetting Policy, and the Adjustment of Status Hold pursuant to 5 U.S.C. § 706;

6. Vacate any termination of refugee status decided under the IFR, and order that refugees whose NOITs were pending on or issued after October 14, 2026, receive the 30-day response period provided by the prior regulation;

7. Award Plaintiffs' counsel attorneys' fees and costs for this action under 28 U.S.C. § 2412; and

8. Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: October 26, 2026

Respectfully submitted,

Hussein Elbakri* (NY Bar No. 5712666)
Guadalupe Aguirre* (NY Bar 5536107)
Kimberly Grano* (NY Bar No. 5858808)
Ghita Schwarz* (NY Bar No. 3030087)
Pedro Sepulveda* (NY Bar No. 6198550)

**INTERNATIONAL REFUGEE ASSISTANCE PROJECT**
One Battery Plaza, 33rd floor
New York, New York 10004
Telephone: (646) 939-9169
Facsimile: (516) 324-2267
helbakri@refugeerights.org
laguirre@refugeerights.org
kgrano@refugeerights.org

*/s/ Erez Reuveni*
Erez Reuveni (MA BBO No. 666769)
Jennie L. Kneedler* (DC Bar No. 500261)
Cynthia Liao* (DC Bar No. 90036947)
Steven Y. Bressler* (DC Bar No. 482492)
Robin F. Thurston* (DC Bar No. 1531399)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
ereuveni@democracyforward.org
jkneedler@democracyforward.org
cliao@democracyforward.org
sbressler@democracyforward.org
rthurston@democracyforward.org

gschwarz@refugeerights.org
psepulveda@refugeerights.org

Dalia Fuleihan* (IL Bar No. 6335082)
**INTERNATIONAL REFUGEE ASSISTANCE PROJECT**
P.O. Box 47611
Chicago, IL 60647
Telephone: (646) 740-6271
Facsimile: (516) 324-2267
dfuleihan@refugeerights.org

John Nathanson (NY Bar No. 2630697)*
Andrew Tannenbaum (NY Bar No. 3940434)*
Leila Siddiky (NY Bar No. 5225164)*
**ALLEN OVERY SHEARMAN STERLING US LLP**
599 Lexington Avenue
New York, NY 10022
212-848-4000
john.nathanson@aoshearman.com
andrew.tannenbaum@aoshearman.com
leila.siddiky@aoshearman.com

Emily Westridge Black (TX Bar No. 24060815)*
**ALLEN OVERY SHEARMAN STERLING US LLP**
300 West 6th Street
Austin, TX 78701
512-647-1909
emily.westridgeblack@aoshearman.com

Gideon J. Duke-Cohan (MA BBO# 716358)
**ALLEN OVERY SHEARMAN STERLING US LLP**
One Beacon Street
Boston, MA 02108
212-610-6353
gideon.duke-cohan@aoshearman.com

*Counsel for All Plaintiffs*

* Motion to appear *pro hac vice* forthcoming