# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, *et al.*,

*Plaintiffs*,

v.

JOSEPH B. EDLOW, in his official capacity as Director of United States Citizenship and Immigration Services, *et al.*,

*Defendants*.

Case No. ____________

**DECLARATION OF MARIA CHAVEZ**

I, Maria Chavez, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am the Immigration Legal Director at the Partnership for the Advancement of New Americans ("PANA"), a named plaintiff in this case. I have worked at PANA for four years.

2. I have personal knowledge of the facts contained in this declaration, including the organization's mission, core activities, programmatic work, and membership, as well as members' circumstances, needs, and priorities.

3. PANA is a nonprofit organization founded, led, and staffed by refugees. PANA was incorporated in California in 2014, is headquartered in San Diego, California, and is a membership-based organization.

4. PANA's mission is to advocate for the full economic, social, and civic inclusion of refugees and displaced populations in the San Diego region, throughout California, and across the country. PANA envisions a world where refugees and displaced people are connected leaders building a global movement that ends forced migration and secures meaningful freedom for all.

PANA pursues its mission through civic engagement, policy advocacy and campaigns, and storytelling led by refugees and immigrants. It serves as a research, public policy, and community organizing hub that centers the leadership and voices of refugees and immigrant communities to address systemic barriers such as racial and ethnic profiling, religious discrimination, and limited access to housing, jobs, and education. Through integrated voter engagement, advocacy for policy reforms, community leadership development, and collective organizing, PANA works to build power, increase civic participation, and promote equitable treatment and meaningful inclusion for its membership.

5. PANA has approximately 400 members, concentrated in California, and stretching to Minnesota and Washington. PANA's membership has diverse citizenship and immigration statuses and includes many refugees, including refugees from Syria, Somalia, and the Democratic Republic of Congo. Membership in PANA is voluntary and free. Our membership is informed through intentional recruiting and ground-up organizing.

6. We use relational organizing to bring the community onto a pathway of long-term engagement and leadership development so they can be involved in, inform, and eventually lead PANA's work. We are unwavering in our commitment to our Serve the People Model, which is the framework for understanding all the work we do.

7. One of the ways members join PANA is by intentional 1:1 engagements with our organizers, who recruit members into the monthly steering committee. We also have a triennial House Meeting and Leadership (HML) program, which helps us expand our base and build a fresh list of our community members who are engaged to inform our work and participate as leaders. On the leadership track, community members commit to completing a survey, which has in the past taken an hour to complete, and to attending or hosting a two-hour house meeting conversation.

This survey is called the Refugee Experiences Report and is one way in which PANA forms its policy and advocacy priorities. The survey questions how people are able to move from their individual experience, examine how individual experiences connect to community level experiences, and move into community-led public leadership as the solution to addressing inclusion, representation, and equity at a societal level. This is how we intentionally recruit people into our steering committees.

8. Staff also recruit members through the HML Development programs, PANA's legal and communities support services, and through dialogue with other PANA staff.

9. Members set PANA's priorities and shape its work in a variety of ways. PANA members attend the monthly steering committee meetings and schedule ad hoc meetings to develop the leadership of members through education workshops and to develop PANA's work and set its policy agendas using learnings from the HML and from PANA's human rights-based direct services work. At the monthly steering meetings, members receive information and updates about past, pending, and anticipated work and are able to provide feedback and input.

10. For example, because of the community's input, PANA advocated for stronger tenant protections following its 2016 HML report; organized refugee participation in the 2020 Census through its Refugee Census Hub; engaged refugee communities in the 2021 redistricting cycle; and campaigned to end the Muslim Ban. PANA continues to pursue policy and advocacy initiatives based on community input.

11. PANA also offers its members free, high-quality immigration legal services, including case-by-case assistance preparing and filing applications for adjustment of status. PANA also assists members with disputing benefit termination, wrongful eviction, and with other local- and state-government related issues. PANA undertakes public education, including on

refugee-related immigration benefits, through Know Your Rights sessions, flyers dispelling various immigration myths, and collaboration with various coalitions throughout the country.

