# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUESSETS**

| | |
|---|---|
| PARTERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>JOSEPH B. EDLOW, in his official capacity as the Director of U.S. Citizenship and Immigration Services, *et al.*,<br><br>*Defendants*. | Case No. |

**DECLARATION OF DIANA KONATÉ**

I, Diana Konaté, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am the Deputy Executive Director of Policy and Advocacy at African Communities Together, a named plaintiff in this case. I have worked at African Communities Together for seven years.

2. I have personal knowledge of the facts contained in this declaration including the organization's mission, core activities, programmatic work, and membership, as well as members' circumstances, needs, and priorities.

3. ACT is a non-profit organization of African immigrants fighting for civil rights, opportunity, and a better life for families and communities here in the United States. ACT was incorporated in New York in 2013 and is a membership-based organization.

4. ACT's mission is to empower African immigrants to integrate socially, advance economically, and engage civically. ACT offers a variety of free services to its members,

including immigration legal services, assistance with health insurance and public-school enrollment, support in applying for identification, job recruitment programs, leadership development, referrals for food and housing, and more.

5. ACT has thousands of members nationwide comprising African immigrants and their families. ACT's membership has diverse citizenship and immigration statuses and includes refugees. Membership in ACT is voluntary and free.

6. One of the ways members join ACT is by meeting with ACT intake staff and filling out an individual membership form, which is available on our website. During the intake process, ACT staff ask new members what services they need and give them the opportunity to provide information about their immigration status.

7. Staff recruit members from within the African immigrant community by sharing information about membership with those who come to ACT seeking services, as well as hosting targeted recruitment events, tabling at community events, and hosting informational webinars that include information about joining ACT.

8. Members set ACT's priorities and shape its work in a variety of ways. Members attend monthly membership meetings at each chapter, during which they can provide feedback and recommendations about ACT's work and its campaigns. Members can also join committees that run ACT's advocacy campaigns. Members on committees have the opportunity to participate in various training programs, including regarding the legislative process, organizing, and media training.

9. ACT is specifically involved in efforts to preserve members' refugee status and ensure members have legal support to file applications for adjustment of status. ACT provides

its members with free, high-quality immigration legal services, including case-by-case assistance with refugee adjustment applications.

10. ACT develops and engages in policy and advocacy campaigns calling for the protection of refugees from African countries facing dangerous conditions. For example, ACT has testified in the Senate, calling for greater investment in the U.S. Refugee Admissions Program; led several World Refugee Day rallies to highlight the plight of refugees and their need for protection; and advocated for increases in the number of refugees, specifically African refugees, resettled to the United States.

11. To advance ACT's goals of advocating for the protection of African immigrants, including refugees, ACT created the African Immigrant Leadership Forum (AILEF), a national network that now encompasses over 110 African member organizations and over 200 African immigrant leaders across 41 states. The network includes a diverse range of members, from small, local African-led organizations to large national ethnic associations, many of which include refugees.

12. ACT recognizes that, without changes and improvements in U.S. immigration policies, the communities it serves can face many roadblocks and are often threatened unlawfully with being uprooted from their families and communities. That is why ACT supports its members in participating in litigation, like this lawsuit. *See also ACT v. Noem*, No. 1:25-cv-13939-PBS (D. Mass.); *ACT v. Noem*, 1:26-cv-10278 (D. Mass.).

13. ACT also recognizes that these actions against refugees are just the latest in a string of attacks against non-European immigrants. ACT discerns in this pattern of actions anti-Black racism and other discriminatory animus driven by a motive of eliminating access to permanent resident status for non-white, non-European-descended people generally and for

Black and African people, specifically. The anti-Black racism and discriminatory animus that ACT discerns to be a cause of or contributor to the Administration's decision to target refugees from non-European countries is harmful, not only for ACT's members but for the diverse and pluralistic fabric of American society.

14. Many of ACT's members are refugees from African nations. Because of the actions at issue in this case, these members are at risk of or have already suffered the following effects: losing access to federal benefits to which they are entitled, having consideration of their adjustment of status applications paused indefinitely, and having their refugee status terminated without a meaningful opportunity to contest the allegations

15. ACT's members who are refugees, or who are the U.S.-based family members of such people, face severe and myriad other harms from threats to terminate their refugee status. These harms include losing lawful status in the United States; losing eligibility for related benefits, such as drivers' licenses; facing the risk of deportation and detention without adequate opportunity to consult with an attorney or community members; forced separation from family members and community in the United States; and potential removal to the countries they fled where they face serious risk of harm.

16. The following member has already been impacted, or is at risk of being impacted.

17. ACT Member 1 is a refugee from of the Democratic Republic of Congo, and he left his home country in 2005 in the midst of lingering conflict in the aftermath of war. He lived in South Africa for nearly twenty years before being resettled in Georgia in August 2023 with his wife and four children. Act Member 1 has established roots in his new community and has been working in the healthcare field. After being in the US for one year, Act Member 1 and

his family all applied for adjustment of status. His wife and children have all received their green cards, however, ACT Member 1's application remains pending. Despite the family's compliance with immigration law, the challenged policies place them at significant risk. The revetting of admitted refugees threatens his status, simply because of when he was resettled in the United States. Meanwhile, the indefinite pause on adjustment of status applications leaves ACT Member 1 in prolonged uncertainty. If the administration seeks to terminate his refugee status, the shortened response period could severely limit his ability to challenge the decision and defend himself. ACT Member 1 also faces the possibility of being separated from his wife and children if he is deported while they remain in the United States. ACT Member and his family fled a region of the DRC that continues to experience armed conflict. He fears that returning to the country could cost him his life and is deeply concerned about the consequences these policies could have for his family's safety, stability, and future together.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Diana Konaté