# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services, *et al.*,<br><br>*Defendants*. | Case No. |

**DECLARATION OF SMITA RAO DAZZO,**

**HIAS DEPUTY LEAD, DOMESTIC PROGRAMS**

1. I, Smita Rao Dazzo, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct. If called as a witness, I could and would testify as follows.

2. I am an attorney residing in Athens, GA, licensed to practice law in Maryland and the District of Columbia, since 2011. I have focused my practice on immigration law, with a particular focus on refugees and asylum seekers.

3. Since 2018, I have worked for HIAS. I first served as Director of U.S. Legal Services, then Senior Director of Legal and Asylum and Vice President of Legal and Asylum. During my time in those positions, I oversaw HIAS' direct U.S. Legal Services in Silver Spring, Maryland and New York City, in addition to our pro bono program. I also provided oversight to our refugee resettlement program in the HIAS New York office. I now serve as Deputy Lead,

Domestic Programs, where my portfolio continues to include all of HIAS' legal programming, as well as overseeing our social services team, and providing support to our resettlement staff who work with affiliates around the country to resettle refugees. As Legal Director, I represented individuals before the Executive Office for Immigration Review (EOIR), the Board of Immigration Appeals (BIA), and in affirmative asylum cases before U.S. Citizenship and Immigration Services (USCIS). In my current role, although I no longer engage in direct representation, I very closely support the direct legal services and pro bono and partnership teams at HIAS and am very familiar with their challenges and their workloads.

4. Prior to joining HIAS, I worked at a different immigration legal services nonprofit as well as a small immigration law firm, providing direct representation to noncitizen clients. I also served as an Associate Protection Officer for the United Nations High Commissioner for Refugees in Phnom Penh, Cambodia.

5. I am writing to address the harm that HIAS has experienced as a result of the November 21, 2025 USCIS Memorandum pausing adjustment of status applications for refugees and subjecting them to potential re-interview and re-vetting, as well as the harm that HIAS will experience because of an Interim Final Rule issued by the Department of Homeland Security (DHS) entitled, "Removing 30 days Refugee Termination Notice," 91 Fed. Reg. 65077 (Oct. 14, 2026) (hereinafter, "the Rule").

6. The facts set forth in this Declaration are based on my personal knowledge as well as the experience and work of HIAS attorneys and refugee resettlement and integration staff.

**<u>HIAS' Mission and Scope</u>**

7. HIAS is a global, faith-based nonprofit organization which, working with the organized American Jewish community, is dedicated to ensuring that the world's forcibly

displaced people find welcome, safety, and freedom. Founded over 140 years ago as the Hebrew Immigrant Aid Society, HIAS is the oldest refugee protection organization in the world.

8. HIAS provides vital services to refugees, asylum seekers, and other forcibly displaced and stateless persons around the world and advocates for their fundamental rights so they can rebuild their lives. Those rights include due process, freedom from persecution, and the right to live safely just as they are. Any hindrance to those rights—including retraumatizing, instilling fear of return to a country of persecution, and the removal of stability, safety, and security for refugees who have already been extensively vetted and approved, necessarily frustrates HIAS' mission and prevents us from engaging in our core work to serve refugees, asylum seekers, and other forcibly displaced persons. By issuing the Rule as an IFR, having immediate effect, rather than through a reasonable notice and comment period, it also diminishes HIAS' ability to not only respond to the agency directly with our concerns and feedback, which we absolutely would have, but it also hinders our ability to educate our stakeholders around the harm of this rule and support them in developing their own comments, and simultaneously prepare to represent and defend affected clients.

9. Today, HIAS operates offices in 11 countries, including the U.S., supporting refugees and other forcibly displaced persons with services to ensure legal protection, economic inclusion, protection from gender-based violence, and access to mental health services.

10. In the United States, HIAS is one of eight nonprofit organizations, called Initial Resettlement Providers, formerly known as Resettlement Agencies, that are designated by the federal government to implement the refugee resettlement program through cooperative agreements with the U.S. Department of State and U.S. Department of Health and Human Services. We have worked with a network of 30 partner agencies, or "affiliates," who work in

communities across the United States to directly resettle refugees from all over the world. Over the past five years, HIAS has resettled 21,558 refugees from 64 different countries.

