# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services, *et al.*,<br><br>*Defendants*. | Case No. |

**DECLARATION OF JEFFREY D. THIELMAN**

I, Jeffrey D. Thielman, upon my personal knowledge and pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the President and Chief Executive Officer (CEO) of the International Institute of New England (IINE), a named plaintiff in this lawsuit.

2. The facts set forth in this declaration are based on my personal knowledge, my conversations with my staff, and the information kept in the ordinary course of business at IINE.

3. I make this declaration because the new and unprecedented Department of Homeland Security (DHS) policies to subject refugees to an indefinite hold on their applications for adjustment of status and terminate their refugee status without adequate notice will cause significant harm to our organization and the refugees we serve.

**International Institute of New England**

4. The International Institute of New England, founded in 1918, is a non-profit social service organization, headquartered in Boston, Massachusetts, that is committed to welcoming refugees and immigrants and helping them restart their lives in the United States. IINE is the oldest organization exclusively serving refugees and immigrants in New England.

5. We create opportunities for refugees and immigrants to succeed through resettlement, education, career advancement, and pathways to citizenship. We provide services to noncitizens living in thirteen counties across Massachusetts and New Hampshire.

6. IINE's primary focus is serving humanitarian populations lawfully admitted to the United States, primarily those eligible for federally funded Office of Refugee Resettlement (ORR) services, including refugees, asylees, Cuban and Haitian entrants, Unaccompanied Minor Children, Victims of Human Trafficking, and humanitarian parolees. IINE provides comprehensive, trauma-informed, wraparound services designed to help refugees and immigrants integrate into and contribute to local communities.

7. IINE is governed by a Board of Directors and operates under the laws of the Commonwealth of Massachusetts for non-profit organizations. The Board of Directors appoints the President and CEO, who oversees the operations of IINE.

8. I have served as the President and CEO of IINE since July 1, 2015. Reporting to the Board of Directors, my role is to lead an organization that serves a broad range of immigrants with a focus on populations fleeing persecution and violence in their homeland. I oversee all departments within IINE, including programming, external relations, finances, fundraising, and human resources.

9. I have a long history of experience working with and on behalf of immigrant populations. Prior to working at IINE, I worked in the Cristo Rey schools, a network of high schools for

low-income students established by the Jesuits, a religious order of the Roman Catholic Church. Students at the Cristo Rey schools come from low-income families, and many are immigrants or the children of immigrants. I worked at the original Cristo Rey school in Chicago from 1998 to 2000, oversaw the scale up of the Cristo Rey schools across the country from 2001 to 2008, and from 2009 to 2015, served as President of Cristo Rey Boston High School, which is located in the Dorchester section of Boston. Prior to my career with the Cristo Rey schools, I practiced law in Boston for a small firm that served mostly Spanish-speaking clients and worked for an insurance company. Following graduation from college and prior to entering law school, I served as a Jesuit International Volunteer in Peru, South America for three-and-a-half years where I taught at a high school and established a program for street children. I am fluent in Spanish.

10. Through my past and current work, I am deeply familiar with IINE's operations and with the process for resettling and integrating refugees in the United States.

11. IINE receives recently resettled refugees as a resettlement agency, providing intensive case management and comprehensive transitional assistance to new arrivals during their first year in the United States. Our work helps newly arrived refugees to become fully engaged members of our New England communities.

12. Before the current administration paused the United States Refugee Admission Program and stopped admitting new refugees, IINE resettled between 400 and 700 new refugees each year. This resettlement work starts with meeting new arrivals at the airport, placing them in housing, helping them navigate the healthcare system, connecting them with public benefits, and enrolling children in public schools. We also provide families with cultural orientation, place adults in English classes, and help refugees find employment and career

pathways in their new communities. Refugee clients are eligible for federal ORR services for their first five years in the United States. IINE supplements public funding for our work with private funding that enables our organization to provide comprehensive services to these new populations.

13. IINE also provides longer-term support to refugees and their families beyond the first year of arrival, including adult education and skills training classes; employment placement programming; and case management, in which trained staff help clients revise family budgets, troubleshoot issues with landlords, support families facing domestic violence, support clients navigating health and mental healthcare issues, provide cultural support to clients navigating systems in other agencies, educate other providers about the unique cultural needs of our clients, and supporting reapplications for public benefits.

