# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, *et al.*,

*Plaintiffs*,

v.

JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services, *et al.*,

*Defendants*.

Case No.

**DECLARATION OF RABBI JAMES GREENE**

I, Rabbi James Greene, upon my personal knowledge and pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Chief Executive Officer (CEO) of the Jewish Family Service of Western Massachusetts. (JFS-WMA). The facts set forth in this declaration are based on my personal knowledge, my conversations with my staff, and the information kept in the ordinary course of business at JFS-WMA.

2. I make this declaration because the new and unprecedented Department of Homeland Security (DHS) policies to subject refugees to an indefinite hold on their applications for adjustment of status and termination of their refugee status without adequate notice will cause significant harm to our organization, our mission, and the refugees we serve.

**Jewish Family Service of Western Massachusetts**

3. Jewish Family Service of Western Massachusetts and its predecessor organizations have served the Springfield area since 1898, focusing on serving newcomers, immigrants, and

refugees, supporting family unity and cohesion, and assisting community members struggling with economic and health crises. Since the 1990s, under the name Jewish Family Service of Greater Springfield, we have been involved in the resettlement of refugees. We expanded the geographic range of our work and changed our name to Jewish Family Service of Western Massachusetts in 2002. As JFS-WMA, we have taken a leading regional role in refugee resettlement and other immigration services such as naturalization assistance.

4. We have a staff numbering 84, including caseworkers, behavioral health staff and mental health counselors, health navigators, youth workers, and elder services providers. These staff provide critical services for over 4,000 clients annually and receive community support from nearly 2,000 community members through engagement, advocacy, and educational programs. Our DPH-licensed mental health clinic provided over 11,000 behavioral health sessions in the past year, serving hundreds of clients who are largely immigrants and refugees. Through our partnership with the Office for Refugees and Immigrants, we provide youth case management and youth mentoring, employment and education support, job training and English as a Second Language classes, health navigation, intensive case management services, and legal services to support continued integration into the community. Additionally, through state-funded programs we provide elder guardianship and conservatorship services for clients, as well as ongoing programs and supports for hundreds of elders in the community through the Naturally Occurring Retirement Communities program.

5. Our refugee resettlement work is core to our mission. Our agency has, for over 100 years, served as a community leader, partnering with people to achieve fulfilling lives. Rooted in

Jewish values and the lived Jewish experience of immigration, we provide a wide variety of social services to support individuals and families from diverse cultural and economic backgrounds. Our agency's work is grounded in the Bible's call to welcome the stranger. We believe that call is best answered through the values of human dignity, compassion, healing, and integrity. Through our work, we have grown to be one of the largest refugee-serving agencies in the Commonwealth of Massachusetts and pride ourselves on having many staff members who have lived experience as refugees and now serve as community leaders in this critical work.

6. I have served as the CEO of JFS-WMA since December 2022. In my role at JFS-WMA, I supervise our senior leadership staff, support the Board and Committees of the agency in their work, and oversee the day-to-day operations of our work. Additionally, I serve as the agency's external affairs staff member, connecting with community groups, faith institutions, government officials and staff members, and regional partners.

7. Prior to working at JFS-WMA, I served in a wide variety of roles in the local Jewish community, including as the Executive Director of a nonprofit residential summer camp, and as the Assistant Executive Director at the Springfield JCC. In that role, I developed partnerships with JFS-WMA including a summer camp program that supported the integration of New American youth through camp attendance. My professional training is as a rabbi. I was ordained by the Reconstructionist Rabbinical College and have served as a rabbi for 18 years.

8. Through my current work and my previous partnerships with JFS-WMA, I am deeply familiar with JFS-WMA's operations and with the process for resettling and integrating refugees in the United States.

9. JFS-WMA has partnered with HIAS, a national refugee resettlement agency, to resettle refugees from around the world to our Western Massachusetts community. Through our partnership with HIAS, we provide initial resettlement services including initial case management, ongoing intensive case management programs, group programming, and emergency financial assistance.

