# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>JOSEPH B. EDLOW, in his official capacity as Director of United States Citizenship and Immigration Services, *et al.*,<br><br>*Defendants*. | Case No. |

**DECLARATION OF JOHN SLOCUM**

I, John Slocum, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am the Executive Director of Refugee Council USA (RCUSA). I have been with RCUSA since January 2021, when I was appointed Interim Executive Director. I became the Executive Director in March 2022.

2. I have personal knowledge of the facts contained in this declaration including the organization's mission, core activities, programmatic work, and membership.

3. RCUSA is a 501(c)(3) nonprofit organization located in Washington, D.C. RCUSA was founded 26 years ago to ensure excellence in U.S. refugee resettlement and integration efforts, and a powerful, unified advocacy voice.

4. RCUSA is the only national coalition devoted to forcibly displaced people in the United States and serves as the coordinating body for the refugee-serving community in the country. RCUSA's goals are to defend, improve, and expand refugee resettlement, asylum,

humanitarian protection, and inclusion for forcibly displaced populations. We also strive to strengthen the collective power and effectiveness of our members and partners in delivering responsive policies and programs.

5. RCUSA's coalition of members includes 39 U.S.-based non-governmental organizations. Among these organizations are the historical ten (now eight) national refugee resettlement organizations (now referred to as "Initial Resettlement Providers" or "IRPs" by the federal government) that, until January 2025, received federal funding to provide statutorily mandated domestic resettlement services to recently arrived refugees. Most of the national resettlement agencies and other refugee-serving organizations within RCUSA's membership continue to support individuals admitted into the United States via the U.S. Refugee Admissions Program (USRAP). These organizations also leverage private funding to provide resettled refugees with holistic support to build successful lives in the United States.

6. RCUSA engages in advocacy and policy work focused on rebuilding and strengthening the USRAP, investing in refugee-serving programs, and defending humanitarian protections in the United States. RCUSA has unified messaging, policy priorities, and policymaker engagement strategies across our member organizations. In 2025, RCUSA formalized our grassroots advocacy network through the launch of RCUSA's new Action Center, which enables our coalition to dramatically expand our voice and reach through educating and mobilizing local communities and constituents around shared goals.

7. RCUSA also serves as a central source of information-sharing and strategic planning for refugee advocates, resettlement and refugee-serving personnel, and the hundreds of staff who work across RCUSA's member organizations.

8. The work of RCUSA and its member organizations has been substantially impacted by President Trump's decision to suspend the entry of refugees under the USRAP, the suspension of funding for overseas processing of refugees to the United States, the suspension of funding for domestic resettlement services for refugees, and the suspension in issuing Afghan and Iraqi Special Immigrant Visas (SIVs). RCUSA has had to lay off three of its five full-time staff members due to funding cuts.

9. RCUSA's work continued to be significantly impacted when the Director of U.S. Citizenship and Immigration Services (USCIS) issued a memorandum on November 21, 2025, directing a hold on the adjudication of pending adjustment of status applications filed by refugees and a sweeping review of more than 200,000 individuals admitted to the United States through the USRAP during the previous administration. *See* Joseph B. Edlow, *Reinterview of Certain Refugees Admitted to the United States and an Immediate Hold on Certain Refugees with a Pending I-485 Application to Register Permanent Residence or Adjust Status* (Nov. 21, 2025) (adjudication hold memo).

10. If USCIS had provided the opportunity for comment before publishing the adjudication memo RCUSA would have submitted a comment explaining the real harm that the adjudication hold and refugee re-vetting would inflict and have inflicted on refugees. Preventing refugees from adjusting their status deprives them of the benefits of lawful permanent residence, a nondiscretionary process under the Refugee Act that refugees have traditionally been granted as a matter of course. In addition, the One Big Beautiful Bill Act of 2025 eliminated unadjusted refugees' longstanding access to federally-funded health care, such as Medicaid, Medicare, and the Children's Health Insurance Program, as well as the Supplemental Nutritional Assistance Program. Cutting refugees' access to benefits they rely on

while denying them the opportunity to become permanent residents leaves them without access to health care and other benefits. Indiscriminate re-vetting has generated pervasive fear among refugees and created the need for new resources and programs to support communities who can no longer depend on refugee status for safety and stability in the United States.

