# EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services, *et al.*,<br><br>*Defendants*. | Case No. |

**DECLARATION OF TRACY ROY, IMMIGRANT LAW CENTER OF MINNESOTA**

1. I, Tracy Roy, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

2. I am the Legal Director with the Immigrant Law Center of Minnesota ("ILCM"). In my role, I oversee our refugee services program and have personal knowledge of the facts herein.

3. ILCM is a Saint Paul, Minnesota-based 501(c)(3) nonprofit organization providing free legal representation to low-income immigrants and refugees in Minnesota since 1996 and refugees in North Dakota since 2022. We are Minnesota's premier provider of free comprehensive immigration legal representation to low-income clients. ILCM's mission is to enhance opportunities for immigrants and refugees through free legal representation for low-

income individuals and conduct both education and advocacy with a wide array of communities.

4. ILCM represents applicants for U.S. citizenship, current recipients of Deferred Action for Childhood Arrivals, refugees and asylees seeking permanent residency, and other noncitizens—including noncitizen survivors of human trafficking, abuse or domestic violence, and other certain violent crimes.

5. ILCM has assisted almost 5,000 refugees with their adjustment of status applications in the last 30 years. The American Immigration Council estimates that over 96,000 refugees live in Minnesota. These folks are our neighbors, colleagues, business owners, entrepreneurs, farmers, and friends. ILCM and its staff have a clear connection to our refugee communities.

6. On October 14, 2026, the Federal Register Notice to remove the 30-day refugee termination notice period was published. This rule change that reduces the 30-day period to respond to a Notice of Intent to Terminate (NOIT) to a 10-day period impacts ILCM and our clients.

7. ILCM currently has 961 open refugee adjustment cases. Many other refugee cases are handled by non-attorneys and resettlement agencies that don't have attorneys, so the impact of limiting the NOIT response period could be catastrophic on refugees who were vetted extensively and invited to live permanently and safely in this country due to insufficient resources to respond within ten days.

8. In the past six months, our office has represented four refugee clients in responding to Notices of Intent to Terminate refugee status (NOITs"). All four clients' applications for adjustment of status were pending adjudication when they received the NOITs.

9. Our role in responding to the notices included conducting consultations and screenings; collecting and reviewing records; conducting legal research; preparing memoranda of law, declarations, and exhibits; communicating with clients and coordinating interpretation; and filing the responses.

10. While a relatively straightforward refugee adjustment-of-status consultation generally requires 45 to 75 minutes, the NOIT response matters require substantially more attorney time.

11. To respond competently to a DHS notice, an attorney must review the client's refugee records. We filed Freedom of Information Act requests for each client, but none of the requests received a response within six weeks. Because we could not obtain the refugee records from DHS within the 30-day response period, we requested one client's records from UNHCR with assistance from the International Refugee Advocacy Project ("IRAP"). UNHCR provided the records after ten days. By that time, we had only five days remaining to prepare and submit that client's response. It is very likely impossible to get these records, review them, and draft a response within ten days.

12. In addition to immigration records, there may be a need to gather other documentation, such as affidavits from family or friends from our clients' countries of origin, or other source documentation from the country of origination or country of refuge. This takes time and often requires translation, which would be logistically improbable to complete in 10 days.

13. The drafting stage includes preparing memoranda of law, client declarations, and supporting exhibits. Because there is no established precedent governing this DHS procedure, attorneys have to devote additional time to identifying the applicable legal framework, analyzing

the agency's stated grounds for termination, and developing arguments tailored to each client's facts.

14. Drafting the client declarations requires multiple attorney-client meetings, often with an interpreter, to ensure that the factual record is complete, accurate, and consistent with the available refugee records. Attorneys then have to organize, and review supporting exhibits, resolve discrepancies, and revise the submissions as additional information becomes available. Each case requires approximately 30 to 45 hours of legal research, factual development, drafting, and final review before the response can be filed.

15. The entire re-vetting process has been traumatizing for our clients. In addition to the extreme negative attention Somali refugees faced prior to the Operation PARRIS memo, our communities were terrorized by armed agents banging doors, ripping mothers away from their children, arresting people, and sending them to other states before we even knew where they could be until a court order stopped the detention of refugees. This fear makes it very difficult for clients to actively participate in their cases. Our communities have not had the chance to heal from this trauma. Things like obtaining medical forms and being able to attend appointments to sign documents, obtain photos, and prepare testimony can be difficult to coordinate.

16. ILCM had over 10 Operation PARRIS interviews which reviewed similar information as the NOITs. We expect based on this that the NOIT interviews would be similar to the Operation PARRIS interviews.

17. In-person interviews take a tremendous number of resources to get attorneys and accredited representatives to the interviews and to arrange preparation for clients.

18. Some of our clients live up to 3.5 hours away from the field office in Minnesota. This is a huge burden on clients who need to take off work and find transportation to attend an

interview. Some of our attorneys and accredited representatives also live far away from the field office and have to travel to attend an interview as USCIS no longer allows for telephonic appearances by legal representatives.

19. The amount of time that clients are waiting at USCIS for re-vetting is untenable. USCIS states food and beverages are not allowed in the waiting room, even if you are waiting for many hours.

20. While clients and representatives are required to appear in person, for Operation PARRIS interviews, USCIS provided a phone interpreter for the interviews in some cases, because many of the refugee populations targeted speak languages of lesser diffusion, it was difficult to find interpreters from the national pool. One client had to wait several hours for phone interpretation to be provided. In the end, USCIS was unable to get a phone interpreter and the client ultimately had to provide their own interpretation through personal connections of ILCM staff, resulting in over 6 hours of waiting time at the interview.

21. Another client faced difficulties understanding her interpreter. Interpretation difficulties can lead to miscommunication and inaccurate information being relayed.

22. Other clients were brought to tears recalling the trauma they and their family endured while fleeing for their lives.

23. Reliving the trauma without adequate support and safety can lead to lasting harm for clients who have already faced enormous life adversity before finding a place here in Minnesota.

24. Other concerns with in-person interviews include that for these Operation PARRIS interviews, many of the officers who conducted the interviews were not versed in

refugee law and were questioning clients based on inaccurate or incomplete knowledge of the law.

25. Having witnessed all of the challenges our clients faced during the Operation PARRIS interview experience, we know that oral testimony will add tremendous hurdles to refugee clients who must restate the basis of their refugee claim.

26. When determining whether to submit a written response or to request an in-person interview, ILCM looks at the impact to the client, the ability to present the case fully and accurately, and the impact on resources for a legal aid non-profit. In almost every case, a written response allows the client to tell their story while minimizing re-traumatization by working with trauma-informed staff members, their family, and remaining close to home. A written response allows for multiple conversations with a client who may remember events in a non-linear manner to ensure accuracy of the declaration and allow for breaks for the client to process. Written responses also allow for attorneys and representatives to focus on the legal arguments instead of logistical challenges such as canceled interviews, transportation, and phone interpretation. Oral interviews are not an adequate substitute for sufficient time to respond to a NOIT in writing.

I, Tracy Roy, declare under penalty of perjury that the information contained in this declaration is true and correct to the best of my knowledge.

Executed in Minneapolis, MN on October 25, 2026

Tracy Roy
Legal Director
ILCM