**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship & Immigration Services, *et al.*,<br><br>*Defendants*. | Case No. 1:26-cv-14817 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR AN ADMINISTRATIVE STAY AND A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705**

## TABLE OF CONTENTS

INTRODUCTION ........ 1
BACKGROUND ........ 2
I. Refugee processing and refugee status ........ 2
II. Refugees' adjustment of status to lawful permanent residents ........ 3
III. Defendants' scheme to detain and punish refugees ........ 4
A. The President bans refugees from entering the United States. ........ 5
B. DHS freezes processing of refugee adjustment applications. ........ 6
C. DHS begins arresting and detaining refugees. ........ 6
IV. DHS issues Refugee Status Termination IFR with no opportunity for comment. ........ 8
V. Plaintiffs seek a stay to prevent harms from the three challenged policies. ........ 9
LEGAL STANDARD ........ 11
ARGUMENT ........ 13
I. Plaintiffs are likely to succeed on the merits of their claims challenging the IFR. ........ 13
A. Defendants promulgated the IFR without following APA procedures. ........ 13
1. Defendants failed to follow notice-and-comment procedures. ........ 13
2. Defendants lacked good cause to make the IFR immediately effective. ........ 19
B. The IFR is arbitrary and capricious. ........ 20
II. Plaintiffs are likely to succeed on the merits of their claims against the Re-vetting Policy and Adjustment of Status Hold. ........ 22
A. The Re-Vetting Policy and Adjustment of Status Hold are contrary to law. ........ 23
B. The Re-vetting Policy and Adjustment of Status Hold were unlawfully promulgated without notice and comment. ........ 26
C. The Re-vetting Policy and Adjustment of Status Hold are arbitrary and capricious. ........ 27
III. The challenged policies irreparably harm Plaintiffs. ........ 30
IV. The balance of equities and the public interest strongly favor a stay. ........ 32
V. The Court should issue immediate relief. ........ 33
CONCLUSION ........ 35

## INTRODUCTION

Plaintiffs challenge the Trump-Vance Administration's unlawful decisions to subject individuals lawfully admitted to the United States as refugees to (1) an indefinite hold on their applications for adjustment of status and mass re-vetting of their admission as refugees and (2) termination of their refugee status without adequate notice. These cruel and unprecedented policies, set forth in an agency memoranda and an interim final rule ("IFR"), upend 45 years of settled practice and regulation and prevent upwards of 100,000 refugees from obtaining lawful permanent resident status—a status they are entitled to by law after one year—and place them at risk of termination of their refugee status, and loss of attendant benefits that status provides, with no meaningful opportunity to be heard.

The Refugee Status Termination IFR, the Adjustment of Status Hold, and the Re-vetting Policy are illegal. They were promulgated without the notice and comment procedures required by the Administrative Procedure Act (APA) and are arbitrary and capricious. In addition, Adjustment of Status Hold and the Re-vetting Policy exceed Defendants' authority under the Immigration and Nationality Act ("INA"). And on top of their illegality, the policies betray the United States' longstanding commitment to provide safe haven for refugees who accepted the United States' invitation to live in and contribute to the fabric of our communities.

Given the immediate threat to Plaintiffs—a putative class of refugees resettled in this country and organizations that serve them—Plaintiffs ask that the Court stay the IFR, Adjustment of Status Hold, and Re-vetting Policy pursuant to 5 U.S.C. § 705 pending final resolution on the merits. Defendants' actions place Individual Plaintiffs and over 100,000 putative class members at imminent risk of losing their lawful status and attendant benefits, including work authorization and protection from detention and removal, without adequate process, and have caused refugees awaiting their lawful permanent resident status to lose access to nutritional assistance and Medicaid and other health insurance programs. The policies have also forced Organizational Plaintiffs to restructure services, redirect personnel hours, and expend enormous human and financial resources to protect their clients and members. The Court should therefore grant

preliminary relief by staying the IFR, Adjustment of Status Hold, and Re-vetting Policy pending resolution of this case.

In addition, because the government is already issuing notices of intent to terminate to putative class members, which may result in termination of status as soon as *today*, **the Court should issue an immediate administrative stay of the IFR and any notices issued pursuant to the IFR.**

## BACKGROUND

### I. Refugee processing and refugee status

Congress amended the Immigration and Nationality Act (INA) in 1980 by enacting the Refugee Act, which embodies the United States's commitment to humanitarian assistance for those fleeing persecution. Pub. L. No. 96-212, 94 Stat. 102 (1980). In enacting the Refugee Act, Congress sought to "provide a permanent and systematic procedure for the admission ... of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are admitted." *Id*. § 101(b). A "refugee" is a person facing displacement from his or her country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1101(a)(42).

The Refugee Act sets out detailed policies and procedures governing refugee admission and resettlement in the United States. *See id*. § 1157 *et seq*. Refugees must go through extensive, often years-long vetting before they may even be considered for resettlement in this country. *See* 8 C.F.R. §§ 207.1(a), 207.2.[1] The DHS Secretary is authorized to admit to the United States "any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible . . . as an immigrant." 8 U.S.C.

[1] *See also* USCIS, Refugee Processing and Security Screening, https://perma.cc/86KA-FPKP; *see also* U.S. Dep't of State, U.S. Dep't of Homeland Sec., & U.S. Dep't of Health and Hum. Servs., *Report to the Congress: Proposed Refugee Admissions for Fiscal Year 2025*, at 28, https://perma.cc/YK4A-AFXN (Dkt. 2, Ex. 23).

§ 1157(c)(1); *see* 8 C.F.R. §§ 207.1–207.7. A refugee's spouse or child is entitled to admission as a refugee even without meeting the statutory definition, so long as they are admissible. 8 U.S.C. § 1157(c)(2)(A). Refugee status comes with significant protections, including indefinite lawful status and work authorization. *Removing 30-Day Refugee Termination Notice*, 91 Fed. Reg. 65,077, 65,080 & n.14 (Oct. 14, 2026) (citing 8 C.F.R. § 274a.12(a)(3)).

An individual's refugee status may be terminated only if DHS "determines that the [non-citizen] was not in fact a refugee within the meaning of § 1101(a)(42) of this title at the time of the [noncitizen's] admission." 8 U.S.C. § 1157(c)(4). Until the challenged IFR, the regulations required USCIS to notify a refugee in writing of its intent to terminate their refugee status, and the refugee had 30 days from the date the Notice of Intent to Terminate ("NOIT") was served upon them to present written or oral evidence to show why their status should not be terminated. 8 C.F.R. § 207.9 (2025). After providing the refugee with the opportunity to respond, if USCIS terminates the individual's refugee status, it issues a notice of termination. USCIS then processes the individual for removal "under sections 235, 240, and 241 of the Act," 8 C.F.R. § 207.9, meaning USCIS issues a notice to appear and initiates removal proceedings under 8 U.S.C. § 1229a. *See, e.g.*, *Mukantagara v. DHS*, 67 F.4th 1113, 1116 (10th Cir. 2023). When a principal refugee's status is terminated, that refugee's derivative spouse and children also lose status and work authorization and are placed in removal proceedings. 8 C.F.R. § 207.9. There is no appeal from the termination of refugee status. *Id*. Termination of refugee status results in immediate loss of employment authorization. 91 Fed. Reg. at 65,081.

## II. Refugees' adjustment of status to lawful permanent residents

Refugees are entitled to adjust their status to that of a lawful permanent resident (colloquially, to obtain a "green card") after they have been in the United States for one year, so long as their refugee status has not been terminated and they are not found, upon inspection after one year, to be inadmissible to the United States. 8 U.S.C. § 1159(a)(1) (agency "shall" issue green card); 8 C.F.R. § 209.1(e) ("If the applicant is found to be admissible for permanent residence [8 U.S.C. § 1159], USCIS *will approve the application* . . . ."). Interviews are not a mandatory part

of the adjustment process and occur only case-by-case. 8 C.F.R. § 209.1(a)(1). If the refugee is found to be admissible for permanent residence, USCIS *must* approve the refugee's application for adjustment of status and admit the applicant for lawful permanent residence as of the date of the refugee's arrival in the United States. *Id*. § 209.1(e); *see* 8 U.S.C. § 1159(a)(2). If USCIS denies the application, it must "notify an applicant of the right to renew the request for permanent residence" in full removal proceedings under 8 U.S.C. § 1229a. 8 C.F.R. § 209.1(e).

Lawful permanent resident status comes with significant protections and benefits, such as the ability to become a naturalized citizen, travel abroad, and sponsor certain family members for lawful permanent resident status. 8 U.S.C. §§ 1101(a)(13)(C), (20), 1153(a)(2), 1427(a); 8 C.F.R. § 274a.12(a)(1). In addition, lawful permanent resident status entitles adjusted refugees to federal health care and nutritional benefits programs such as Medicaid and the Supplemental Nutrition Assistance Program ("SNAP"). Declaration of Sarah Krieger ¶¶ 6, 9.[2]

Although the statute requires refugees to apply to adjust their status after one year in the United States, *see* 8 U.S.C. § 1159(a), it takes time for USCIS to process the applications. For example, in the third quarter of 2025, the average processing time for adjustment of status applications filed by refugees was 7.8 months.[3] Until late 2025, under longstanding DHS policy, a refugee's failure to adjust status or to apply for adjustment was "not a sufficient ground to place them in removal proceedings, and therefore not a proper basis for detaining them." James Chaparro, *ICE Policy No. 11039.1: Detention of Refugees Admitted Under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status* at 2 (May 10, 2010), https://perma.cc/5YRK-GBLQ ("2010 ICE Policy") (Dkt. 2, Ex. 17).

## III. Defendants' scheme to detain and punish refugees

Over the past two years, the government has taken extraordinary steps to prevent new refugees from entering and to detain and remove refugees already settled in the United States. To

[2] All declarations and exhibits are attached to the Declaration of Erez Reuveni (Dkt. 2).