12. To advance its goals, PANA works in coalition with other organizations. PANA is a member of the Transparent and Responsible Use of Surveillance Technology San Diego (TRUST SD) Coalition. PANA is also working with 15 partner organizations to build the Refugee and Immigrant Cultural Hub, which will provide affordable housing, wraparound services, and community space for refugee and immigrant families. PANA is also a member of the San Diego Immigrant Right Consortium, the Community Budge Alliance, Coalition for Equitable Development, San Diego Refugee Communities Coalition, African Immigrant Leadership Forum's Calabash, among others.

13. PANA recognizes that, without changes and improvements in U.S. immigration policies, the communities it serves can face many roadblocks and are often threatened unlawfully with being uprooted from their families and communities. That is why PANA supports its members in participating in litigation, like this lawsuit.

14. Many of PANA's members are refugees who have not adjusted status. They include Syrian refugees resettled between 2021 and 2025, many of whom have pending adjustment applications. Because of the actions at issue in this case, these members are at risk of, or have already suffered, the following effects: losing access to federal benefits to which they are entitled, having consideration of their adjustment of status applications paused indefinitely, having their refugee claims reassessed, and having their refugee status terminated without a meaningful opportunity to contest the allegations.

15. PANA's members who are refugees, or who are the U.S.-based family members of refugees, face severe and myriad other harms from threats to terminate their refugee status. These

harms include losing lawful status in the United States; losing eligibility for related benefits, such as drivers' licenses; facing the risk of deportation and detention without adequate opportunity to consult with an attorney or community members; forced separation from family members and community in the United States; and potential removal to the countries they fled, where they face serious risk of harm.

16. These policies have also directly harmed PANA. Because of the Adjustment of Status Hold, PANA staff have had to respond to member inquiries about stalled applications, advise about the immigration enforcement risks they face. Our staff have also had to help members who have lost Cal-Fresh (SNAP) and Medi-Cal (Medicaid) find other assistance. Since the interim final rule took effect, PANA has had to field frantic phone calls from members, clients, and community members, diverting staff from its organizing and advocacy work.

17. The following members have already been impacted or are at risk of being impacted.

18. PANA Member 1 is a refugee from the Democratic Republic of Congo. She fled violence and lived in a refugee camp for nine years before she was resettled in the San Diego area in October 2024. She is a widowed mother of two children who are also refugees, and she works as a home caregiver for people with disabilities. With PANA's help, she applied to adjust status in February 2026. USCIS acknowledged receipt of her application, but she has received no interview or decision. She has serious medical conditions that require ongoing treatment and medication, as well as lasting physical and psychological effects of the violence she suffered before coming to the United States. Because she cannot adjust status, she and her children recently lost their Medicaid and food assistance benefits. Without health coverage, she has been unable to keep appointments with specialists. She came to the United States expecting safety and stability after

more than a decade of displacement, and she now fears that her refugee status will be terminated before she has any real chance to respond.

19. PANA Member 2 is a Syrian refugee in his twenties who fled Syria as a teenager and lived in Malaysia for a decade. He was resettled in San Diego in August 2022 with his parents and siblings, as a derivative refugee on his father's case. He applied to adjust status in September 2023 and completed biometrics that year. Despite repeated inquiries, USCIS has told him only that his application remains in processing, and he has never been interviewed. Other refugees who arrived when he did have received their green cards, but he and his family have not. He works several jobs while attending community college, and he has been accepted to a four-year university to study psychology. Without permanent residence, he cannot travel outside the United States, and he avoids certain places for fear that a minor mistake will lead to immigration enforcement. Because he is a derivative refugee, he could lose his own refugee status without notice or any opportunity to respond if his father's refugee status were terminated. His family's home and business in Syria are gone, and armed conflict continues there. He entered the United States through the lawful refugee process and fears losing the life he has spent four years building.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 25, 2026, in San Diego, California.

____/s/ Maria C. Chavez________________
Maria C. Chavez