11. HIAS has also provided pro bono immigration legal services for more than 50 years. We have 12 staff members providing either direct legal services or facilitating the provision of legal services by volunteer pro bono attorneys to refugees, asylum seekers, and other forcibly displaced immigrants in the United States. HIAS U.S. Legal Services provides all services free of charge exclusively to clients who fall below 200% of the national poverty line. Between our Direct Services legal team and our Pro Bono and Partnerships team, we have served approximately 450 refugees and over 3500 total forcibly displaced clients in the U.S. in the last five years.

**Legal Programming at HIAS**

12. HIAS U.S. Legal Services represents some of the most vulnerable of noncitizen clients, all of whom are afraid to return to their home countries and are seeking protection to be able to remain legally in the United States. We represent clients seeking various forms of legal relief, including, but not limited to, asylum, U and T visas, Special Immigrant Juvenile Status (SIJS), protection under the Violence Against Women Act (VAWA), adjustment of status, and citizenship. Our attorneys represent clients before the U.S. Immigration Courts, the Board of Immigration Appeals (BIA), U.S. Citizenship and Immigration Services (USCIS), the Department of State (DOS), federal district courts, and before local family courts (for SIJS-related custody and guardianship matters). Our Pro Bono program, comprised of three full-time attorneys and one legal coordinator, works with a network of more than 3600 volunteer pro bono attorneys and over 40 law firm and corporate partners, to expand the capacity of our legal

services program and resettlement affiliates by providing guidance, training, and direct support to volunteer attorneys who represent HIAS and HIAS affiliate clients.

13. The HIAS U.S. Legal Services department is currently working with approximately 270 refugees. The Pro Bono team currently has 206 refugee adjustment of status cases placed with Pro Bono Attorneys; some of them are filed and pending, and some are recently placed and not yet filed. HIAS, between the Pro Bono team and the direct services team, have approximately 80 pending refugee adjustment of status cases-the majority of which have been pending for over one year.

14. As noted, we provide all our legal services to clients completely *pro bono.* To sustain our work without charging fees to clients, our program is funded through federal, state, and local grants, as well as through institutional and small donors. At any given time, HIAS attorneys are responsible for meeting requirements under five or more grants, some of which require us to take a specific number of cases that fall under either categorical requirements (i.e., serving survivors of torture) or jurisdictional ones (i.e., representing residents of Montgomery County, Maryland). Our U.S. legal services team is a small branch of HIAS, and because we have many obligations under our current funders, we must be careful about what kinds of cases we take to ensure that we maintain capacity to meet the required number of clients, relative to each grant we have been awarded. Because of grant restrictions, in some situations, if a client moves to a different address, or if their underlying status changes, we lose the ability to serve them under that grant; losing the grant coverage results in our team either overextending our staff to continue representing the client, or needing to end our representation. Currently, about half of the refugees served by our direct legal services team are covered by a restricted grant, which only permits us to serve that population in applications for adjustment of status or naturalization.

15. Since 2016, HIAS has been working to develop and expand its Pro Bono program to build the capacity of our legal team, help the legal team meet its funding deliverables, and serve more clients through new partnerships locally and across the country. HIAS works with pro bono attorneys in several ways, through our headquarters in Silver Spring, Maryland, our office in New York City, as well as remotely with over 3600 volunteer attorneys in our network nationwide. HIAS currently employs four full-time staff members in its pro bono program who oversee and supervise a robust network of volunteer attorneys located across the US.

16. Additionally, our Pro Bono and Partnerships team develops, on average, 12-18 trainings per year, designed to provide pro bono attorneys with the detailed knowledge that they need to be able to competently represent clients in a variety of immigration legal matters. A key component of HIAS' pro bono work is our comprehensive training program, which includes a library of resources and hands-on mentorship by expert attorneys. These resources are vital to our pro bono attorneys, who are bound by ethical rules to competently represent their clients. Nearly all of HIAS' pro bono attorneys are not practicing immigration attorneys, so they rely on HIAS' trainings, resources, and mentoring to learn and stay up to date on changes to the law. We have earned an excellent reputation with our law firm partners, precisely because we provide comprehensive trainings (webinars as well as written materials) as well as hands-on mentorship support to our volunteer attorneys. We review their draft filings, answer questions, and otherwise troubleshoot issues that arise over the course of their representation of their HIAS clients.