14. One of the important services we provide is legal assistance to refugees in filing their applications for lawful permanent resident (LPR) status. Our legal staff files a Form G-28, Notice of Entry of Appearance, with U.S. Citizenship and Immigration Services (USCIS) for each refugee client we represent, allowing our team to manage the client's case and represent the client through the entire adjustment of status process. Refugees who have been in the United States for more than one year are entitled to file for and receive LPR status. However, many refugees struggle to complete and file an application on their own, and outside attorneys charge significant fees to assist with this application. IINE represents refugees without charging for these legal services. There are also other costs associated with this application, including the cost of medical examinations and translation services. IINE's legal team organizes Civil Surgeon (medical examination) days for our refugee clients to ease the financial burden of obtaining medical examinations. IINE's legal

representation includes document gathering and review, preparation of the required forms, filing the application with USCIS, monitoring all correspondence from USCIS, responding to requests for evidence from USCIS, interview preparation, and attendance at USCIS interviews for our refugee clients.

**DHS' Refugee Adjustment Hold, Re-vetting, and Status Termination Policies**

15. IINE currently provides services to approximately 860 refugees who have not yet adjusted to LPR status. Many of these individuals have already filed their applications for permanent residency but have been waiting for many months—sometimes years—for the government to adjudicate their applications. IINE files green card applications or has filed applications for most of this population, and some of these clients remain enrolled in our case management, adult education, and employment programming. Some members of this population are refugee children who are participants in our refugee youth program.
16. On November 21, 2025, the Director of USCIS issued a policy memorandum that directed (1) an adjudicative hold on all pending adjustment of status applications filed by refugees who were admitted to the United States between January 20, 2021 and February 20, 2025, and (2) the agency to conduct a sweeping review of more than 200,000 refugees admitted into the United States during that same time period.
17. On January 9, 2026, DHS announced the launch of Operation PARRIS, an immigration enforcement operation which led to the indiscriminate arrest and detention of refugees, including children in Minnesota. Operation PARRIS created incredible fear and need in the refugee community across the country.
18. On February 18, 2026, USCIS and ICE announced in a new policy memorandum that they will arrest and detain refugees who have been in the United States for more than one year

but have not yet obtained LPR status. The memo also stated that USCIS would be conducting re-vetting investigations to determine if a refugee may remain in the United States as a lawful permanent resident, should have their refugee status terminated, or should be placed into removal proceedings. IINE is a plaintiff in a case challenging the Refugee Detention Policy articulated in that memo, *Jean A. v. Noem*, No. 3:26-cv-30031-RGS (D. Mass. 2026). The Refugee Detention Policy has been stayed by the federal district court. *Jean A. v. Noem*, No. 3:26-cv-30031, 2026 WL 805207, at *1 (D. Mass. Mar. 23, 2026).

19. On October 13, 2026, DHS posted an interim final rule (IFR), effective October 14, 2026, that significantly reduces the amount of a time that an individual has respond to a notice of intent to terminate (NOIT) their refugee status—the response time was reduced from thirty to ten days. I am aware that the IFR went into effect immediately without considering comments from the public.

20. These DHS policies, which delay lawful permanent status, impede access to public benefits, and threaten loss of status altogether, including employment authorization, are tremendously destabilizing for refugees and have significantly impacted IINE's core work and efforts. Critically, IINE staff has diverted resources from providing refugee clients with life-saving assistance like food distribution to proactively engaging all refugees we resettled between January 20, 2021, and February 19, 2025 to ensure that they were taking steps to prepare themselves for contact with immigration officials.

21. Refugees whose green card applications remain pending for extended periods are already losing access to certain public benefits, such as SNAP and Medicaid. This has increased housing and financial instability for our refugee clients as well as placed significant pressure on IINE's limited resources. To address these issues, IINE has had to increase

referrals to food assistance programs, emergency rental and utility assistance funds, requests for private financial support, and behavioral health services.

22. The reduction of the NOIT response period from 30 days to 10 days would create significant operational and staffing burdens for IINE if refugee re-vetting efforts result in increased status termination proceedings. The shortened timeline would require IINE staff to identify affected clients, conduct outreach, gather supporting documentation, coordinate with legal counsel, and respond to clients in a matter of days instead of weeks. Some of our refugee clients have limited English proficiency, may require interpretation services, and often need assistance obtaining records from multiple sources.