10. During the four years before the current administration paused the United States Refugee Admission Program and stopped admitting new refugees, JFS-WMA provided these services to 1298 refugees making their new home in Western Massachusetts. This resettlement work began with accompaniment at the airport, placement in housing, helping new arrivals navigate the healthcare system, connecting them to health plans and public benefits, securing day care spots and enrollment for preschool-aged children, and enrolling school-aged children in local public schools. We also provided families with cultural orientation, placed adults in English classes, and helped refugees find employment and career pathways in their new communities.

11. Beginning in November 2025, JFS-WMA opened an emergency food pantry service for clients, predominantly refugees, who are impacted by the loss of their SNAP benefits due to the enactment of H.R. 1 as well as the government's own actions indefinitely delaying the adjudication of refugee applications for lawful permanent residence status. Under H.R. 1, refugees and most other noncitizens do not qualify for SNAP; however, lawful permanent residents generally remain eligible for SNAP.

12. Through our Citizenship and Immigration Services program, JFS-WMA also provides longer-term legal support for refugees and their families. We had been funded by United States Citizenship and Immigration Services and Project Citizenship since 2011, however

our contract with USCIS was canceled abruptly in February 2025. As part of that contract, we provided free classes to prepare our clients for the citizenship interview and also prepared their citizenship applications. Our accredited representative has remained on staff and now assists and supports clients through all phases of their immigration applications, to bring family members to the United States, and to become citizens. This includes supporting asylum applicants and preparing a variety of other forms for immigration benefits, including work authorization.

13. One of the important services we continue to provide is assistance to refugees in filing their applications for lawful permanent residency after they have been in the United States for more than one year. Refugees who have been in the United States for more than one year are entitled to file for and receive lawful permanent residency. However, many refugees struggle to complete and file this application on their own, and attorneys charge significant fees to assist with this application. There are also other costs associated with this application, including the cost of medical examinations and translation services. We currently have one accredited representative, and she assists JFS-WMA's clients with completing these applications at no cost.

**DHS's Refugee Adjustment Hold, Re-vetting, and Status Termination Policies**

14. JFS-WMA currently provides services to approximately 1,062 refugees who have not yet adjusted to lawful permanent resident (LPR) status. Many of these individuals have already filed their applications for permanent residency, but they have been waiting for months—sometimes years—for the government to adjudicate their applications. Since January 2021 JFS has welcomed 1,298 refugees into the geographic area served by JFS-WMA.

15. On November 21, 2025, the Director of USCIS issued a policy memorandum that directed (1) an adjudicative hold on all pending adjustment of status applications filed by refugees between January 20, 2021 and February 20, 2025, and (2) the agency to conduct a sweeping review of more than 200,000 refugees admitted into the United States during that same time period.

16. In January 2026, we learned about the implementation of DHS's program to arrest, detain, and interview refugees in Minnesota through Operation Post-Arrival Refugee Reverification and Integrity Strengthening (Operation PARRIS). Operation PARRIS created incredible fear and need in the refugee community across the country.

17. We became concerned that our clients may be targeted for interviews for adjustment or re-vetting of their refugee status, and we obtained training for how to represent any refugee who may be called in for re-vetting. So far, we have had one refugee family subject to such an interview. Several members of our staff team spent dozens of hours assisting in the preparation process. In addition to the support of our accredited representative, JFS-WMA engaged an outside legal firm to aid us in that support, given the unusual nature of re-vetting and the uncertainty it represented. Given the intensity of staff resources needed and balancing other client needs with limited staffing, I personally accompanied this family to Eastern Massachusetts for their interview along with a DOJ-accredited representative from a partner agency and a volunteer translator who donated her time to support the family that day. The interview was conducted over several hours and involved the USCIS officer interviewing all four family members, including two minors who were interviewed without their parent being present in the room.

18. On February 18, 2026, USCIS and ICE announced in a new policy memorandum that they will arrest and detain refugees who have been in the United States for more than one year but have not yet obtained lawful permanent resident status. The memorandum also stated that USCIS would be conducting re-vetting investigations to determine whether a refugee may remain in the United States as an LPR, should have their refugee status terminated, or should be placed into removal proceedings. The detention aspect of that policy is the subject of litigation in a separate lawsuit—*Jean A. v. Mullin*, No. 3:26-cv-30031-RGS (D. Mass. 2026)—in which JFS-WMA is participating as a plaintiff, and which has been stayed by the federal district court. *Jean A. v. Noem*, No. 3:26-cv-30031, 2026 WL 805207, at *1 (D. Mass. Mar. 23, 2026).