11. Our work was derailed further when the Department of Homeland Security (DHS) announced Operation PARRIS, which wastefully re-vetted thousands of refugee cases. Operation PARRIS led to the indiscriminate arrest and detention of refugees, including children; many refugees were detained and subject to re-vetting out of state before being released without support for their return to Minnesota. The announcement of Operation PARRIS created incredible fear and need in the refugee community across the country.

12. RCUSA's work has been further compromised by an interim final rule (IFR) issued by DHS and published on October 14, 2026, which will expedite the termination of refugee status by reducing the period of time that a refugee has to respond to a notice of intent to terminate refugee status from 30 to 10 days. *Removing 30-Day Refugee Termination Notice*, 91 Fed. Reg. 65077, 65077 (Oct. 14, 2026). The IFR went into effect immediately without considering comments from the public.

13. If DHS had provided an opportunity for public comment before finalizing the interim final rule, RCUSA would have submitted a comment describing the negative consequences of the rule. Ten days is not enough time for a refugee to receive a notice of termination, obtain legal or other assistance, and prepare a meaningful response. The interim final rule therefore places refugees in danger of losing their refugee status and makes them vulnerable to removal to a country where they face danger.

14. The adjudication hold, refugee re-vetting, and the IFR threaten the core of RCUSA's mission, which is to ensure that people forced to flee their homes have agency, access to safety, and opportunity to thrive — not to send them back to places where their lives may be in danger or where they face persecution. Policies that enable refugee re-vetting and termination of refugee status with insufficient due process or a meaningful opportunity to be heard, in addition to referral of refugees to removal proceedings, make it far more likely that displaced people will be sent back to countries where they fear persecution or will experience life-threatening conditions.

15. These actions have impacted RCUSA's work in multiple ways. RCUSA plays a significant role in generating materials and resources for members, with an emphasis on creating resources for refugee-serving organizations and refugees themselves. We have increased this work since 2025 as refugee-serving organizations have had to scale back their capacity due to funding cuts, and as refugees face new, acute challenges.

16. In the wake of Operation PARRIS, the adjudication hold memo, and refugee re-vetting, RCUSA staff also has invested substantial time in creating a playbook of resources for communities to be equipped for increased immigration enforcement against refugees. This playbook includes know-your-rights information, information regarding accessing legal representation, and family and emergency preparedness resources.

17. Since creating those resources, RCUSA staff have facilitated a training session for national and local resettlement directors to help them prepare for increased immigration enforcement against refugees in their communities, as well as coordination meetings among legal and refugee service providers, advocacy organizations, and refugee leaders. RCUSA also facilitated a survey among local resettlement providers, refugee leaders, and other

refugee-serving organizations about the imposition of new burdens on refugee communities as a result of DHS's re-vetting initiative. In response to the survey results, RCUSA spent more time communicating with the refugee community about the state of refugee re-vetting nationally – and scaled up national coordination among legal practitioners, policy staff, and resettlement directors to improve our community response. After providing this training and supporting such coordination, RCUSA received requests for additional trainings and ongoing coordination. This work has required a significant amount of staff time to plan and conduct.

18. RCUSA also worked with national resettlement directors to create a Resource Hub on its website in response to Operation PARRIS. The Resource Hub is continually updated with new resources, as well as information about new federal government policies impacting refugees. Creating and updating the Resource Hub has taken a considerable amount of staff time, time that our staff has not been able to devote to normal program activities – including projects on improving refugee integration, mapping refugee-serving organizations, and improving safeguards for refugees throughout the resettlement process. This work has also necessitated another layer of coordination with legal service providers at resettlement organizations.

19. The IFR has further accelerated the need for these resources and training. Our staff plans to create updated preparedness materials for refugees, outlining the steps they should take if they receive a notice of intent to terminate and/or are placed in removal proceedings. Our staff is already creating (and continually updating) advocacy materials to educate the public and policymakers about the IFR, its impact on resettled refugees, and what action steps to take.

20. RCUSA also has responded to increased enforcement against refugees by identifying needs for additional support and developing the infrastructure to respond to those

needs. Since 2025, RCUSA has expended resources identifying the top cities of refugee arrivals over the last few years, as well as the top nationalities of arrivals, in an effort to anticipate the impacts if a particular city and/or nationality were to be targeted for immigration enforcement against refugees. In addition, because of the contraction in resettlement infrastructure due to funding cuts, resettlement offices in some areas of the country have closed. This means that there are currently locations in the country where refugees were resettled, but where there is no longer a resettlement office or capacity to support them. RCUSA has engaged in an effort to identify those areas where there is no resettlement office or capacity to support refugees and to identify refugees who face heightened vulnerabilities due to new policies targeting refugees, such as re-vetting and termination of status. RCUSA also maintains an alumni listserv of former resettlement agency staff who opted-in to receiving regular refugee-related policy and advocacy updates. RCUSA plans to facilitate connections among former local resettlement staff, virtual resettlement staff or area/regional service providers, and refugees directly to encourage (or otherwise equip) them to take self-preparedness steps, such as applying for adjustment of status and other steps as outlined in the playbook, discussed above.