[3] Drishti Pillai & Samantha Artiga, *Green Card Processing Backlogs for Refugees and Asylees Could Have Implications for Health Coverage and Care* (Oct. 15, 2026), https://perma.cc/35R7-GUN6 (Dkt. 2, Ex. 24).

accomplish the latter, the government has sought in various ways to not only prevent refugees from becoming lawful permanent residents—depriving them of the opportunity to obtain greater protection from detention and removal and to move forward on their path to citizenship—but to strip them of their refugee status. This case challenges three such agency actions: (1) a November 21, 2025, policy of mass re-vetting of refugees admitted during the Biden Administration; (2) a November 21, 2025, blanket hold on adjudicating those refugees' applications for adjustment of status; and (3) an October 14, 2026, interim final rule reducing the amount of time refugees have to respond to the government's notice of intent to terminate their refugee status from 30 days to 10 days.

**A. The President bans refugees from entering the United States.**

On the first day of his second term, President Trump signed Executive Order 14163, indefinitely suspending entry of refugees under the U.S. Refugee Admissions Program and suspending decisions on applications for refugee status. *Realigning the United States Refugee Admissions Program*, Exec. Order No. 14,163, § 3(a)-(b), 90 Fed. Reg. 8459 (Jan. 30, 2025) ("Refugee Ban E.O."). Section 2 states that "it is the policy of the United States to ensure that public safety and national security are paramount considerations in the administration of the USRAP, and to admit only those refugees who can fully and appropriately assimilate into the United States and to ensure that the United States preserves taxpayer resources for its citizens." *Id.* § 2.

On the same day, the President also issued Executive Order 14,161, that, among other things, directed the DHS Secretary and other government officials to "[e]nsure that sufficient safeguards are in place to prevent any refugee or stateless individual from being admitted to the United States without undergoing stringent identification verification beyond that required of any other [noncitizen] seeking admission or entry to the United States." *Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, Exec. Order No. 14161, § 3(b), 90 Fed. Reg. 8451 (Jan. 30, 2025).

**B. DHS freezes processing of refugee adjustment applications.**

On November 21, 2025, Defendant Edlow issued a memorandum directing USCIS to immediately hold all refugee adjustment of status applications filed by and "re-interview any refugees admitted to the United States from January 20, 2021, to February 20, 2025." Joseph B. Edlow, *Reinterview of Certain Refugees Admitted to the United States and an Immediate Hold on Certain Refugees with a Pending I-485 Application to Register Permanent Residence or Adjust Status* at 3 (Nov. 21, 2025) ("November 2025 Memo") (Dkt. 1-4). The November 2025 Memo contended this indefinite hold and re-vetting were necessary to re-assess whether refugees admitted "during this timeframe" "met the refugee definition ... at the time of admission" and to ensure "that all principal refugees admitted to the United States warranted a favorable exercise of discretion." *Id.* at 1-2. In support of this indefinite adjudication hold and re-vetting initiative, the Memo asserts vague "national security or public safety" concerns. *Id.* at 2-3.

Then, on December 2, 2025, and January 1, 2026, USCIS issued two memoranda directing the indefinite hold of all USCIS benefit applications, including refugees' applications to adjust status, for all individuals from countries listed in two Presidential Proclamations barring entry of nationals from many countries.[4] This indefinite hold was later found to be contrary to law and arbitrary and capricious, and does not presently apply to refugee adjustment applications. *Dorcas Int'l Inst. of R.I. v. USCIS*, 834 F. Supp. 3d 242, 311 (D.R.I. 2026), *appeal filed,* No. 26-1703 (1st Cir. June 12, 2026).

**C. DHS begins arresting and detaining refugees.**

On December 18, 2025, ICE issued a one-sentence memorandum that purported to rescind the 2010 ICE Policy against detaining refugees who have not yet adjusted their status to lawful permanent resident. *See* Marcos Charles, *Rescission ICE Policy No. 11039.1: Detention of*

---

[4] *See* USCIS, PM-602-0192, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries* (Dec. 2, 2025), https://perma.cc/VG95-6Z2V (Dkt. 2, Ex. 20); USCIS, PM-602-0194, *Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries* (Jan. 1, 2026), https://perma.cc/FMR8-7M86 (Dkt. 2, Ex. 21).

*Refugees Admitted Under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status (May 10, 2010*) (Dec. 18, 2025) ("Refugee Rescission Memo") (Dkt. 2, Ex. 18).

Shortly afterward, on January 9, 2026, USCIS announced "Operation PARRIS" to "target[]" allegedly "fraudulent refugee applications in Minnesota" by "reexamining thousands of refugee cases through new background checks and intensive verification of refugee claims."[5] USCIS announced that "[t]he initial focus is on Minnesota's 5,600 refugees who have not yet been given lawful permanent resident status (Green Cards)," but left open the likelihood that the operation would later expand to refugees in other states.[6] In Operation PARRIS, USCIS arrested refugees in Minnesota, flew many of them to detention facilities in Texas, and subjected them to custodial "re-vetting" interviews that largely involved interrogating them about their original refugee resettlement applications. *U.H.A. v. Bondi*, 817 F. Supp. 3d 752, 760 (D. Minn. 2026) (describing interrogation of Minnesota refugee in a detention facility in Texas); *U.H.A. v. Bondi*, 822 F. Supp. 3d 1007, 1022 (D. Minn. 2026) (describing three-hour interview of Minnesota refugee, his spouse, and his four-year-old daughter while detained in a hotel in Texas). Even though these interviews were aimed at eliciting testimony that could potentially support termination of their refugee status, refugees were not given notice or any opportunity to prepare for the re-vetting interviews, let alone a NOIT and the 30 days' notice required by regulation. Declaration of Allegra Drobnick ¶¶ 5-6.

The 2010 ICE Policy having been rescinded, DHS began taking the position that § 1159 mandates indefinite detention of all unadjusted refugees after they have been in the United States for one year. *See, e.g.*, *Mohamednoor A. v. Bondi*, No. 26-CV-525, 2026 WL 221926, at *2 (D. Minn. Jan. 28, 2026). However, a district court in the District of Minnesota rejected that premise and preliminarily enjoined the government from arresting or detaining refugees in Minnesota based on their unadjusted status and ordered the immediate return and release of those detained

---

[5] USCIS, *DHS Launches Landmark USCIS Fraud Investigation in Minnesota* (Jan. 9, 2026), https://perma.cc/X2VN-DNDA (archived Feb. 25, 2026) (Dkt. 2, Ex. 22).

[6] *Id.*; *see also* 91 Fed. Reg. at 65,084 (admitting Operation PARRIS is part of a broader, continuing strategy to subject refugees to re-vetting).

under the policy. *U.H.A.*, 817 F. Supp. 3d at 765 (concluding "that federal statutes governing refugees and immigrant detention do not permit prolonged detention of unadjusted refugees who have not been charged with any ground of removability").

On February 18, 2026, despite the court order in Minnesota, the government doubled down on its new policy of detaining unadjusted refugees. Defendants Edlow and Lyons issued a memorandum titled "Detention of Refugees Who Have Failed to Adjust to Lawful Permanent Resident Status," trying to justify ICE's policy mandating potentially indefinite detention of all refugees who have not adjusted their status after one year. Dkt. 2, Ex. 19 at 1-2 ("Refugee Detention Memo"). ICE's detention policy, in combination with the November 2025 Memo's hold on all adjustment of status applications, have trapped unadjusted refugees in an impossible position—if they fail to adjust, they will be detained, but even if they apply to adjust, their applications go nowhere. On March 23, 2026, a court in this district stayed the mandatory detention policy under § 705 of the APA, finding it contrary to law. *See Jean A. v. Noem*, No. 3:26-cv-30031, 2026 WL 805207 (D. Mass. Mar. 23, 2026). Although Defendants' refugee detention policy is stayed while the litigation continues, Defendants continue to defend the policy.

## IV. DHS issues Refugee Status Termination IFR with no opportunity for comment.

Having been stymied in their attempts to detain and remove unadjusted refugees, Defendants are now pursuing a new tactic of terminating refugee status. After 45 years of following a 30-day notice rule, on October 14, 2026, DHS suddenly issued an immediately-effective interim final rule reducing the 30-day time frame to only 10 days, so that USCIS can "expedite termination of refugee status." 91 Fed. Reg. at 65,077; *see also id.* at 65,091 (revising 8 C.F.R. § 207.9). DHS tried to justify the IFR by saying that the reduced timeframe "aims to restore integrity to the immigration system, mitigate risks to national security and public safety, and prevent fraud and exploitation." *Id.* at 65,077. But the IFR does not explain why reducing the notice period will accomplish any of these objectives, or why the 30-day notice period in place for decades has impeded achievement of any of them.

While the IFR provided a 30-day comment period, it went into effect on the day it was published, before any input from the public was considered. *Id.* According to DHS, as many as 186,000 refugees could be subject to the IFR. *Id.* at 65,088.

**V. Plaintiffs seek a stay to prevent harms from the three challenged policies.**

Four individual refugees and six refugee-serving organizations filed suit on October 26, 2026. Compl. (Dkt. 1). Plaintiffs challenge the Re-vetting Policy and the Adjustment of Status Hold set forth in the November 2025 Memo; and the Refugee Status Termination IFR. Plaintiffs seek a preliminary stay of all three policies under § 705 of the APA to halt irreparable ongoing and imminent harms. And because at least one refugee has received a notice of intent to terminate refugee status with a 10-day response time, Plaintiffs request that this Court enter an immediate administrative stay of the IFR while the parties brief and the Court considers Plaintiffs' stay motion.