**<u>Harm to HIAS from Revetting and Pause in Adjudication of Adjustment of Status</u>**

17. As a result of the pause in adjudications of green cards for refugees, HIAS staff have had to spend a substantial amount of capacity to support clients through the lengthened

process, counsel them through new hardship, and prepare and educate themselves in order to maintain expertise.

18. HIAS attorneys must have multiple conversations with the same client (or supporting a Pro Bono Attorney who needs to have these conversations), over a period of 2-4 years (now estimated time for adjudication), which includes discussing the reasons for the delay, what can be done about it, if anything, and how to ameliorate the impacts of the paused processing on their cases. Additionally, the longer a case takes, the more likely that employment authorization documents will lapse and therefore need to be renewed, which adds to our work that may not otherwise exist if the case had processed under normal timelines. It also impacts our ability to apply for family reunification documents and refugee travel documents, both of which lead to additional stress for clients of protracted family separation.

19. The HIAS pro bono program has already had to divert resources and staff capacity from its existing projects to develop a response to the growing threat of refugee re-vetting interviews. They had to develop new toolkits and sample interview questions for pro bono attorneys to prepare their refugee clients for potential re-vetting interviews, following Operation PARRIS, and the potential for increased immigration enforcement and detention. In addition to maintaining expertise on the topic and keeping up with current trends, staff have had to field frequent questions and concerns from Pro Bono Attorneys who are working with scared clients about how best to prepare for potential re-vetting. Because of our involvement with and service to this community, the pro bono team has also been deeply involved in federal litigation on these issues, and has devoted time and capacity to coordinate with outside counsel on the development of amicus briefs in support of refugee plaintiffs.

20. Many of our grant deliverables are based on the idea that the cases proposed can be completed on a certain timeline. When adjudications completely pause, however, work backs up, and leads to a lack of positive outcomes during our reporting periods, making it difficult to demonstrate success for funders and puts our chances of renewed funding at risk. For example, in 2026, HIAS has had 7 green cards approved. During the same time period in 2025, we had 91 grants, 84 of those before May 5, 2025. When the same funder is able to see both of those outcomes, they may think that if HIAS cannot secure positive outcomes for their clients, they may not be worth funding in the future.

21. The pauses in adjudication do not exist in a vacuum and are affected, and often exacerbated by other policy and law changes. Since the passage of H.R.1, refugees and asylees are no longer eligible for Medicaid and SNAP until they become lawful permanent residents (LPRs). This loss has been tremendously difficult to navigate both for our staff and especially for our clients.

22. Our clinical case management team has had to spend a lot of time researching alternative community resources for those losing access to federally funded food and healthcare benefits. They've been meeting with local service providers to strategize resource and referral pathways. They're coordinating care for newly destabilized families and navigating complex local and state benefits programs to determine eligibility and alternative care programs for individual clients in varying jurisdictions. Staff have to get additional training to understand all of the policy changes, eligibility requirements, and access to benefits.

23. The severe toll that these changes take on our clients also harm HIAS staff. Our staff regularly report emotional distress when coordinating care for extremely vulnerable clients losing access to basic needs. They suffer from supporting our clients through a high level of

mental health deterioration and also experience burnout due to additional workload burdens. Our staff most definitely suffer from vicarious trauma, which if we do not find ways to better support or improve, will very likely result in the loss of highly dedicated and competent staff or lower quality of service, neither of which is acceptable for our organization.

**Harm to HIAS as a Result of the Refugee Status Termination Interim Final Rule**

24. In the decades that HIAS has provided or facilitated legal representation to refugees, to the best of my knowledge, we have never had a client receive a Notice of Intent to Terminate (NOIT) refugee status. The proposed changes will cause great strain on our attorneys, who will need to both get up-to-speed on the legal impact for their own clients, and will need to provide helpful insights and respond to inquiries from our resettlement partners. When this Rule was announced on October 14, the HIAS Pro Bono and Partnerships team immediately began developing a pro bono project, in partnership with another legal service organization, to engage with pro bono attorneys to provide immediate and urgent legal counsel for refugees who receive NOITs. In order to develop and launch this new project to the standards our pro bono team has established, the attorneys on the pro bono team will need to develop new trainings and resources to ensure that our pro bono attorneys are well-equipped to competently represent their clients, including trainings on how to prepare refugee clients for NOIT interviews, how to prepare supplemental evidence in defense against a NOIT, how to prepare and file Freedom of Information Act (FOIA) requests for refugees, and how to understand the results of a FOIA request. Due to the immediate implementation of the Rule, the Pro Bono team is diverting its capacity away from existing projects, delaying service to other existing clients, and postponing taking on new matters that would fulfill grant requirements for other funders.