23. If more refugees are subjected to re-vetting and subsequent NOITs, IINE would likely need to divert staff time and resources away from core resettlement and integration services to crisis response activities. Staff would be required to provide intensive case management, legal referrals, documentation support, family stabilization assistance, and coordination with community partners on an emergency basis. This would increase workload across legal, case management and employment teams.

24. IINE legal staff would devote significantly more time to prepare our refugee clients for re-vetting and possible NOITs. Preparation includes: dedicating significant time to research and developing resources to prepare responses to re-vetting interviews; contacting clients to determine what access to documents or information they have from their refugee application(s) and interview process(es); and offering to file Freedom of Information Act (FOIA) requests to obtain that individual information. The need to urgently obtain this information will increase exponentially as our clients are subject to having their refugee status questioned or revoked in light of the NOIT policy. Before the Trump administration,

FOIA work comprised a smaller part of our work. During the Trump administration, our FOIA work has increased and became a larger part of our work, including filing FOIA requests more regularly and training staff to handle this type of work. If IINE staff were not engaging as heavily in this line of work, they would be doing their regular case management work. Any FOIA-related work will itself involve appeals, when necessary, FOIA denials, and a thorough review of FOIA results once obtained. The volume and scope of this FOIA work is unprecedented, but we do it to prepare for re-vetting and the possibility of our refugee clients receiving NOITs. It is specific to our refuge green card applicants, but due to our staffing constraints, it prevents us from serving clients in need of other immigration legal services.

25. If, due to the NOIT IFR policy, more refugee clients lose public benefits or face status-related disruptions, like loss of employment authorization, IINE would need to devote substantial additional resources to emergency stabilization efforts. These resources would likely include providing emergency support for dependent family members when a primary wage earner is detained and/or loses status—IINE would engage in a private fundraising effort to provide support that pays for rent, utilities, and other expenses—and connecting clients to food pantries, other emergency financial assistance providers, and housing stabilization resources at a higher rate than we do currently. Additionally, we would need to take steps to increase the capacity of our food pantry at our Lowell, Massachusetts site, but this fundraising effort would likely take away from other organizational fundraising needs. IINE raises private money to support all our programs because public money does not cover the complete costs of all our contracted services.

26. These DHS policies also have created immense fear in the refugee community. Many of our refugee clients have reached out to our staff seeking Know Your Rights (KYR) trainings and emergency preparedness workshops. Previously, IINE provided community members with one KYR training per year. KYR trainings have now been integrated into all client-facing programming. For instance, staff provide KYR information during routine client meetings, which occur multiple times per week, and include guidance on I-9 employment documentation requirements and E-Verify. Staff also distribute KYR red cards to all newly enrolled clients and offer them to all office visitors in their preferred language. KYR red cards help people by outlining their constitutional rights which they can assert during encounters with law enforcement, including U.S. Immigration and Customs Enforcement (ICE). If NOITs are issued to our refugee clients, the panic button will go off in the larger refugee community. In response, IINE staff would have to contact and convene community members in order to provide them with more information about what NOITs are and how to address them.

27. Despite IINE's increase in the provision of KYR materials and trainings, our staffing constraints remain. Because we need to provide these services in clients' native languages, the number of staff who can conduct these trainings is limited. Additionally, conducting KYR trainings requires staff to temporarily pause other programmatic responsibilities because significant staff time is required for outreach, coordination, interpretation and the facilitation of training sessions.

28. In cases where refugee status is terminated and individuals are detained the impact would be even more severe. Staff would face urgent requests from clients and family members seeking information, legal assistance, and support for dependent family members left

behind. Detention or removal of clients would disrupt service plans, employment placements, public benefit enrollment, and long-term integration efforts that IINE has invested significant resources to develop. More broadly, these policies would undermine IINE's mission and effectiveness by creating fear and instability among refugee communities, reducing trust in resettlement services, and forcing IINE to dedicate substantial staff capacity to addressing the consequences of detention and status termination rather than supporting successful integration and self-sufficiency.

29. Devoting a significant amount of IINE’s resources to responding to DHS’s slate of anti-refugee policies will set back our organization’s priorities and existing work. Diverting staff time and money to supporting refugees and their families will significantly set back our organization’s existing work on behalf of other immigrant communities and will interfere with the services we provide in the normal course of business.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Jeff Thielman

Jeffrey D. Thielman

Executed: Boston, Massachusetts

Date: October 26, 2026