19. On October 13, 2026, DHS posted an interim final rule (IFR), effective October 14, 2026, that significantly reduces the amount of a time that an individual has respond to a notice of intent to terminate (NOIT) their refugee status—the response time was reduced from thirty to ten days. I am aware that the IFR went into effect immediately without considering comments from the public.

20. These DHS policies, which delay lawful permanent status, impede refugee access to vital public benefits, and threaten loss of status altogether, are tremendously destabilizing for refugees and have significantly impacted JFS-WMA's core work and efforts. Critically, staff has diverted resources from providing refugee clients with other critical services like case management services to proactively engaging all refugees we resettled between January 20, 2021, and February 19, 2025 to ensure that they were taking steps to prepare themselves for contact with immigration officials.

21. Until January 2026, JFS-WMA did not have any refugees who were called in for re-vetting interviews. In fact, because USCIS requires interviews for adjustment of status only on a case-by-case basis, many of our clients did not even have to appear in person to be granted adjustment of status.

22. If, due to the new NOIT policy, more unadjusted refugee clients are sent notices informing them of the government's intent to terminate their refugee status, JFS-WMA staff will need to devote significant time to prepare our refugee clients with responses. We have just one staff person who does this client-facing work, and we would need ten of her in addition to translators, case workers, and drivers to serve more than 1,000 refugees with pending applications. There is no question that we would have to divert current resources from other programs to protect our clients. Given our experience helping just one family with the re-vetting interview process, we know that it is incredibly time and resource intensive. Our organization does not have the resources to provide that service for the many families who might receive NOITs at the same time, especially with the shortened timeline being imposed by the government. This would certainly leave our clients without the means to properly respond to these notices.

23. In addition, if the refugees we serve are issued NOITs and subsequently have their refugee status terminated and are placed in removal proceedings, JFS-WMA staff will spend large amounts of time searching for and contacting possible legal referrals to represent these individuals in removal proceedings and/or federal habeas petitions, as detained removal work is outside the scope of the legal services we can provide. It is very time consuming for our staff to identify and secure low- or pro-bono referrals for these types of cases. Additionally, given the intense fear that these anti-refugee policies have created in our

refugee client community, we anticipate increasing the number of Know-Your-Rights trainings and diverting already precious staff time and resources to do so.

24. If our refugee clients are ultimately placed in removal proceedings and unable to work, their families will be left without their income. Most of our refugee clients do not have significant financial resources and their families rely on their paychecks to survive. We have already had to divert resources to help with benefit eliminations that began with refugees being removed from SNAP in November, 2025 and will continue with the elimination of access to Medicaid that began in October, 2026. To support these families who will have lost their only source of income and access to critical benefits because of their detention or at the very least due to the delay in issuing their green card, JFS-WMA will have to dip further into our limited emergency funds to provide financial assistance to these refugee populations. Additionally, the elimination of Medicaid will move many clients from MassHealth Standard to an emergency coverage MassHealth Limited plan for health care coverage. This will make it more difficult for clients to fill needed prescriptions like insulin or get other routine care, pushing them to delay care until it is emergent or not receive care and instead end up in the emergency department.

25. The indefinite pause on adjudicating refugee adjustment of status applications has forced JFS-WMA to divert its resources from its core mission to managing a crisis created by the government's own actions. Because eligibility for critical public benefits now depends on whether a refugee has obtained lawful permanent residence, our agency has spent hundreds of hours of staff time responding to the consequences of the pause. Staff called every client individually to determine their immigration status and whether they have received a green card going back to applications filed several years ago. They have attended numerous

trainings to understand the complex system of benefits adjudication, learn which benefits these clients stand to lose, and built new databases so that information can be shared across our programs and tracked given the inconsistent data being shared by the federal and state governments. They have held community meetings to educate clients about the loss of benefits and conducted emergency food distributions made necessary by cuts to clients' SNAP benefits. The demands of this response have been so intense that members of our leadership team have had to step in to cover assignments that would otherwise fall to program staff. Our Chief Operating Officer, Sara Bedford, spent dozens of hours coordinating a food insecurity team, including filling in for staff to hand out food as emergency cases came on foot to the office, organizing and distributing donated food cards and helping arrange to get emergency food to the office and then to clients whose SNAP benefits were cut due to the delay on their green card applications. Each of these hours is time that our leadership and staff could not devote to the resettlement, integration, and support services that JFS-WM exists to provide.