21. There also are areas of the country where a resettlement organization may still be in place, but there is a local lack of affordable legal services or pro bono legal aid. RCUSA staff serves as an interlocutor connecting legal service providers with learning-based organizations, refugee-serving, and national and local resettlement organizations to ensure that resettled refugees have the necessary legal and related support. Previously, this kind of work (legal aid for resettled refugees) has not been necessary on this scale, because in the past refugees were not targeted for mass re-vetting, arrest, detention, termination of refugee status, and removal.

22. The lack of local capacity caused by the freeze in funding for domestic resettlement services in particular has had many downstream effects on recently arrived refugees, including a decimation of the support infrastructure that was in place to provide not only resettlement services, but also assistance with things like filing adjustment of status applications. Part of RCUSA's mission is to make sure that the necessary infrastructure is in place to support resettled refugees, so our staff has invested substantial effort in identifying areas and individuals who need support so that we can make connections and seek help from particular organizations that may, for example, be able to provide virtual assistance or send capacity or resources to a particular area impacted by re-vetting and other policies targeting refugees. This is coupled with a substantial amount of time invested in advocating for statutorily-mandated guardrails around how federal dollars are spent so that they achieve the goals intended by Congress.

23. Now our staff will also need to invest time and effort in expanding this infrastructure to include support for responding to notices of intent to terminate refugee status on an accelerated time frame and assisting refugees placed in removal proceedings. Given the lack of capacity to support refugees with the assistance organizations have traditionally provided to them, such as support for filing adjustment of status applications, there is an acute lack of resources and infrastructure to assist refugees with challenges like re-vetting and notices of intent to terminate status, which they have not faced in the past.

24. For example, RCUSA has begun efforts to recruit immigration attorneys with experience handling asylum claims in immigration court who could represent refugees if they are placed in removal proceedings. Practicing in immigration court and applying for asylum require different skill sets than the types of legal and social services that refugee serving

organizations have traditionally provided to refugees, so setting up the infrastructure to support refugees in this way will require creating new relationships and systems. This will be very difficult to do on such a compressed time frame given that the IFR went into effect immediately, and refugees now only get 10 days to respond to a notice of intent to terminate their status.

25. RCUSA also expects that our member organizations and other allies will want to offer support to refugees who are targets for termination of status. RCUSA anticipates having to create systems to funnel volunteers to places where their assistance is needed, and ensure that there is the organizational infrastructure to manage their work. Developing these systems is a significant time investment.

26. RCUSA also frequently hears directly from refugees seeking help, so I expect that RCUSA will be inundated with requests for assistance from refugees who receive notices of intent to terminate. RCUSA will need to stand up urgent calls with our membership organizations and planning calls with legal service providers to make sure that we can help to coordinate these activities and make sure that local refugee-serving organizations have the most up-to-date and effective guidance regarding best practices. RCUSA already routinely receives urgent requests for assistance from unadjusted refugees who are experiencing food insecurity or life-threatening, severe, or complex medical needs as a direct result of the adjustment-of-status adjudication hold, which prolongs the length of time they remain ineligible for SNAP and Medicaid/CHIP.

27. Prior to the funding cuts and the threat of increased enforcement against unadjusted refugees, RCUSA staff did not need to spend nearly as much of its time ensuring that the needed infrastructure was in place to support resettled refugees in this particular way.

28. The adjustment hold, refugee re-vetting, and the IFR therefore threaten to undermine RCUSA's core function as an organization coordinating and fostering collaboration among refugee resettlement providers and other refugee-serving organizations. Reducing the amount of time that refugees have to respond to a notice of intent to terminate refugee status from 30 days to 10 days, and making this change effective immediately, means that RCUSA will not have sufficient time to coordinate with our networks and member organizations to work with refugees who receive notices of intent to terminate refugee status.

29. Due to our decreased staffing, RCUSA will not have the capacity to work on anything other than responding to community concerns about the IFR. We will need to focus all of our efforts on scheduling community webinars, producing policy resources, creating and disseminating advocacy materials, and finding legal resources for people.