First, the Re-vetting Policy and Adjustment of Status Hold are stopping unadjusted refugees from obtaining the permanent resident status that would put them on a path to citizenship and allow them to access crucial nutritional and medical benefits. The financial impacts of delays in adjustment are devastating. In 2025, Congress passed H.R. 1, which strips humanitarian immigrants, including refugees, of eligibility for SNAP, Medicaid, the Children's Health Insurance Program ("CHIP"), and other benefits. Refugees could retain those benefits if they adjust to lawful permanent resident status. Krieger Decl. ¶¶ 8-9. But the Re-vetting Policy and the Adjustment of Status Hold prevent refugees like Individual Plaintiffs from doing so. Thus, as a result of the Re-vetting Policy and the Adjustment of Status Hold, disabled refugees like Julio C. and families like Abdi B.'s that rely on Medicaid are losing access to crucial medical care. Declaration of Julio C. ¶ 4; Declaration of Abdi B. ¶ 14. The Re-vetting Policy and Adjustment of Status Hold are also harming the other Plaintiffs: to address the needs of their refugee clients, organizational Plaintiffs HIAS, the International Institute of New England ("IINE") and Jewish Family Service of Western Massachusetts ("JFS-WMA") have expended significant staff hours and resources working to enroll their refugee clients in alternative state programs and connect them with food assistance,

often digging into private resources to adapt to federal benefit losses because refugees are waiting so long for adjustment; JFS-WMA also has lost funding for programs that in the past provided medical services directly to resettled refugees through Medicaid funding. Declaration of Jeffrey D. Thielman ¶ 21; Declaration of Rabbi James Greene ¶¶ 24-26; Declaration of Smita Rao Dazzo ¶ 22.

Moreover, without lawful permanent status, refugees are in a state of tremendous fear because of the government's policies targeting unadjusted refugees for indefinite detention. Declaration of Lida A. ¶¶ 9-10; Abdi B. Decl. ¶¶ 7-13; Julio C. Decl. ¶¶ 6-7; Declaration of Firas D. ¶¶ 11, 13-16; Declaration of Maria Chavez ¶¶ 18-19; Declaration of Diana Konaté ¶ 17; Thielman Decl. ¶ 26. So long as they are unadjusted, their only protection from indefinite detention is the § 705 stay issued by the district court in *Jean A. v. Noem*. With the threat of refugee re-vetting, Organizational Plaintiffs have responded by training staff to prepare their clients and to accompany them to high-stakes, in-depth re-interviews that can last hours for each family. Greene Decl. ¶ 17; Dazzo Decl. ¶ 19. Plaintiff JFS-WMA has had one family subject to a re-vetting interview, and preparing and supporting just one family required extensive work by multiple staff including the Executive Director. Greene Decl. ¶ 17.

The IFR threatens Plaintiffs with even more dramatic harms by shortening the time to respond to a NOIT from 30 days to just 10 days, a near-impossible time frame to mount a defense against the catastrophic loss of refugee status. This harm is not theoretical: at least one refugee has received a notice of intent to terminate since the IFR was issued. Drobnick Decl. ¶¶ 7-9. That notice was issued on October 15, 2026, and was delivered to the individual refugee on October 19, 2026. *Id.* Individual refugees who do not have counsel to help them respond to NOITs, who need time to obtain their immigration files through Freedom of Information Act requests, or who have language access needs and/or disabilities that impede their ability to respond quickly to NOITs, face the loss of lawful status, attendant employment authorization, and employment itself in a matter of days. Declaration of Tracy Roy Decl. ¶¶ 7, 9-10, 12; Dazzo Decl. ¶ 26; Greene Decl. ¶¶ 22, 24; Thielman Decl. ¶¶ 22-25, 28. Termination of status will result in refugees' placement in

removal proceedings, detention, and even deportation to the very countries they fled because of persecution and potential separation from family members in the United States. Declaration of John Slocum ¶¶ 13-14; Dazzo Decl. ¶¶ 26-28, 41-44; Greene Decl. ¶¶ 23-24; Thielman Decl. ¶¶ 25, 28; Konaté Decl. ¶ 15.

Individual Plaintiffs and refugees like them are terrified. Lida A. Decl. ¶¶ 9-10; Abdi B. Decl. ¶¶ 7-13; Julio C. Decl. ¶¶ 6-7; Firas D. Decl. ¶¶ 11, 13-16; Chavez Decl. ¶¶ 18-19; Konaté Decl. ¶ 17; Thielman Decl. ¶ 26. Organizational Plaintiffs were already scrambling to gather legal, interpreter, and advocacy resources to help their clients and other refugees respond to anticipated NOITs within thirty days, and that scramble has become all the more urgent and time-consuming now that refugees will have only 10 days to mount a high-stakes response to threatened loss of status and ability to work. Slocum Decl. ¶¶ 16-24, 28; Dazzo Decl. ¶¶ 19, 24, 26; Greene Decl. ¶¶ 17, 20. With the IFR taking effect immediately and an expected significant increase in volume of NOITs, Organizational Plaintiffs are redirecting resources typically used to help refugees maintain stability in order to address imminent and unprecedented emergencies for their clients. Slocum Decl. ¶¶ 19, 23-24.

**LEGAL STANDARD**

Section 705 of the APA authorizes courts "to postpone the effective date of an agency action" or "preserve status or rights" pending resolution of the proceedings when "necessary to prevent irreparable injury." 5 U.S.C. § 705. Such stays may be issued by courts *after* the effective date of challenged agency action. *E.g.*, *Doe v. Noem*, 784 F. Supp. 3d 437, 470 (D. Mass. 2025). Courts also have equitable authority to grant emergency or preliminary relief. Fed. R. Civ. P. 65. To obtain relief, the movant must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Together Emps. v. Mass. Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022).

The Court also should issue a temporary administrative stay of the IFR pending resolution of the motion to stay under § 705. A court may "issue[] a temporary administrative stay" to "buy[]

the court time to deliberate." *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring); *accord Nat'l Park Conservation Ass'n v. Dep't of the Interior*, 178 F.4th 805, 806 (1st Cir. 2026). "Administrative stays do not typically reflect the court's consideration of the merits" but rather are meant "to minimize harm while an appellate court deliberates." *Texas*, 144 S. Ct. at 798 (Barrett, J., concurring). Because an administrative stay precedes the decision of whether to grant a full § 705 stay, the traditional stay factors—likelihood of success on the merits, irreparable harm, and the balance of equities and public interest—may "influence the stopgap decision" but "do not control it." *Id.* at 799.

Rather, "the choice to issue an administrative stay" turns on the harms the parties may suffer while the court considers the motion for preliminary relief. The Court makes a "first-blush judgment about the relative consequences of staying the [challenged action] versus allowing it to go to into effect." *Id.* at 798; *accord Afr. Cmtys. Together v. Noem*, No. 26-CV-11201-ADB, 2026 WL 710666, at *1 (D. Mass. Mar. 13, 2026). Courts in the district have administratively stayed agency action when the potential harm to the plaintiffs and other affected people absent a stay outweighs any temporary harm a stay might cause the government. *See*, *e.g.*, *Venezuelan Ass'n of Mass. v. USCIS*, 839 F. Supp. 3d 86, 87 (D. Mass. 2026) (staying agency actions pending decision on § 705 motion where immediate termination of work authorization, rejection of asylum applications, and initiation of removal proceedings was at stake); *Afr. Cmtys. Together*, 2026 WL 710666, at *1 (staying termination of Somalia's TPS status to allow time for the court to consider motion for stay under § 705); *see also Afr. Communities Together v. Noem*, 820 F. Supp. 3d 48, 59 (D. Mass. 2026) (noting that administrative stay was "'not a reflection of the merits' but rather was issued solely to 'allow the [C]ourt time to consider the merits' of Plaintiffs' § 705 motion"). The Court should do the same here and issue an administrative stay of the IFR.

## ARGUMENT

### I. Plaintiffs are likely to succeed on the merits of their claims challenging the IFR.

Plaintiffs are likely to succeed on their APA claims against the IFR. The IFR was promulgated without notice and comment and Defendants failed to establish that the good cause or foreign affairs exceptions apply. Defendants also failed to demonstrate good cause to make the rule immediately effective upon issuance rather than waiting the normal 30 days.

#### A. Defendants promulgated the IFR without following APA procedures.

##### 1. Defendants failed to follow notice-and-comment procedures.

Unless an exception applies, the APA generally requires rules to be promulgated through notice-and-comment rulemaking. 5 U.S.C. § 553. Those requirements are not mere formalities. Notice and comment is meant "(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005); *New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980) ("It is now a commonplace that notice-and-comment rule-making is a primary method of assuring that an agency's decisions will be informed and responsive."). "Failure to abide by these requirements renders a rule procedurally invalid." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018).

DHS bypassed these procedures entirely. It invoked two exceptions to notice-and-comment as reasons for doing so: good cause and foreign affairs exceptions. 91 Fed. Reg. at 65,086-88; 5 U.S.C. § 553(a)(1), (b)(B). As detailed below, neither exception applies to the IFR. It is therefore procedurally defective.

###### a. Defendants did not have good cause to skip notice and comment.

The good cause exception applies only "when the agency for good cause finds ... that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). The agency must provide a "brief statement of reasons." *Id.* The exception "is

narrowly construed," and generally "should be limited to emergency situations." *Levesque v. Block*, 723 F.2d 175, 184 (1st Cir. 1983) (internal citation omitted); *Am. Fed. of Govt. Emps., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981) ("*AFGE*"); *see also Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754-55 (D.C. Cir. 2001). Courts owe no deference to an agency's legal conclusion that good cause exists; courts review those conclusions de novo. *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 706 (D.C. Cir. 2014).