25. As a resettlement agency with a strong Immigration Legal Services program, there is an expectation that HIAS play a role in the legal response for refugees. This was our experience both following the fall of Afghanistan to the Taliban in late 2021, as well as after the Russian invasion of Ukraine in 2022, when thousands of affected Afghans and Ukrainians were paroled into the United States, needing assistance with resettlement and in their pursuit of durable legal status. As a result of the Rule, we expect to see an influx of referrals from partner organizations, asking us to take on refugee clients facing the threat of termination of status. With capacity limitations of our current staff and existing grant requirements, we likely will only be able to accept a fraction of the referrals we expect to receive. As a result of the Rule, HIAS' legal services staff will need to spend significant time and capacity to learn and understand the changes in law and policy, and how to best represent their clients in light of these changes. With only ten days to respond to a Notice of Intent to Terminate, legal staff expect to receive urgent requests for representation, with insufficient time to either submit a comprehensive response to the NOIT or prepare a refugee for an interview.

26. Additionally, even if HIAS is able to accept referrals for new refugee clients, it would be a significant undertaking, both in terms of the scope of work and the expected duration of representation, between assisting clients with preparing written responses to NOITs interviews, preparing for the NOIT interviews, understanding consequences to possible termination of refugee status, and ultimately representing clients whose status is terminated in ensuing removal proceedings. With only ten days to respond to a NOIT, it is likely that few refugees will be able to secure attorneys to submit a written response to a NOIT or request an oral interview in time. According to the Rule, the response period begins either upon personal service of the NOIT directly to the refugee or, if sent by mail, upon mailing of the NOIT; as a

practical matter, a refugee might only have seven days or less to secure legal assistance. By the time many refugees contact HIAS to request legal assistance, they may have already had their status terminated and been placed in removal proceedings. Ultimately, the Rule would result in HIAS – either our direct legal service attorneys or through our pro bono network – diverting our already strapped resources to attend to this urgent issue, and potentially committing to long-term representation of clients facing removal proceedings, without grant funding to do so or have to refuse these cases for lack of capacity.

27. Representing clients in removal proceedings is more time- and resource-intensive than representing clients in proceedings before USCIS. To provide representation for terminated refugees in removal proceedings, HIAS attorneys will have to prepare briefs in advance, prepare their client and any witnesses for direct and cross examination, and attend multiple hearings in which they may be required to appear in-person. HIAS staff attorneys spend significant staff time, as well as financial expenses, accompanying clients to immigration court hearings. In addition to the hours that HIAS attorneys spend working with clients to prepare for hearings, they spend roughly half a day, including transit time, attending a single Master Calendar Hearing. Expending staff capacity on attending additional immigration court hearings jeopardizes HIAS' funding because it reduces the number of clients who can be served due to the increased financial burden each case presents.

28. Refugees whose status is terminated and who are placed in removal proceedings before the Immigration Court will likely also be increasingly vulnerable to additional scrutiny, including ICE check-in appointments, or even arrest and detention. Over the past year, with increased numbers of immigrants facing arrest and detention at routine ICE check-ins and USCIS interviews, HIAS attorneys now prophylactically prepare petitions for Writs of Habeas

Corpus for clients facing ICE or Intensive Supervision Appearance Program (ISAP) check-in appointments. Attorneys have long faced barriers of access to detained clients, which impacts client communication and their ability to adequately and timely prepare evidence and legal filings. The detained dockets at immigration courts also proceed on a significantly faster timeline than affirmative asylum cases, or non-detained defensive cases, so representing clients on those dockets requires even more time and effort from HIAS attorneys as they prepare their client's case on a compressed timeline.