26. The pause also threatens JFS-WMA's operations as a critical behavioral health provider in our region. JFS-WMA operates a behavioral health center that receives reimbursement for services provided to clients who are MassHealth recipients. Without lawful permanent residence, many of these clients face the loss of their MassHealth coverage due to the pause on green card adjudications, and JFS-WMA would no longer be able to provide services to them through that coverage. These services are deeply needed for our clients, and also represent hundreds of thousands of dollars in annual insurance payments to the agency. Beyond the direct financial harm, the threatened loss of coverage has required additional staff time to identify potentially affected clients, assess their coverage options, and plan for

continuity of care including closing their cases and trying to provide other service options where available in the community. Clinical and administrative staff have spent that time responding to the crisis when they would otherwise have spent it providing behavioral health services to the clients who depend on them. As Chief Executive Officer of JFS-WMA, I am responsible for setting the strategic direction of an agency whose refugee resettlement and integration work rests on a single foundational premise: that a refugee admitted to the United States arrives with a durable, non-expiring path to lawful permanent residence and, ultimately, citizenship. Every element of our model, including initial resettlement, case management, employment services, English language instruction, housing support, and long-term community integration, is built on the expectation that the families we serve will become permanent members of our communities in Western Massachusetts. Congress codified that expectation by requiring refugees to apply for adjustment of status after one year in the United States. The government's ongoing pause on adjudicating adjustment of status applications for refugees breaks that promise. It leaves otherwise eligible refugees, including those individuals served by JFS-WMA, unable to obtain the green cards to which they are entitled. As a result, they cannot plan their futures, sponsor family members, or begin the residency period that leads to naturalization.

The harm is compounded by the government's shortening of the time a refugee has to respond to a notice of intent to terminate refugee status. Together, these policies turn a status Congress designed to lead to permanence into one that is provisional and precarious. This directly undermines the mission that our Board has established and that I am charged with carrying out. JFS-WMA cannot credibly promise the people we serve that the stability and belonging they are working toward is secure. And the agency's leadership must instead

plan around a federal posture that treats refugee status as temporary, which is incompatible with the very reason our refugee programs exist. In short, these policies do not merely burden our agency's operations. They undercut the very purpose for which JFS-WM resettles and serves refugees.

27. JFS-WMA also employs a significant number of refugees, including those who may be targeted by these DHS policies because their adjustment of status applications have not been adjudicated. Our work will be further strained if our employees—lawfully present refugees who are helping their communities—are targeted by the government.

28. Devoting a significant portion of JFS-WMA's resources to responding to these DHS policies has already harmed and will continue to harm our organization's priorities and existing work and will pull us away from our critical mission of welcoming immigrants to Western Massachusetts. Diverting staff time and resources to supporting refugees and their families will directly impact our organization's existing work on behalf of other immigrant communities as well as resources available for other programs that we ordinarily provide, such as our Jewish Community and Older Adults programs. Additionally, the loss of benefits caused solely by the indefinite pause in issuing green cards will harm both our clients due to the loss of SNAP and health insurance, and JFS-WMA due to the increased expense in responding as well as the lost revenue from our behavioral health programs. JFS-WMA has been in existence since 1898 and has welcomed Jewish and non-Jewish immigrants to the region for the entirety of that time. These DHS policies will create an intentionally sustained emergency for the community we serve as well as for our organization itself and will deny benefits to refugees who otherwise would be eligible for federal benefits except for the government's refusal to issue them green cards.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

______________ Executed: Springfield, Massachusetts

Rabbi James Greene Date: October 25, 2026