30. If my staff did not have to spend so much time on resource building and triaging requests for assistance for individual refugees throughout the country, they would be spending more time on building a proactive legislative, appropriations, and oversight agenda at the national and state levels of government – including by training and mobilizing refugee leaders to educate elected leaders, and engaging in congressional, state, and local policy and advocacy.

31. Because of the numerous actions taken by the Administration against refugee resettlement and unadjusted refugees, RCUSA staff also have had to divert their time from core programs and work to facilitate additional meetings with our Board and membership. In addition to the regular monthly meeting we convene for RCUSA membership executives (including RCUSA resettlement organization executives), we convened more than 25 additional "special" or "emergency" meetings with our member executives in 2025 and 2026. This increased my workload and caused me to invest additional time in supporting the refugee

resettlement agencies. As a result, I was unable to focus on other core RCUSA programs, such as refugee leadership training, improving measures of refugee integration outcomes, supporting members who work primarily with asylum seekers, torture survivors, or other humanitarian populations, and engaging in international information-sharing meetings with counterparts in other countries that engage in refugee resettlement.

32. I expect to have to convene additional meetings of our refugee resettlement executives and/or Board as a result of the IFR because refugee resettlement and other refugee-serving organizations will be looking for advice and resources to support refugees if they (or their family members) receive notices of intent to terminate refugee status and are later placed in removal proceedings.

33. Finally, increased enforcement against refugees undermines our mission to empower forcibly displaced people to serve as leaders, experts, and advocates. These programs are jeopardized by the adjustment hold, refugee re-vetting, and the IFR because our programs rely on refugees (recently-resettled and otherwise) feeling safe to travel and meet with elected leaders, reporters, and others who hold positions of power. The prospect of re-vetting and now the IFR make refugees afraid even to leave their homes to go to the grocery store, work, or school, especially when the adjustment hold makes it nearly impossible for them to obtain lawful permanent resident status and the protections it provides.

34. For example, with several partner organizations, RCUSA until recently operated a young refugee leadership training program, the National Young Adult Leadership Council (NYALC). The target population for the program was young adults who came to the United States in the last five years. In 2025, 15 Council Members participated in intensive virtual trainings, tailored mentorship, and an in-person gathering in Washington, DC. This year, the

program brought 35 people to Washington, D.C. in August for a set of trainings and a convening to meet with lawmakers. While federal funding for NYALC has ended as of September 29, RCUSA and partners plan to continue carrying out leadership development programs for young refugees. I am concerned that many recently-arrived refugees may not be willing to travel for future such programs because they will be concerned about being targeted for immigration enforcement, even though they are all living in the United States under lawful status. Many recently arrived young refugees are from Afghanistan, and Afghan arrivals have been targeted by many of the Administration's recent actions.

35. RCUSA also convenes member and partner organizations and individual refugees for in-person advocacy days in Washington, D.C. In our experience, having refugees participate in advocacy days is very effective because it enables lawmakers to hear from individuals about the importance of resettlement programs and impact of federal policies based on their own lived experience.

36. Because of the refugee adjustment hold and re-vetting, our advocacy days in June of this year focused on community care and safety, rather than expanding access to opportunities for refugees. Refugee participation in advocacy days in 2026 was about the same as last year, but that is only because RCUSA staff spent considerable time providing participants with the resources and information necessary for them to feel comfortable. Almost half of the refugees who intended to participate declined at the last minute, many due to safety concerns. RCUSA's ability to bring together refugees for these programs is diminished when refugees are afraid to travel or participate publicly in engagement with lawmakers.

37. To make refugees feel more secure participating in advocacy, RCUSA also ran an in-district program in August so that people could participate in advocacy in their area

without having to travel. This program required a significant investment of time, including revising our training to include information about refugees' legal rights. Because some of these local, in-district meetings were held in federal buildings, we also had to train refugees on how to interact with security personnel and law enforcement, as well as how to prepare for hostile interactions.

38. Some refugees were hesitant to participate in any type of in-person advocacy, so we also supported one of our members to participate in an in-district virtual advocacy days program. Virtual advocacy is not a replacement for in-person advocacy because the local congressional staff often decline meeting requests (unless they are in-person during recess periods), virtual connection does not build as strong of a relationship with the congressional office, and virtual meetings make it almost impossible for the refugee to encounter the Members themselves.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 23, 2026

John W Slocum

John Slocum