DHS has not established good cause. DHS did not claim that notice and comment is "unnecessary"; the agency relied solely on the "impracticable" and "contrary to the public interest" prongs. 91 Fed. Reg. at 65,086-87. "'Impracticable' means a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings." *Kollett v. Harris*, 619 F.2d 134, 145 (1st Cir. 1980) (quoting *Nat'l Nutritional Foods Ass'n v. Kennedy*, 572 F.2d 377, 385 (2d Cir. 1978)). It is usually limited to "'emergencies' where 'delay would do real harm to life, property, or public safety.'" *California v. Mullin*, 833 F. Supp. 3d 50, 78 (D. Mass. 2026) (quoting *California v. Azar*, 911 F.3d 558, 576 (9th Cir. 2018)). "It should not be used, however, to circumvent the notice and comment requirements whenever an agency finds it inconvenient to follow them." *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 (5th Cir. 1979). Similarly, the public interest prong "is met only in the rare circumstance when ordinary procedures—generally presumed to serve the public interest—would in fact harm that interest." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012).

DHS has not established that it would be "unavoidably prevented" from executing its functions if it was required to undergo notice and comment before issuing a final rule. For example, DHS expressed a desire to remove individuals quickly and cited examples of an individual who should have been subject to the persecutor bar and an individual who had misrepresented facts about his participation in the Oromo Liberation Front in Ethiopia. 91 Fed. Reg. at 65,078. But DHS does not need to terminate refugee status to remove individuals who misrepresented material facts about themselves to gain admission to the United States in the first place. 8 U.S.C. § 1227(a)(1)(A) (classes of deportable individuals include those who were inadmissible at time of

entry); *id.* § 1182(a)(6)(C)(i) (an individual who procures admission "by fraud or willfully misrepresenting a material fact" is inadmissible). The desire to remove individual bad actors expeditiously thus does not supply good cause for promulgating to shorten the termination notice period for all refugees without notice and comment. Indeed, DHS itself recognizes in the IFR that it can initiate removal proceedings against noncitizens without first terminating their refugee status. 91 Fed. Reg. at 65,081 & n.27. And USCIS has been issuing NOITs with 30-day response times since the implementation of Operation PARRIS in January, 2026. *See* Roy Decl. ¶ 11. If the 30-day notices were truly interfering with DHS's operations, one would reasonably have expected USCIS to undertake this rulemaking earlier. But it did not, casting doubt that there is any urgent need to bypass notice and comment.

DHS also claimed that engaging in notice-and-comment rulemaking would "impede DHS's duties" under E.O. 14,161 and 14,163. 91 Fed. Reg. at 65,087. But the duties DHS cited concern entry and admission of refugees, not termination of status for refugees already settled in the United States. *See* E.O. 14,161, § 3(b), 90 Fed. Reg. 8,451 (Jan. 30, 2025); E.O. 14,163, § 3(c), 90 Fed. Reg. 8,459 (Jan. 30, 2025). Nor do the E.O.s direct DHS to skip notice and comment. Indeed, both E.O.s direct that "[t]his order shall be implemented consistent with applicable law." E.O. 14,161, § 4(b); E.O. 14,163, § 7(b).

**b. The foreign affairs exception does not apply.**

The foreign affairs exception to the APA's procedural requirements applies only where a rulemaking involves a "foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). Although the First Circuit has not interpreted this exception, other courts have held that it applies only where (1) the rulemaking "clearly and directly involve[s] activities or actions characteristic to the conduct of international relations," *CAIR v. Trump*, 471 F. Supp. 3d 25, 53 (D.D.C. 2020); *see City of New York v. Permanent Mission of India to U.N.*, 618 F.3d 172, 202 (2d Cir. 2010) (rules that involve "quintessential foreign affairs functions such as diplomatic relations and the regulation of foreign missions") or (2) following APA procedures would "provoke definitely undesirable international consequences," *Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008)

(cleaned up). No matter what test applies, the foreign affairs exception is narrow. *CAIR*, 471 F. Supp. 3d at 54 (noting the D.C. Circuit has only applied it when "a rule implements an international agreement" and the Second Circuit where a rule "regulate[s] foreign diplomats in the United States").

The exception does not apply here because the IFR involves implementation of a domestic statute—8 U.S.C. § 1157—through domestic means, and regulates only individuals within the United States. It does not involve activities or actions characteristic of foreign relations at all, much less clearly and directly. No foreign government is involved, either directly or indirectly; no actions on foreign territory are involved; and no implementation of a negotiated treaty is involved. *See, e.g.*, *Amica Ctr. for Immigrant Rts. v. Exec. Off. for Immigr. Rev.*, 822 F. Supp. 3d 119, 164 (D.D.C. 2026) (rejecting foreign affairs argument in similar context because "the [challenged] rules apply exclusively to proceedings: (1) taking place in the United States, (2) relating to individuals who are present here, and (3) applying U.S. law").

The IFR never argues otherwise. *See* 91 Fed. Reg. at 65,087-88. The IFR conclusorily asserts that the IFR "is connected to an alien's status as a refugee admitted into the United States, which directly stems from the conduct of international relations of the United States," and therefore "it constitutes a foreign affairs function." *Id.* But that can be said about any action involving immigration. *See, e.g.*, *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) ("The foreign affairs exception would become distended if applied to [immigration] actions generally, even though immigration matters typically implicate foreign affairs."); *Permanent Mission*, 618 F.3d at 202 ("While immigration matters typically implicate foreign affairs at least to some extent … it would be problematic if incidental foreign affairs effects eliminated public participation in this entire area of administrative law." (cleaned up)). "It is difficult to conceive of any immigration regulation—or, indeed, any regulation relating to a host of other fields, from aviation to the environment—that would not support a similar justification for avoiding the notice-and-comment requirement." *Amica*, 822 F. Supp. 3d at 164–65.

The IFR also contends that refugee admissions require consideration of "conditions within [other] specific countries," "'the extent to which other countries will admit and assist' in resettlement," and "'the impact of the participation of the United States in the resettlement of such refugees on the foreign policy interests of the United States,'" and thus require "diplomatic relationships with countries[,] . . ongoing assessments of foreign governments' conduct, stability, and human rights practices," and "a multinational response," all of which impact the United States' " ongoing diplomatic relations and negotiations." 91 Fed. Reg. at 65,088. But the IFR does not identify any specific diplomatic or multinational negotiation the IFR is meant to facilitate and support, and even if it did, "downstream effects on foreign affairs or negotiations with other countries—either positive or negative—do not bring the Rule under this exception." *CAIR*, 471 F. Supp. 3d at 57; *see E.B. v. U.S. Dep't of State*, 583 F. Supp. 3d 58, 67 (D.D.C. 2022); *see Maria L. v. Mullin*, No. CV 25-13471, 2026 WL 2983111, at *7 (D. Mass. Sept. 30, 2026) (rejecting similar argument because "[t]hese tasks, however, only indirectly implicate international relations").

The IFR next asserts that "changing the 30-day response period to NOITs to 10 days in refugee termination cases allows DHS to expeditiously terminate cases where applicable, and process aliens for removal as soon as possible," such that "this rulemaking is also related to the control of the entry and exit of aliens across the borders of the United States and falls within the Secretary's foreign affairs determination." 91 Fed. Reg. at 65,088. But even if the IFR could be construed as involving removal proceedings—which it does not—rules impacting removal proceedings, which occur domestically and which involve individuals inside the country, do not involve the conduct of international affairs. *See, e.g.*, *Narenji v. Civiletti*, 481 F. Supp. 1132, 1137 (D.D.C. 1979), *rev'd on other grounds*, 617 F.2d 745 (D.C. Cir. 1979) ("the executive [may not] invoke the foreign affairs exemption to control a matter that essentially involves naturalization and deportation"); *Hou Ching Chow v. Att'y Gen.*, 362 F. Supp. 1288, 1290–91 (D.D.C. 1973) ("deportation proceedings do not come within the foreign affairs exemption."). Regardless, terminating refugee status is not a pre-requisite to initiating removal proceedings as the IFR itself

recognizes, 91 Fed. Reg. at 65,081 & n.27, so the purported need to process noncitizens "for removal as soon as possible" does not support dispensing with notice and comment. *Id.* at 65,088.

Finally the IFR contends that the foreign affairs exception is satisfied because the Secretary of State has declared that "all efforts, conducted by any agency of the federal government, to control the status, entry, and exit of people and the transfer of goods, services, data, technology, and any other items across the borders of the United States, constitutes a foreign affairs function of the United States under the Administrative Procedure Act, 5 U.S.C. 553, 554," *see* 91 Fed. Reg. at 65,087 (quoting *Determination: Foreign Affairs Functions of the United States*, 90 Fed. Reg. 12,200 (Mar. 14, 2025)), and that the IFR falls under this declaration. *Id.* at 65,088. Neither Secretary Rubio nor Defendants, however, are entitled to any deference in construing the "foreign affairs" exception. *See, e.g.*, *CAIR*, 471 F. Supp. 3d at 57 (rejecting identical argument). "[A]n agency has no interpretive authority over the APA. [A court] cannot find that an exception applies simply because the agency says we should." *Sorenson*, 755 F.3d at 706; *see also Envirocare of Utah, Inc. v. NRC*, 194 F.3d 72, 79 n.7 (D.C. Cir. 1999) (noting that "when it comes to statutes administered by several different agencies—statutes, that is, like the APA ...—courts do not defer to any one agency's particular interpretation"); *see generally Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). And even on its own terms, the argument fails. *See Doe 1 v. DHS*, No. 8:26-cv-0006, 2026 WL 2678275, at *7 (C.D. Cal. Sept. 11, 2026) (rejecting argument that an immigration rule involving "employment eligibility within the United States" involved "control of an alien's status, and affects the transfer of goods").