29. The HIAS pro bono team would also face significant hardship by these changing rules. Given the extraordinary danger clients will be facing, as well as the rapid response necessary to serve them appropriately, the pro bono team will need to divert its attention and capacity to addressing these acute concerns for this particular base of clients. Because our volunteer pro bono attorneys are commonly corporate or transactional attorneys, without expertise in immigration law and with other competing clients/deadlines, it would require significant time and effort by the HIAS pro bono team to ensure that these attorneys are trained and prepared to respond as is necessary for these clients. I anticipate that a substantial amount of work in preparing for this response and serving clients would fall to HIAS – the pro bono team as well as the direct legal services team. This would greatly burden HIAS financially. By pulling staff away from service requirements for restricted grants, and by increasingly relying on HIAS' unrestricted funds to serve this community, especially considering that the organization has faced substantial funding cuts from government grants, the rule and our ensuing representation of impacted clients would put long-term feasibility for immigration legal representation at risk.

30. As noted, HIAS presently represents approximately 450 refugees, including in their applications for adjustment of status. If these refugee clients' status is terminated, HIAS

will have to spend exponentially more time on those cases, including by preparing defenses to removal in immigration court. Additionally, as mentioned above, the grant which currently covers approximately half of the refugee cases for our direct services clients would not cover the work involved in our attorneys' representation of former refugee clients facing deportation proceedings. This would mean that our attorneys would either have to withdraw from representation, which ethically we would not be inclined to do, or serve these clients through already overextended unrestricted funding. Being unable to serve this client base under our existing grant would also mean that our team would need to take on additional clients to meet the required outcomes under that grant, and the added time spent working on those cases would hinder us from being able to take on other new clients- including clients whose representation may otherwise be covered by a different funding source.

31. For the adjustment of status cases that our Pro Bono team has placed with volunteer pro bono attorneys, we anticipate harmful repercussions to both our program and the clients that we serve. Refugee adjustment of status matters have historically been relatively straightforward cases, and attorneys who initially volunteered to represent these refugee clients did so with an expectation of how the cases are prepared and how they routinely proceed. If our refugee clients begin receiving NOITs, the work involved in serving these clients would diverge substantially from the expectations we provided. If this happens, our law firm partners will lose trust in our ability to accurately describe the work we ask them to take on with us. Additionally, if we cannot adequately prepare our pro bono partners for what they and their clients will face during their representation, we jeopardize both our and our volunteer attorneys' ethics. We, and our pro bono attorneys, like all attorneys, are bound by ethical rules to competently represent clients. *See* ABA Model Rule 1:1. Asking attorneys to continue representing clients with new

legal issues that they are not adequately trained to handle will not only put their attorney ethics in jeopardy, it will understandably discourage them from volunteering to take on new cases through HIAS' pro bono program, because they will be less confident in our ability to support them. This, in turn, will damage HIAS' reputation, our ability to secure grants for this program, and our ability to serve clients.

32. If HIAS attorneys had to withdraw representation from clients because we do not have the capacity or funding to support a new matter for them (representation before the immigration court), it would not only prejudice our clients, but it would also severely damage our reputation. Most of our new clients come to HIAS because of our reputation for excellent representation, because we prioritize linguistic support and cultural competency, and because we are steadfast and committed to those that we serve. For those same reasons, we are also a trusted referral partner from other non-profit and community-based organizations, in the DC and NYC metro areas as well as nation-wide. As a legal service organization that provides free representation to our clients, if we were forced to withdraw from large numbers of clients at once, we would be putting those clients at risk of moving forward without representation because they cannot afford it. Withdrawing from a client's case when they are even closer to the possibility of a removal order or detention would be especially grievous. It could make our attorneys vulnerable to bar complaints, putting their professional licenses on the line. It could leave HIAS vulnerable to claims that we abandon people in their hour of need, which could lead donors to cut relations with us, or other stakeholders to lose faith and respect for HIAS and all the good that we do. It would also be antithetical to the legal ethics of our individual attorneys and to the broader mission of HIAS itself.

**Resettlement Programs at HIAS**

33. HIAS has been welcoming refugees to the United States for over 140 years, and has been a partner of the United States and an official refugee resettlement agency for at least fifty years, since before the passage of the Refugee Act of 1980. We currently partner with social service agencies in twenty five cities in the United States and provide support with initial resettlement, intensive case management, mental health and psychosocial support, economic inclusion support, and housing. As grantees of the U.S. government, we provide subaward funding, training and other technical assistance, manage quality assurance and ensure compliance with federal grants, and data management and support. Our network of partners is reliant on both the funding and the expertise that HIAS provides in order to provide direct service to refugees.