The IFR also does not satisfy the "undesirable circumstances" test, if it applies at all. To start, Defendants do not invoke the test in the IFR, and so cannot invoke it for the first time in litigation. *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 311 (D. Mass. 2025) (collecting cases) ("It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." (cleaned up)). But even if they could, the test is constitutionally suspect; unlike the "activities or actions" test employed in the D.C. Circuit, the alternative "definitely undesirable international consequences" test is "unmoored from

the legislative text." *CAIR*, 471 F. Supp. 3d at 53. It is instead "lifted" from a piece of legislative history. *Id*. That distinction matters, because the undesirable-consequences test would permit invocation of the foreign affairs exception in rare cases in which a rule does not involve a foreign affairs function. Rather, it would permit agencies to use the exception whenever the downstream effects of a rule went beyond some unknown level of significance. That result cannot be squared with Congress's focus on a "foreign affairs function" rather than foreign affairs consequences. 5 U.S.C. § 553(a)(1). And given that legislative history cannot override clear bounds in statutory text, *see, e.g.*, *Azar v. Allina Health Servs*., 587 U.S. 566, 579–80 (2019), this Court should only apply the "activities and actions" test.

In any event, the undesirable-consequences test also precludes Defendants' reliance on the foreign affairs exception. To satisfy that test, the consequences must "flow[] from the application of notice and comment review." *Rajah*, 544 F.3d at 437. Defendants must thus show "definitely undesirable international consequences" would occur if they had announced a proposed rule and then engaged in notice and comment rather than issuing an IFR. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 776 (9th Cir. 2018). In the context of a rule shortening the period of time a refugee has to contest termination of their status, the notion that announcing a proposed rule and soliciting comments would somehow affect international relations is deeply implausible. Indeed, nothing in the IFR identifies let alone discusses any such thing. Absent such an explanation—and evidence to support it—the foreign affairs exception cannot apply. *See, e.g.*, *id.* (evidence needed where "the connection between" foreign-policy consequences "and the immediate implementation of the Rule is not apparent"); *California*, 833 F. Supp. 3d at 78 ("Defendants have not offered any evidence of the undesirable international consequences that would have flowed from complying with the APA's procedural requirements.").

**2. Defendants lacked good cause to make the IFR immediately effective.**

The Administrative Procedure Act also "requires that a rule be published not less than thirty days before its effective date." *AFGE*, 655 F.2d at 1155; 5 U.S.C. § 553(d). Like the notice-and-comment requirement, this requirement "serve[s] the laudable purpose of informing affected

parties and affording them a reasonable time to adjust to the new regulation." *AFGE*, 655 F.2d at 1156. An agency can make a rule effective fewer than 30 days after publication for "good cause found and published with the rule," 5 U.S.C. § 553(d)(3), but this good cause exception, like the § 553(b) exception, is also "narrowly construed and only reluctantly countenanced" and is reserved for emergency situations. *AFGE*, 655 F.2d at 1156 (cleaned up). "Congress intended to impose upon an administrative agency the burden of showing a public necessity for an early effective date and that an agency cannot arbitrarily find good cause." *United States v. Gavrilovic*, 551 F.2d 1099, 1105 (8th Cir. 1977) (relying on legislative history to explain that "[l]egitimate grounds were defined as an urgency of conditions coupled with demonstrated and unavoidable limitations of time, and that the primary consideration was to be the convenience or necessity of the people affected" (cleaned up)).

As with the good cause determination under § 553(b), *supra* Argument § I.A.1.a., the IFR fails to explain what urgency of conditions or limitations of time require an immediate effective date. *See, e.g.*, *Env't Def. Fund v. EPA*, 515 F. Supp. 3d 1135, 1151 (D. Mont. 2021) (agency failed to demonstrate 30-day notice period would "cause real harm to life, property, or public safety").

The IFR also failed to demonstrate that a 30-day effective date was "unnecessary" because affected parties would not need time to adjust their behavior. 91 Fed. Reg. at 65,087. Had there been a 30-day effective date, Plaintiffs could have better prepared to respond to NOITs on a shortened timeframe. For example, RCUSA would have more time to coordinate with its networks and member organizations and recruit immigration attorneys with relevant experience. Slocum Decl. ¶¶ 24, 28. Because of the immediate implementation of the IFR HIAS' Pro Bono team also is developing a project to engage attorneys in providing legal counsel for refugees, which is diverting its capacity away from existing projects. Dazzo Decl. ¶ 24.

**B. The IFR is arbitrary and capricious.**

An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,

or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). Also, an agency must provide a "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009); *accord DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (agency action arbitrary and capricious if, "[w]hen an agency changes course," it fails to consider "that longstanding policies may have engendered serious reliance interests" (cleaned up)); *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 33 (1st Cir. 2026) (consideration of reliance interests is "a critical factor in the analysis of an arbitrary-and-capricious claim"). Although an agency need not "consider all policy alternatives in reaching [its] decision," where the agency is "not writing on a blank slate, ... it [is] required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33 (cleaned up).

The IFR is arbitrary and capricious because the agency failed to consider important aspects of the problem. It is clear from the preamble that the purpose of the IFR is to strip individuals whom DHS once determined *were* admissible but now DHS thinks were *not* admissible of refugee status as soon as possible. 91 Fed. Reg. at 65,086-87. But this puts the cart before the horse: the very purpose of providing a written NOIT and an opportunity to be heard is to give an individual a fair chance to make her case *before* DHS makes any final termination decision. *See A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025) ("Procedural due process rules are meant to protect" against "the mistaken or unjustified deprivation of life, liberty, or property"). DHS fails to address the reality that a 10-day window substantively compromises an individual's ability to defend against a NOIT. Individuals responding to a NOIT are typically low income with limited English proficiency and are likely to need assistance to even read the NOIT. Then they must scramble to find legal counsel, arrange for interpreters (including for less-common languages within the United States, such as Dari and Oromo, gather documents, and prepare written or oral responses—all at their own cost.

Dazzo Decl. ¶ 26; Greene Decl. ¶ 17; Roy Decl. ¶¶ 8-15; Thielman Decl. ¶ 22. Since USCIS does not produce the evidence they are relying on in issuing a NOIT to the refugee, preparing responses may also involve filing a FOIA request for the refugee's documents. Dazzo Decl. ¶ 24; Thielman Decl. ¶ 24; Roy Decl. ¶ 11. In 2025, the median time USCIS took to process even a simple FOIA request was 27 days.[7] Contrary to DHS's blithe assumption that refugees will still be able to respond to a NOIT, *see* 91 Fed. Reg. at 65,088, many refugees likely will not be able to respond or will not be able to assemble fulsome evidence within the 10-day window—falling into the IFR's forfeiture trap.[8] *See id.* at 65,085; Dazzo Decl. ¶ 26; Roy Decl. ¶¶ 10-14.

DHS also fails to adequately address reliance interests. Organizations that serve refugees relied on having a 30-day window. A 30-day window, for instance, allows more refugees to be matched with volunteer pro bono counsel. With only a 10-day window, organizations must scramble to identify impacted clients, conduct outreach, gather supporting documentation, perform legal research and prepare a written response to the agency's stated grounds for termination, draft client declarations, and coordinate with pro bono legal counsel. Roy Decl. ¶¶ 10-14; Greene Decl. ¶¶ 17, 22; Thielman Decl. ¶¶ 22-24; Dazzo Decl. ¶¶ 24-26, 29.

## II. Plaintiffs are likely to succeed on the merits of their claims against the Re-vetting Policy and Adjustment of Status Hold.

Plaintiffs are also likely to succeed on the merits of their claims against the Re-vetting Policy and Adjustment of Status Hold, both of which are in the November 2025 Memo. Both

---

[7] *See* DHS, 2025 FOIA Annual Report 19 (Mar. 2026), https://perma.cc/JN4T-FQT6 (Dkt. 2, Ex. 25). In 2025, USCIS granted only 11 requests for expedited processing and denied 48,131 such requests. *Id.* at 23.

[8] The preamble to the IFR states that "[a]n alien does not need to submit evidence or a full response within the 10 days, and may instead opt for an interview, but must make the interview request to USCIS within the response period," *see* 91 Fed. Reg. at 65,085, but this language is not reflected in the text of the regulation itself, which states only that "[t]he alien will have 10 days from the date notice is served upon him or her in accordance with 8 CFR 103.8 to present written or oral evidence to show why the alien's refugee status should not be terminated." *Id.* (amending 8 C.F.R. § 207.9).

policies are contrary to law. Both policies should have gone through notice and comment, but did not. And both are arbitrary and capricious.

**A. The Re-Vetting Policy and Adjustment of Status Hold are contrary to law.**

Both the indefinite adjudication freeze and re-vetting portions of the November 2025 Memo exceed the agency's authority under 8 U.S.C. §§ 1157 and 1159. As to the Adjustment of Status Hold, the statute and implementing regulation direct that Defendants "shall" issue a green card unless the refugee's status has been terminated by a process established by regulation. 8 U.S.C. § 1159(a)(2); *see* 8 C.F.R. § 209.1(e) ("If the applicant is found to be admissible for permanent residence [8 U.S.C. § 1159], USCIS *will approve the application*...." (emphasis added)). Section 1159(a)(2)'s use of the phrase "shall" "generally imposes a nondiscretionary duty" on the actor to whom it is directed, *see SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 362 (2018), and it "creates a mandate, not a liberty," *Murphy v. Smith*, 583 U.S. 220, 223 (2018). Against this clear directive to issue green cards to refugees, Defendants identify not a single source of statutory authority authorizing a blanket, indefinite hold on adjudications. "[H]ad Congress intended to give USCIS [the] sweeping authority" to indefinitely freeze all adjudications, "it surely would have said so." *See Dorcas*, 834 F. Supp. 3d at 311 (finding USCIS lacked authority to pause benefit adjudications, including adjustment applications arising under 8 U.S.C. § 1255, where relevant statutory provisions did not expressly authorize such a pause (cleaned up)); *Doe v. Trump*, No. 1:25-cv-13946, 2026 WL 1170971, at *15 (D. Mass. Apr. 30, 2026) (similar).[9] Indeed, the

[9] Notably, these cases involve a *discretionary* authority. 8 U.S.C. § 1255(a) (providing that a noncitizen's status "may be adjusted by the [DHS Secretary], in his discretion and under such regulations as he may prescribe"). Even in that context, courts have found that the "governing statutory and regulatory language, as well as relevant congressional intent, demonstrate 'implicit requirement[s] that ... applications be decided.'" *Dorcas*, 834 F. Supp. 3d at 310 (alterations in original) (quoting *Doe*, 2026 WL 1170971, at *15). But unlike § 1255, § 1159 and its implementing regulation are written in *mandatory* terms. Put differently, unlike § 1255 adjustments, USCIS has no discretion to deny a refugee's adjustment application if they are otherwise admissible—it *must* grant the application. 8 U.S.C. § 1159(a)(2); 8 C.F.R. § 209.1(e). If Defendants cannot freeze the adjudication of discretionary applications, they certainly cannot do so for mandatory applications.

agency's own regulations do not authorize blanket adjudication holds, but instead carefully circumscribe when an individual benefit application may be held pending an investigation. *See* 8 C.F.R. § 103.2(b)(18)).