34. To the best of my knowledge, of the over 21,000 refugees we have resettled to the United States over the last five years, not a single refugee has ever had their status terminated. Additionally, no refugee resettled by HIAS in the past five years was ever determined, in an adjustment of status interview or other adjudication, to be ineligible for adjustment of status, or placed in removal proceedings. To resettle in the United States, secure permanent legal immigration status, and rebuild their life here, a refugee must first meet rigid legal requirements and undergo multiple levels of stringent vetting procedures mandated by statute and regulation. Our experience has always been that the extensive screenings, interviews, and vetting that all refugees undergo prior to arrival in the United States, has been a sufficient determination of their approved status as a refugee. Therefore, our area of focus in serving refugees has always been in welcoming them, supporting them with their basic needs, assisting them in attaining self sufficiency, and putting them on a strong path to success. To suddenly divert our programming

to having to defend refugees and their basic designation and right to be here would be a huge departure from the work we have always done. It would absolutely require us to divert resources and capacity away from the areas of our expertise and strength, and away from what we consider to be our mission in this work.

35. Refugees in the United States are eligible for temporary cash assistance, employment assistance (employment readiness training, job development, interpretation support, securing employment), English language training, and case management (navigating healthcare systems, insurance, public assistance, housing, and mental health support). For Fiscal Year 2027, HIAS is contracted to receive close to $60 million from the federal government to be able to operate programs for refugees such as the Program for Initial Resettlement, Matching Grant, and Preferred Communities. For most of the programs, most of the funding is calculated based on an estimate of the number of participants served, therefore any overall reduction to that number, as a result of re-vetting and termination of status, would have serious financial consequences for HIAS and our affiliates; individuals whose refugee status is terminated would no longer be eligible to receive services under these grants. Additionally, we are currently applying for other private grants, where we are required to show the need and number of clients to be served. If the number of refugees in HIAS' existing network is greatly diminished, as a result of the Rule, it could significantly impact proposals already submitted, which generally include estimates of total numbers to be served.

36. If refugees resettled by HIAS were to have their status terminated, there could be financial consequences if HIAS were to have to pay back to the federal government any funds used for those clients. Affiliates base their projected caseload sizes on the number of arrivals and potential referrals to the integration program. If clients were deemed inadmissible through the re-

vetting process and had their status terminated, it would significantly decrease the number of clients served, which would impact the amount of funding each affiliate receives. This would impact staffing, both at HQ and at the affiliate level, which would in turn impact institutional knowledge, consistency of programming for clients, and create instability among affiliate offices and refugee communities. This would also have an impact on performance, potentially with consequences to contractual obligations, as resettlement agencies would not meet their projected goals due to the number of clients no longer eligible for the program.

37. We would likely also see an increase in requests for virtual support from HIAS HQ for local programming, including virtual case management, economic wellbeing, and mental wellness support, especially if, due to a loss of funding, affiliates experience mass layoffs or- even worse, are forced to shut down. If we divert more resources to our virtual support, it could take capacity away from other programs that HIAS is contractually obligated to implement, leaving us at risk of non-compliance. Resources would need to be diverted from our resettlement programming to ensure clients are receiving appropriate and accurate information, with frequent changes.

38. Clients and program participants that put their trust and faith in HIAS to protect and support them, may view HIAS as being complicit with the U.S. government, and blame HIAS for cutting off services or for failing to prevent the termination of their status, which could harm HIAS' reputation- within the communities we serve, as well as the general public. It could also harm our connections to the communities within which we engage. Since the termination of most of our federal funding, HIAS is deeply reliant on the support of individual members of the Jewish community, which could be imperiled by such negative reporting.