As to re-vetting, the November 2025 Memo directs that USCIS will "review" the case of and "re-interview any refugee admitted to the United States from January 20, 2021, to February 20, 2025," "to determine that they met the refugee definition as defined in" 8 U.S.C. § 1101(a)(42) "and to explore ... any inadmissibilities that may have existed prior to the time of admission as a refugee." Nov. 2025 Memo at 1-2. But nothing in § 1157 or § 1159 purports to authorize a blanket re-vetting of all refugees previously lawfully admitted. Section 1159(a)(1) by its own terms "contemplates that a refugee be returned, temporarily, to the control of DHS because they have the responsibility to inspect and examine the refugee for admission" as *a lawful permanent resident*. *U.H.A.*, 817 F. Supp. 3d at 766. Nothing in that provision authorizes that inspection process to transform into a categorical, indefinite "re-vetting" scheme concerning the applicant's prior admissibility as a refugee—indeed determining a refugee's admissibility at the time of their admission is governed by § 1157. And USCIS's own regulations implementing § 1159 expressly provide that "USCIS will determine, *on a case-by-case basis, whether an interview by an immigration officer is necessary* to determine the applicant's *admissibility for permanent resident status under this part*." 8 C.F.R. § 209.1(d) (emphasis added).

Nor does § 1157 authorize the re-vetting. That provision grants authority to DHS to promulgate procedures to terminate refugee status, but only under "such *regulations* as [DHS] may prescribe." 8 U.S.C. §§ 1157(c), 1159(a)(1)) (emphasis added). "[I]t is undisputed that the [Re-vetting Policy] was not established 'by regulation'—i.e., through notice-and-comment rulemaking." *Refugee & Immigrant Ctr. for Educ. & Legal Servs. (RAICES) v. Mullin*, 174 F.4th 81, 110 (D.C. Cir. 2026) (finding asylum policies issued as guidance exceeded government's authority providing that it "may by regulation establish additional limitations and conditions . . . under which an alien shall be ineligible for asylum"); *see Dorcas*, 834 F. Supp. 3d at 280 (finding policies purporting to implement § 1255(a) unlawful because "none of the Challenged Policies

were promulgated as regulations by USCIS"); *see also Doe*, 2026 WL 1170971, at *9 (finding challenged policies purporting to implement § 1255(a) "were not issued as regulations promulgated by USCIS").

To the extent an administrative agency might have some inherent authority to revisit prior decisions—an issue the First Circuit has not reached—"any inherent reconsideration authority does not apply in cases where Congress has spoken." *Ivy Sports Med. v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.); *accord Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1019 (9th Cir. 2025) (agency may not revisit past decisions on some other ground "where Congress has spoken as to the proper procedure for reversing a decision"), *vacated on other grounds*, *Mullin v. Nat'l TPS All.*, No. 26-48, 2026 WL 2976626, at *1 (U.S. Oct. 5, 2026). Such is the case here. Congress has made clear that the sole mechanism for so-called "re-vetting" is through the termination of refugee status after admission under regulations authorized by § 1157(c)(4); *see also* 8 U.S.C. § 1159(a)(1). But the Memo does not purport to implement a refugee status "termination" process under that authority. Instead, it directs the sweeping re-investigation of all refugees admitted from January 20, 2021 to February 20, 2025, well beyond what even the IFR's new termination provisions permit. *See* 91 Fed. Reg. at 65,091 (amending 8 C.F.R. § 207.9). Had Congress wished to authorize such sweeping authority, it would have done so explicitly.

Finally, the Memo is contrary to controlling agency regulations, and therefore is unlawful under the *Accardi* doctrine as articulated in *U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). "An agency has an obligation to abide by its own regulations." *Rotinsulu v. Mukasey*, 515 F.3d 68, 72 (1st Cir. 2008). Here, the Memo conflicts with at least three binding regulations, including: (1) 8 C.F.R. § 209.1(e), which mandates issuance of green cards to refugees unless they are found inadmissible at their inspection under § 1159(a)(1) and 8 C.F.R. § 207.9; (2) 8 C.F.R. § 209.1(d), which explicitly provides for only "case-by-case" determinations—not blanket ones—on whether interviews are needed, and even then only to assess eligibility for adjustment of status, not to re-vet for termination of refugee status; and (3) 8 C.F.R. § 103.2(b)(18), "which authorizes withholding of adjudication for individual benefit requests at specified intervals pending an

ongoing investigation," but does not "confer authority to adopt a generally applicable policy withholding adjudication." *Doe*, 2026 WL 1170971, at *15 (citing 8 C.F.R. § 103.2(b)(18)); *see also Dong v. Chertoff*, 513 F. Supp. 2d 1158, 1168 (N.D. Cal. 2007) ("8 C.F.R. § 103.2(b)(18) is not a blanket authority to indefinitely withhold adjudication of an application."). None of these regulations mentions, much less authorizes, blanket adjudication freezes or re-vetting of refugees seeking to adjust status.

Accordingly, the November 2025 Memo exceeds Defendants' authority under the INA and the Court should stay it under § 705.

### B. The Re-vetting Policy and Adjustment of Status Hold were unlawfully promulgated without notice and comment.

The November 2025 Memo sets forth legislative rules and therefore needed to go through notice and comment. A legislative rule "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *N.H. Hosp. Ass'n*, 887 F.3d at 70 (quoting *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992)). Both the re-vetting and adjustment hold aspects of the Memo are legislative rules because they assign duties and imposes obligations on refugees and USCIS employees not already outlined in the law. First, as described *supra* at 23, the Memo replaces § 1159 and its implementing regulations' system of case-by-case interviews and mandatory grants of adjustment absent a finding of inadmissibility with a categorical and indefinite ban on the processing of all adjustment applications from refugees. The Memo creates a "a binding norm" cabining USCIS employees' discretion going forward. *Doe v. Noem*, 817 F. Supp. 3d 27, 51 (D. Mass 2026) (cleaned up). And it "is 'inconsistent with another rule having the force of law,'" namely the regulations governing interviews and the granting of adjustment applications for refugees. *N.H. Hosp. Ass'n*, 887 F.3d at 73 (citation omitted).

Second, for similar reasons, the Memo's re-vetting scheme is a legislative rule. It directs USCIS personnel to review and reinterview every refugee admitted to the United States between January 20, 2021, and February 21, 2025, and eliminates any discretion USCIS officers retain

under controlling regulations to determine whether an interview is necessary. *Compare* Nov. 2025 Memo at 1-3, *with* 8 C.F.R. § 209.1(d). The re-vetting scheme likewise conflicts with controlling regulations, including the regulation governing whether an interview is required, *see id.*, and the regulation dictating when USCIS may hold adjudication of an individual benefit request. *See* 8 C.F.R. § 103.2(b)(18). This "inconsisten[cy]" with other rules "having the force of law" indicates that the memorandum is a legislative rule requiring notice and comment. *N.H. Hosp. Ass'n*, 887 F.3d at 73 (citation omitted).

**C. The Re-vetting Policy and Adjustment of Status Hold are arbitrary and capricious.**

The policies set forth in the November 2025 Memo are arbitrary and capricious in numerous ways. *First*, the Memo failed to provide a reasoned explanation for enacting the policies. *See FCC*, 556 U.S. at 515. The Memo's cursory invocations of national security and public safety fall far short of the reasoned explanation the APA demands. The Memo does not explain what evidence the agency considered and how it reached the conclusion that national security and public safety were implicated; nor does it explain how mass re-vetting and mass blocking of refugees' green card applications will further national security or public safety. USCIS offered nothing more than vague, unsubstantiated warnings that the policies are necessary to protect public safety, but those "conclusory statements will not do; an agency's statement must be one of *reasoning*." *NIH*, 770 F. Supp. 3d at 305 (cleaned up). At most, the Memo articulates USCIS's inchoate aspiration—to promote public safety and national security—but a statement of an agency's "goals cannot substitute for the reasoned basis required under the APA." *Ass'n of Am. Univs. v. Dep't of Def.*, 792 F. Supp. 3d 143, 171 (D. Mass. 2025); *accord Ass'n of Am. Univs. v. Dep't of Energy*, 789 F. Supp. 3d 118, 140 (D. Mass. 2025).

*Second*, the Memo justifies the freeze on adjustment of status applications based on the need to ensure the refugee was admissible at the time of admission. But ensuring admissibility is part of the adjustment of status process itself, so it makes little sense to hold adjudication for that purpose. *State Farm*, 463 U.S. at 43 (agency action is arbitrary capricious if the explanation "is so

implausible that it could not be ascribed to a difference in view or the product of agency expertise").