**Harm to HIAS' Clients**

39. The process to be approved to enter the United States through the US Refugee Admissions Program is long and arduous. Many refugees flee from their home countries and spend months or even years in a refugee camp or other temporary location while they go through the very intense process of screening, interviewing, and background checks necessary to be approved for refugee status. This process includes security checks, health screenings, interviews, and biometric checks. Federal agencies including CBP, CDC, DHS, DOD, DOS, FBI, UNHCR, and USCIS are involved in this vetting process. To obtain refugee status, an individual must provide specific and detailed reports to meet eligibility requirements, often recounting significantly traumatic events. They come to the United States with the promise that they would be welcomed here and given the opportunity to rebuild their lives. We assured them that they could care for their families, earn a living, contribute to their communities, and live in peace here in the United States.

40. Both the re-vetting and pause in adjudications memo as well as the Rule severely impact refugees' freedom and ability to create new lives for themselves in the United States. At HIAS, we help to put refugees on the path to success, but if that path is ripped out from underneath them, by leaving them in legal limbo with no ability to adjust, or worse—by threatening to terminate their refugee status, it has harmful impacts to their mental health, to their safety and stability, and even to their hope for family unity. Requiring individuals to recount traumatic events in re-vetting interviews, or during an interview following a NOIT, when they have already reached a high emotional threshold is irresponsible and fails to recognize the long vetting process established collaboratively by multiple federal agencies.

41. The Rule notes that refugees, once their status has been terminated, will immediately lose employment authorization. Taking away any meaningful manner in which to provide for their families before placing refugees in removal proceedings, which could last for any number of years, removes their ability to truly participate in their legal process. Asylum seekers in removal proceedings have the ability to maintain employment authorization throughout the duration of their immigration court proceedings and therefore can afford to remain in legal limbo for years. Refugees, who may have limited English capacity or live in single income households, will lose any existing safety net they once had in the United States, as a result of this Rule. To potentially suffer such huge economic repercussions as a result of not being able to secure support in responding to a NOIT within ten days is an egregious and unnecessary harm to refugees.

42. All of this in itself is deplorable, but to add fuel to the fire, refugees are now no longer eligible for Medicaid or SNAP, meaning that not only are they in legal limbo, but they are at risk or major health issues, especially if they also lose their work authorization, following a NOIT. We have welcomed these refugees with open arms and made them the promise of a better future, but in the course of one year, this Administration has not only absolved itself of any responsibility to provide safety and security and freedom from persecution, but it is actively and willingly seeking to send people back to danger.

43. Refugees, by definition in U.S. law, are a population that has been determined by both international and U.S. government authorities to be unable or unwilling to return to their home country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. To first welcome a refugee who has already fled persecution and then send them back to the harm and

persecution they fled is unbelievably cruel and contrary to our own responsibilities under international law. Even if refugees were not immediately sent back to their home countries, but instead third countries to which they have no connection, they would remain at risk of being deported back to the harm they fled, or otherwise face a life devoid of civil or human rights. The sheer fear of facing the horrific possibility of being returned to persecution, or being sent to face similar harm elsewhere, will take a huge mental and emotional toll on refugees and their families.

44. We would expect to see an increase in mental health symptoms, with both affiliates and HQ social service case managers overwhelmed with an acute need for crisis support. We would also expect to see families being torn apart, with refugee families not always arriving at the same time. Family members who arrived earlier and have already adjusted status to lawful permanent resident would not be vulnerable to NOITs and the potential for removal from the United States. Additionally, some members of refugee families could receive NOITs while others don't, yet another way to tear families apart.

**Conclusion**

45. The changes proposed in the Rule will have the cumulative effect of causing severe and irreparable harm to HIAS, its clients, and our affiliate partners. If we are forced to spend additional time working on current refugee cases, to the detriment of taking new ones, it will severely risk our ability to apply for new funding opportunities or even meet required outputs of current funders. If we are otherwise unable to provide legal support to large numbers of refugees, it could hurt our reputation with partners, donors, and the refugee community itself. We could suffer serious financial consequences if we are unable to meet existing grant requirements, or if we are unable to meet our required caseload of refugees who need services

because of wide-scale terminations. Most importantly, if the Rule is not enjoined, HIAS will not be able to carry out its mission to protect the most vulnerable non-citizens and help them build new lives in the U.S.

I, Smita Rao Dazzo, declare under penalty of perjury that the information contained in this declaration is true and correct to the best of my knowledge.

Executed in Athens, GA. on October 23, 2026

Smita Rao Dazzo
Deputy Lead, Domestic Programs
HIAS