*Third*, the Memo claims that USRAP and USCIS "*potentially* prioritized expediency, quantity, and admissions over quality interviews and detailed screening and vetting," Nov. 2025 Memo at 2 (emphasis added), but USCIS provided no evidence to support this oddly tentative claim. USCIS cannot rely on speculation to justify dramatic changes in policy, particularly given the extensive vetting refugees go through. *See* 8 U.S.C. § 1152 *et seq*.; *State Farm*, 463 U.S. at 43 (agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made" (cleaned up)); *Doe*, 817 F. Supp. 3d at 49 (USCIS suggestion that minimal vetting justified agency action ignored "extensive vetting" required by programs at issue).

*Fourth*, USCIS failed to consider important aspects of the problem: the harm the Memo would inflict on refugees and the disruption of refugees' reliance interests. *See Regents*, 591 U.S. at 30. The refugees targeted by the Memo fled persecution in their home countries, went through extensive vetting, and came to the United States expecting to stay permanently and to have a pathway to lawful permanent residence and citizenship after one year. *See supra* at 2-3. At this point, they have lived in the United States for up to five years and have put down roots. They have jobs, homes, and families here and cannot go back to the countries from which they fled. Julio C. Decl. ¶¶ 4-5; Abdi B. Decl. ¶ 3; Firas D. Decl. ¶¶ 8, 12, 16; Lida A. Decl. ¶¶ 4-5. Before now, while the United States has occasionally investigated whether a particular individual had not met the definition of refugee at the time of admission, where there was individual and particularized reason to do so, the United States has never deemed hundreds of thousands refugees suspicious and conducted mass re-vetting just because they were admitted during a previous presidential administration. The United States also has never blocked refugees en masse from obtaining lawful permanent residence. Thus, refugees "reasonably expected that the government would tell them whether their benefits requests have been granted or denied, which would, in turn, allow them to make professional and personal life plans." *Doe*, 2026 WL 1170971, at *18. In the Memo, "[t]here

is no indication that USCIS meaningfully considered the consequences of throwing thousands of benefit applicants into indefinite limbo and perpetual uncertainty about whether they will . . . obtain a green card." *Id.* Thus, it is arbitrary and capricious. *Id.*; *see also Doe*, 817 F. Supp. 3d at 47 (finding policy arbitrary and capricious where DHS failed to consider the targeted group's expectation that they were making a permanent move to the United States and the infeasibility of returning to their home countries).

*Fifth*, USCIS failed to consider alternative policies that would have mitigated harms, such as using its already-existing tools. Where there are specific, individualized reasons to believe particular individuals did not actually meet the definition of "refugee" when they were admitted, USCIS can refer the individual for potential status termination. Adjustment applications for those particular individuals can be put on hold in 6-month increments, pending an investigation, on a case-by-case basis. 8 C.F.R. § 103.2(b)(18) ("USCIS may authorize withholding adjudication of a visa petition or other application if USCIS determines that an investigation has been undertaken involving a matter relating to eligibility ... , where applicable, in connection with the benefit request, and that the disclosure of information to the applicant or petitioner in connection with the adjudication of the benefit request would prejudice the ongoing investigation."). The Memo creates a blanket, indefinite hold preventing even those who are not under investigation from obtaining green cards, without considering the historic case-by-case approach as an alternative.

*Sixth*, the Memo relied on factors that Congress did not intend USCIS to consider. *See State Farm*, 463 U.S. at 43. The Memo states that "USCIS' top priority is to ensure that all principal refugees ... warranted a favorable exercise of discretion and met the definition of a refugee ... at the time of admission." Nov. 2025 Memo at 2. Under the INA, when a refugee is first admitted to the United States, DHS has discretion to refuse to admit her even if she otherwise meets the statutory definition of refugee and other admissibility criteria. *See* 8 U.S.C. § 1159(c)(1). However, DHS does not have that discretion when it comes to adjusting a refugee's status to that of a lawful permanent resident. As discussed above, § 1159(a)(2) is written in mandatory terms. *See supra* at 2-3. Nor can DHS terminate refugee status simply because DHS changes its mind about favorably

exercising its discretion to admit a refugee. The only reason for termination Congress contemplated in the INA is if the refugee did not in fact meet the definition at the time of admission. 8 U.S.C. § 1159(c)(4).

Also, whether a refugee "can fully and appropriately assimilate into the United States" is not a criterion for admission as a refugee or for a refugee's adjustment to lawful permanent resident status. *Compare* Dkt. 1-4 at 2, *with* 8 U.S.C. §§ 1101(a)(42), 1159, 1182. Moreover, in the context of the government's actions—shutting down admissions of refugees, who previously largely came from Africa, Asia, and Latin America; targeting Somali refugees in Minnesota; and only admitting non-Black refugees from South Africa, *see* Dkt. 1 ¶¶ 6, 53-57—claiming that only refugees who can assimilate should be admitted can only be understood as a repugnant racial dog-whistle.

**III. The challenged policies irreparably harm Plaintiffs.**

"[A] substantial injury that is not accurately measurable or adequately compensable by money damages" constitutes irreparable harm. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). Plaintiffs face immediate, irreparable and grave harm absent an order staying all three policies.

Most urgently, the IFR allowing refugees just ten days to respond to the threat of termination of refugee status poses imminent harm to unadjusted refugees who may not be able to mount effective defenses in a matter of days. Lida A. Decl. ¶ 9; Abdi B. Decl. ¶ 13; Julio C. Decl. ¶ 6; Firas D. Decl. ¶¶ 14-15. USCIS has already started issuing NOITs under the new IFR to unadjusted refugees in Minnesota. Drobnick Decl. ¶ 7 (attesting to issuance of 10-day NOIT dated October 15 and received October 19, 2026). Loss of lawful immigration status and its attendant benefits—work authorization and protection from detention and removal—is paradigmatic irreparable harm. *E.g., Venezuelan Ass'n of Mass. v. USCIS*, No. 26-cv-13038, 2026 WL 2255272, at *5 (D. Mass. Aug. 5, 2026) (rejection of an asylum application and the initiation of removal procedures constitutes irreparable harm), *appeal filed*, No. 26-1893 (1st Cir. Aug. 6, 2026); *A.O. v. Cuccinelli*, 457 F. Supp. 3d 777, 794-95 (N.D. Cal. 2020) (losing eligibility for immigration status and attendant benefits "constitutes irreparable harm"); *Dorcas*, 834 F. Supp. 3d at 300

("[t]he mere fear of immigration detention and deportation may alone constitute a sufficient irreparable injury"); *Bowser v. Noem*, No. 26-cv-10382, 2026 WL 555624, at *9 (D. Mass. Feb 27, 2026) (the loss of employment authorization constitutes irreparable harm because the noncitizen loses the right to work at all); *Nat'l Educ. Ass'n-N.H. v. N.H. Att'y Gen.*, 806 F. Supp. 3d 166, 208 (D.N.H. 2025) ("Loss of the ability to practice one's chosen profession is irreparable harm.") (citing *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1165 (9th Cir. 2011)); *Varniab v. Edlow*, No. 25-cv-10602, 2026 WL 485490, at *22 (N.D. Cal. Feb. 20, 2026) (imminent loss of work authorization constitutes irreparable harm).

The Re-vetting Policy and the Adjustment of Status Hold – which together stop refugees from obtaining permanent status until they are re-vetted – are already causing ongoing irreparable harm to refugee families, because they have lost access to nutritional assistance, and, as of October 1, 2026, to Medicaid and other health insurance programs. Krieger Decl. ¶ 8. There is no possibility of damages for these lost benefits, and their loss is therefore irreparable. *See R.I. State Council of Churches v. Rollins*, 808 F. Supp. 3d 370, (D.R.I. 2025) (loss of SNAP benefits is irreparable harm); *AFGE v. Trump*, 139 F.4th 1020, 1040 (9th Cir. 2025) (federal employees who would experience loss of healthcare and need to relocate from their homes after job loss would suffer irreparable harms), *stay pending appeal granted on other grounds, Trump v. AFGE*, No. 24A1174 (U.S. July 8, 2025); *E. Bay Sanctuary Covenant v. Garland,* 994 F.3d 962, 984 (9th Cir. 2020) (in an APA case, economic harms may be irreparable because plaintiffs cannot recover damages).

Similarly, Organizational Plaintiffs who cannot accomplish their core missions of providing safety and stable resettlement to refugees are suffering irreparable harm because the three policies are forcing them to restructure services, redirect personnel hours, and expend enormous human and financial resources to protect their clients. Slocum Decl. ¶¶ 15-32; Dazzo Decl. ¶¶ 17-19, 22, 24; Greene Decl. ¶¶ 11, 17, 20, 24-26, 28; Thielman Decl. ¶¶ 20-21, 26-27. "Obstacles that unquestionably make it more difficult for the plaintiff to accomplish its primary mission provide injury for purposes of irreparable harm." *NIH*, 770 F. Supp. 3d at 322 (cleaned

up); *see also Nat'l Educ. Ass'n v. U.S. Dep't of Educ*., 779 F. Supp. 3d 149, 200 (D.N.H. 2025) (finding plaintiffs faced irreparable harm to their organizational missions and core activities).

**IV. The balance of equities and the public interest strongly favor a stay.**

The balance of equities and public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, these factors weigh heavily in favor of a stay of the IFR pursuant to 5 U.S.C. § 705.

*First*, as described above, these actions exceed Defendants' authority under 8 U.S.C. §§ 1157 and 1159, conflict with binding agency regulations codified at 8 C.F.R. §§ 103.2(b)(18) and 209.1(e), were promulgated without notice and comment as required both by § 1157 and § 1159 and the APA, and are arbitrary and capricious. "[T]here is generally no public interest in the perpetuation of unlawful agency action." *New York v. Kennedy*, 155 F.4th 67, 77 (1st Cir. 2025) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

*Second*, although Defendants claim that the IFR "aim[s] to restore integrity to the immigration system, mitigate risks to national security and public safety, and prevent fraud and exploitation," 91 Fed. Reg. at 65,077, the IFR does not explain why the 30-day notice period in place for decades has impeded achievement of any of these goals. Therefore, Defendants can demonstrate no harm from simply abiding by their previous 30-day rule, which had been in place for 45 years. *Nat'l Educ. Ass'n*, 779 F. Supp. 3d at 201 ("defendants stand to suffer little harm if a preliminary injunction is granted ... a preliminary injunction would merely maintain the status quo prior to the 2025 Letter's enactment—a status quo which, as recently as 2023, the Department believed was … lawful"); *Guerrero Orellana v. Moniz*, 802 F. Supp. 3d 297, 313 (D. Mass. 2025) ("Providing bond hearings to noncitizens in Guerrero Orellana's position was the government's consistent practice until very recently, so a preliminary injunction here merely returns the parties to that status quo."); *Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *32 (D.C. Cir. Nov. 22, 2025) (rejecting argument that district court's stay order harmed the government because that order "maintains the status quo that has existed for decades"). Staying the IFR until this Court can determine its lawfulness simply continues the "decades-long practice" for providing

30 days' notice "for a short period of time while this court adjudicates the merits." *Id.*; *see also RAICES v. Noem*, No. 25-5243, 2025 WL 5144253, at *19 (D.C. Cir. Aug. 1, 2025) (Millet, J., concurring in part and dissenting in part) (denying government's request for a stay pending appeal because the district court's stay order "simply requires the government to adhere to mandatory statutory procedures and standards"). The same is true for the November 2025 memo. Issuing a stay would return the adjustment process to the status quo that has existed for decades.

The severe, irreparable harm to Plaintiffs, their families, and communities from imminent termination of refugee status outweighs any temporary harm to the government from issuing an administrative stay as to the IFR. Defendants have not demonstrated that the 30-day notice period is unworkable, and they have the authority to place refugees in removal proceedings in lieu of terminating their status.

For similar reasons, the balance of the equities and the public interest favor issuing a § 705 stay.

**V. The Court should issue immediate relief.**

Given the severe and immediate harms to Plaintiffs of the IFR, the Court should administratively stay the IFR for a short period, so that the Court has sufficient time to consider Plaintiffs' request for a § 705 stay and any response from Defendants. *See* Proposed Order (Admin. Stay); *see also, e.g.*, *Venezuelan Ass'n of Mass.*, 839 F. Supp. 3d at 86-88; *Afr. Cmtys. Together*, 2026 WL 710666, at *1; *Doe*, 816 F. Supp. 3d at 150.

In addition, because Plaintiffs have demonstrated that they are entitled to relief under § 705 of the APA, the Court should stay the November 2025 Memo and the IFR in their entireties for the duration of this litigation, as outlined in the proposed order. *Woonasquatucket River Watershed Council v. USDA*, 186 F.4th 25, 53-56 (1st Cir. 2026) (relief under § 705 "may be universal in nature to preserve the rights that could be obtained through vacatur"); *Make the Rd. N.Y.*, 2025 WL 3563313, at *35 ("Section 705 stays operate on the legal source of authority for an agency to act at all" and "empower[] the judiciary to act directly against the challenged agency action"); *see also Trump v. CASA*, 606 U.S. 831, 847 n.10 (2025) ("Nothing we say today resolves the distinct

question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action.").

Because the purpose of a § 705 stay is to "preserve status or rights pending" the Court's review, 5 U.S.C. § 705, while the stay is in place, the Court should require Defendants to promptly process Class members' adjustment of status applications without consideration of the November 2025 Memo and should prevent Defendants from terminating refugee status based on failure to respond in less than 30 days. *See* Proposed Order (§ 705 Stay) ¶¶ 5-6. Furthermore, as described above, because the IFR has already (illegally) gone into effect, and 10-day NOITs have already been issued to putative class members, the Court should also vacate any NOIT issued under the IFR to Class members prior to this Court's order and prevent Defendants from terminating refugee status based on those NOITs. *See A.A.R.P.*, 605 U.S. at 97 ("Court may properly issue temporary injunctive relief to the putative class . . . ." and "need not decide whether a class should be certified as to the [Plaintiffs'] claims in order to temporarily enjoin the Government from" taking action while the question of the government action's legality is adjudicated). Although First Circuit law currently (correctly) provides that § 705 relief may be universal, *Woonasquatucket*, 186 F.4th at 53-56, to avoid any doubt that the Court's order would apply to all refugees subject to the IFR and the November 2025 Memo,[10] the Court should provisionally certify the Class that Plaintiffs have proposed in their motion for class certification, filed contemporaneously with this motion, pending resolution of the pending motions.

Finally, in order to ensure prompt compliance with the Court's order should it grant an administrative stay or a § 705 stay, the Court should require the government to notify the regulated public of the Court's order via an alert on USCIS's website and to submit periodic status reports demonstrating good faith compliance with the Court's order as outlined in the proposed order. *See, e.g.*, *Storie v. Trump*, No. CV 26-00567, 2026 WL 2516560, at *9 (D.D.C. Aug. 25, 2026)

[10] *Cf.* Govt's Pet. for Cert. at 14, *HHS v. Texas Med. Ass'n*, No. 26-491 (S. Ct. filed Oct. 14, 2026) (government seeking Supreme Court review of whether vacatur under § 706 of the APA provides for universal relief and arguing that "Section 705, the provision dealing with interim relief, similarly contemplates only party-specific remedies").

(ordering status reports and prompt compliance requirements as part of injunctive relief enjoining unlawful visa adjudication hold); *Medani v. Trump*, No. 5:26-cv-06332, 2026 WL 2547287, at *13 (N.D. Cal. Aug. 28, 2026) (same); *Escobar Molina v. DHS*, 811 F. Supp. 3d 1, 65 (D.D.C. 2025) (similar, requiring extensive reporting requirements and periodic status reports concerning enjoined policy); *Pacito v. Trump*, No. 2:25-cv-255, 2025 WL 1295660, at *3 (W.D. Wash. May 5, 2025) (similar, case involving refugee policies).

**CONCLUSION**

For the foregoing reasons, the Court should: (1) immediately issue an administrative stay of the IFR pending the Court's decision on a § 705 stay, and (2) stay the November 2025 Memo and the IFR under 5 U.S.C. § 705 pending final resolution of this case.

Dated: October 26, 2026

Respectfully submitted,

/s/ Erez Reuveni
Erez Reuveni (MA BBO No. 666769)
Jennie L. Kneedler* (DC Bar No. 500261)
Cynthia Liao* (DC Bar No. 90036947)
Steven Y. Bressler* (DC Bar No. 482492)
Robin F. Thurston* (DC Bar No. 1531399)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
ereuveni@democracyforward.org
jkneedler@democracyforward.org
cliao@democracyforward.org
sbressler@democracyforward.org
rthurston@democracyforward.org

John Nathanson (NY Bar No. 2630697)*
Andrew Tannenbaum (NY Bar No. 3940434)*
Leila Siddiky (NY Bar No. 5225164)*
**ALLEN OVERY SHEARMAN STERLING US LLP**
599 Lexington Avenue
New York, NY 10022
212-848-4000

Hussein Elbakri* (NY Bar No. 5712666)
Guadalupe Aguirre* (NY Bar 5536107)
Kimberly Grano* (NY Bar No. 5858808)
Ghita Schwarz* (NY Bar No. 3030087)
Pedro Sepulveda* (NY Bar No. 6198550)

**INTERNATIONAL REFUGEE ASSISTANCE PROJECT**
One Battery Plaza, 33rd floor
New York, New York 10004
Telephone: (646) 939-9169
Facsimile: (516) 324-2267
helbakri@refugeerights.org
laguirre@refugeerights.org
kgrano@refugeerights.org
gschwarz@refugeerights.org
psepulveda@refugeerights.org

Dalia Fuleihan* (IL Bar No. 6335082)
**INTERNATIONAL REFUGEE ASSISTANCE PROJECT**
P.O. Box 47611
Chicago, IL 60647
Telephone: (646) 740-6271

Facsimile: (516) 324-2267
dfuleihan@refugeerights.org

john.nathanson@aoshearman.com
andrew.tannenbaum@aoshearman.com
leila.siddiky@aoshearman.com

Emily Westridge Black (TX Bar No. 24060815)*
**ALLEN OVERY SHEARMAN STERLING US LLP**
300 West 6th Street
Austin, TX 78701
512-647-1909
emily.westridgeblack@aoshearman.com

Gideon J. Duke-Cohan (MA BBO# 716358)
**ALLEN OVERY SHEARMAN STERLING US LLP**
One Beacon Street
Boston, MA 02108
212-610-6353
gideon.duke-cohan@aoshearman.com

*Counsel for All Plaintiffs*

* Motion to appear *pro hac vice* forthcoming

**CERTIFICATE OF SERVICE**

I certify that, on October 26, 2026, I emailed the foregoing to:

August Flentje
Deputy Director
U.S. Department of Justice, Civil Division, Office of Immigration Litigation
august.flentje@usdoj.gov

Papu Sandhu
Acting Senior Counsel for District Court Litigation
U.S. Department of Justice, Civil Division, Office of Immigration Litigation
Papu.Sandhu@usdoj.gov

Rayford Farquhar
Chief, Defensive Litigation, Civil Division
U.S. Attorney's Office for the District of Massachusetts
rayford.farquhar@usdoj.gov

I also caused the foregoing to be served on the U.S. Attorney's Office for the District of Massachusetts by courier and certified priority mail and to be served on Defendants and the Attorney General by certified priority mail.

*/s/ Erez Reuveni*
Erez Reuveni