**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS; *et al.*,

*Plaintiffs*,

v.

JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services, *et al.*,

*Defendants*.

Case No. 1:26-cv-14817

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................2

A. Legal Framework ..........................................................................2

B. Challenged Policies..........................................................................5

C. Named Plaintiffs ..........................................................................7

LEGAL STANDARD..........................................................................................10

ARGUMENT ....................................................................................................10

I. The Proposed Class Meets the Requirements of Rule 23(a)...............................11

A. The Proposed Class Satisfies the Numerosity Requirement. ......................11

B. The Proposed Class Satisfies the Commonality Requirement. .................12

C. The Proposed Class Satisfies the Typicality Requirement. .......................14

D. The Proposed Class Representatives and Class Counsel Satisfy the Adequacy Requirement. ...............................................................16

II. The Proposed Class Meets the Requirements of Rule 23(b)(2)............................18

CONCLUSION ...................................................................................................19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. Bechtel Power Corp.*,
780 F.2d 124 (1st Cir. 1985) ........................................ 16, 17

*Bowers v. Russell*,
766 F. Supp. 3d 136 (D. Mass. 2025) ........................................ 16

*DeRosa v. Massachusetts Bay Commuter Rail Co.*,
694 F. Supp. 2d 87 (D. Mass. 2010) ........................................ 11

*Dionne v. Bouley*,
757 F.2d 1344 (1st Cir. 1985) ........................................ 18

*In re Eaton Vance Corp. Sec. Litig.*,
220 F.R.D. 162 (D. Mass. 2004) ........................................ 10

*Garcia-Rubiera v. Calderon*,
570 F.3d 443 (1st Cir. 2009) ........................................ 11, 12, 15

*Gomes v. Acting Sec'y, D.H.S.*,
561 F. Supp. 3d 93 (D.N.H. 2021) ........................................ 15, 16

*Guerrero Orellana v. Moniz*,
808 F. Supp. 3d 167 (D. Mass. 2025) ........................................ 1, 11, 12, 14, 15

*In re Loestrin 24 Fe Antitrust Litig.*,
No. 13-2472-WES-PAS, 2019 WL 3214257 (D.R.I. July 29, 2019) ........................................ 12

*Jean A. v. Noem*,
No. 3:26-cv-30031 (RGS), 2026 WL 805207 (D. Mass. Mar. 23, 2026) ........................................ 6

*Mantha v. QuoteWizard.com, LLC*,
347 F.R.D. 376 (D. Mass. 2024) ........................................ 12, 16

*Matamoros v. Starbucks Corp.*,
699 F.3d 129 (1st Cir. 2012) ........................................ 10

*Matamoros v. Starbucks Corp.*,
No. 08-10772-NMG, 2011 WL 2555760 (D. Mass. Feb. 8, 2011) ........................................ 12

*McCuin v. Sec'y of Health & Hum. Servs.*,
817 F.2d 161 (1st Cir. 1987) ........................................ 11

*McKenna v. First Horizon Home Loan Corp.*,
475 F.3d 418 (1st Cir. 2007)....................18

*Muniz v. XPO Last Mile, Inc.*,
342 F.R.D. 189 (D. Mass. 2022)....................15

*Ouadani v. Dynamex Operations E., LLC*,
405 F. Supp. 3d 149 (D. Mass. 2019)....................15, 16

*Overka v. Am. Airlines, Inc.*,
265 F.R.D. 14 (D. Mass. 2010)....................13

*Parent/Prof'l Advoc. League v. City of Springfield*,
934 F.3d 13 (1st Cir. 2019)....................13

*Payne v. Goodyear Tire & Rubber Co.*,
216 F.R.D. 21 (D. Mass. 2003)....................15

*In re Pharm. Indus. Average Wholesale Price Litig.*,
230 F.R.D. 61 (D. Mass. 2005)....................16

*Powers v. Receivables Performance Mgmt., LLC*,
801 F. Supp. 3d 17 (D. Mass. 2025)....................15

*Reid v. Donelan*,
297 F.R.D. 185 (D. Mass. 2014)....................11

*Rolland v. Cellucci*,
No. CIV A 98–30208–KPN, 1999 WL 34815562 (D. Mass. Feb. 2, 1999)....................18

*Rolland v. Patrick*,
No. 98–30208–KPN, 2008 WL 4104488 (D. Mass. Aug. 19, 2008)....................14

*Swack v. Credit Suisse First Boston*,
230 F.R.D. 250 (D. Mass. 2005)....................12, 16, 17

*Tassinari v. Salvation Army*,
349 F.R.D. 10 (D. Mass. 2025)....................18

*In re Volkswagen*,
No. 1:07–md–1790–JLT, 2010 WL 3769259 (D. Mass. Sept. 22, 2010)....................13

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....................10, 14, 19

**Statutes**

5 U.S.C. § 705....................2, 6

5 U.S.C. § 706 .......... 2, 19

8 U.S.C. § 1101 .......... *passim*

8 U.S.C. § 1153 .......... 5

8 U.S.C. § 1157 .......... 1, 3, 4

8 U.S.C. § 1159 .......... 5

8 U.S.C. § 1427 .......... 5

One Big Beautiful Bill Act, Pub. L. No. 119-21 (2025) .......... 6, 8

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 .......... 2, 3

**Other Authorities**

8 C.F.R. §§ 207.1-207.7 .......... 4

8 C.F.R. § 207.9 .......... 4

8 C.F.R. § 209.1 .......... 5

8 C.F.R. § 274a.12 .......... 5

90 Fed. Reg. 8459 .......... 3

91 Fed. Reg. 65,077 (Oct. 14, 2026) .......... *passim*

5 Moore's Fed. Prac. § 23.24 .......... 15

Fed. R. Civ. P. 23 .......... *passim*

## INTRODUCTION

For over 45 years, refugees in the United States, once lawfully admitted, have had a clear path to stability and safety. The Trump Administration has now illegally barred that path, frustrating the rights of thousands outside and within the United States. Individual Plaintiffs bring this lawsuit on behalf of themselves and others similarly situated to challenge three new policies that subject lawfully admitted refugees to (i) an *indefinite* hold on their adjustment applications (the "Adjustment of Status Hold"); (ii) a categorical re-examination of their *already-adjudicated* refugee status (the "Re-vetting Policy"); and (iii) termination of their refugee status on just 10 days' notice pursuant to an interim final rule titled "Removing 30-Day Refugee Termination Notice," 91 Fed. Reg. 65,077 (Oct. 14, 2026) (the "IFR"). These policies were adopted in clear violation of the Administrative Procedure Act ("APA") and the U.S. Constitution.

Given the policies' widespread and egregious impact on all refugees currently present in the United States, Individual Plaintiffs seek to litigate their claims on a class basis. The Adjustment of Status Hold, the Re-vetting Policy, and the IFR each operate as a categorical rule affecting all refugees who have not yet adjusted their status. Accordingly, Individual Plaintiffs request that the Court certify the following class:

> **Proposed Class**: All individuals admitted to the United States as refugees under 8 U.S.C. § 1157 who have not adjusted to lawful permanent resident status as of and after October 14, 2026.[1]

[1] Individual Plaintiffs reserve the right to modify the Proposed Class definition or to propose subclasses as this litigation progresses. *See* Fed. R. Civ. P. 23(c)(1), (5); *Guerrero Orellana v. Moniz*, 808 F. Supp. 3d 167, 183 (D. Mass. 2025) ("The parties may propose a more specific [class] definition at a later stage in the case, at which point the Court may modify the class definition.").

The proposed Class satisfies Rule 23(a)'s requirements for the following reasons: (i) *numerosity*: it comprises tens of thousands of individuals across the country and will continue to grow as new refugees are admitted, making joinder impracticable; (ii) *commonality*: the statutory, regulatory, and constitutional questions presented are common to the entire Class and would yield common answers; (iii) *typicality*: Individual Plaintiffs' claims arise from the same November 21, 2025 USCIS memorandum establishing the Adjustment of Status Hold and the Re-vetting Policy and from the IFR, and seek the same relief as the Class, making their claims typical of all class members' claims; and (iv) *adequacy*: Individual Plaintiffs and their experienced undersigned counsel will fairly and adequately protect the interests of the Class.

The Class further satisfies Rule 23(b)(2) because the Individual Plaintiffs seek a stay and vacatur of the Adjustment of Status Hold, the Re-vetting Policy, and the IFR under 5 U.S.C. §§ 705-06, and corresponding declaratory and injunctive relief, that applies generally to the Class and would resolve the claims of all Class members in a single, indivisible remedy.

Accordingly, Individual Plaintiffs respectfully request that the Court certify the Class, appoint Individual Plaintiffs as Class Representatives, and appoint the undersigned counsel as Class Counsel.

## BACKGROUND

### I. Legal Framework

Congress amended the Immigration and Nationality Act ("INA") in 1980 by enacting the Refugee Act, which embodies the U.S. commitment to humanitarian assistance for those fleeing persecution. Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102. In enacting the Refugee Act, Congress sought to "provide a permanent and systematic procedure for the admission ... of refugees of special humanitarian concern to the United States, and to provide comprehensive and uniform provisions for the effective resettlement and absorption of those refugees who are

admitted." *Id.* § 101(b). A "refugee" is a person facing displacement from his or her country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1101(a)(42).

The Refugee Act sets out detailed policies and procedures governing refugee admission and resettlement in the United States, which together create the U.S. Refugee Admissions Program ("USRAP"). *See* 8 U.S.C. § 1157 *et seq*. Prior to January 2025, when President Trump issued an executive order titled "Realigning the United States Refugee Admissions Program," Exec. Order No. 14,163, 90 Fed. Reg. 8459 (Jan. 30, 2025) (the "Refugee Ban EO"), suspending the USRAP, refugees underwent extensive, often years-long vetting, including background and biometric checks, before they could be resettled. ¶¶ 33, 35.[2] To be considered for resettlement, an individual must typically be referred to USRAP by the United Nations High Commissioner for Refugees ("UNHCR"), a U.S. Embassy, a designated non-governmental organization, or a private group of citizens through a program known as Welcome Corps. ¶ 34. The overwhelming majority of refugee applicants are referred by UNHCR based on its determination that they meet the international definition of a refugee, which is largely consistent with the definition in 8 U.S.C. § 1101(a)(42). ¶ 34. Once referred, an applicant went through a security screening process involving multiple federal agencies before being interviewed under oath by a specially trained U.S. Citizenship and Immigration Services ("USCIS") Refugee Officer who evaluated the applicant's eligibility for refugee status. ¶¶ 35-36. Applicants who were conditionally approved then underwent a medical examination, completed a cultural orientation program, and underwent additional recurrent security checks before travel. ¶ 37.

---

[2] A ¶__ reference is to Plaintiffs' Complaint. Dkt. 1.

The Department of Homeland Security ("DHS") Secretary is authorized to admit to the United States "any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible ... as an immigrant." 8 U.S.C. § 1157(c)(1); *see* 8 C.F.R. §§ 207.1-207.7. ¶ 38. So long as they are admissible, a refugee's spouse or child is entitled to admission as a refugee even without meeting the statutory definition. 8 U.S.C. § 1157(c)(2)(A); ¶ 38. Refugee status comes with significant protections and benefits, including indefinite lawful status and work authorization. *See* 91 Fed. Reg. at 65,080 & n.14; ¶ 39.

An individual's refugee status may be terminated only if DHS "determines that the [noncitizen] was not in fact a refugee within the meaning of section 1101(a)(42) of this title at the time of the [noncitizen's] admission." 8 U.S.C. § 1157(c)(4); 8 C.F.R. § 207.9; ¶ 40. Because derivative refugees do not need to meet the refugee definition to be admitted, their refugee status may be terminated only if the status of their refugee spouse or parent is terminated. ¶ 40.

For over 45 years until October 14, 2026, USCIS was required to notify a refugee in writing of its intent to terminate refugee status, through a Notice of Intent to Terminate ("NOIT"), and the refugee had 30 days from the date the NOIT was served to present written or oral evidence to show why their status should not be terminated. 8 C.F.R. § 207.9; ¶ 41. If USCIS terminated refugee status, it issued a notice of termination and then processed the individual for removal. 8 C.F.R. § 207.9; ¶ 42. There was no option for administrative appeal, and the termination also immediately ended the refugee's work authorization. 91 Fed. Reg. at 65,088; ¶ 92.

Separately, Congress provided that refugees are entitled to adjust their status to that of a lawful permanent resident after they have been physically present in the United States for at least 1 year, so long as their refugee status has not been terminated and they are not found to be

inadmissible to the United States. 8 U.S.C. § 1159(a); 8 C.F.R. § 209.1(e); ¶¶ 43, 45. Interviews are not a mandatory part of the adjustment process and occur only on a case-by-case basis. 8 C.F.R. § 209.1(d). If the applicant is found to be admissible for permanent residence, USCIS must approve the application and admit the applicant for lawful permanent residence as of the date of the refugee's arrival in the United States. *Id.* § 209.1(e); *see* 8 U.S.C. § 1159(a)(2); ¶ 45. If USCIS denies the application, it must "notify an applicant of the right to renew the request for permanent residence" in full removal proceedings under 8 U.S.C. § 1229a. 8 C.F.R. § 209.1(e). Lawful permanent residents enjoy greater protections against removal than refugees and may live permanently in the United States, work lawfully, travel abroad, sponsor certain family members, and eventually apply to naturalize. 8 U.S.C. §§ 1101(a)(13)(C), (20), 1153(a)(2), 1427(a); 8 C.F.R. § 274a.12(a)(1); ¶ 46.

## II. Challenged Policies

***Adjustment of Status Hold and Re-Vetting Policy***. On November 21, 2025, Defendant Joseph B. Edlow, the USCIS Director, issued a memorandum titled "Reinterview of Certain Refugees Admitted to the United States and an Immediate Hold on Certain Refugees with a Pending I-485, Application to Register Permanent Residence or Adjust Status" (the "November 2025 Memo" or the "Memo") that immediately placed all pending adjustment applications filed by refugees admitted between January 20, 2021, and February 20, 2025, on hold and directed a "comprehensive review" and "potential re-interview" of all refugees admitted in that period. Dkt. 1-4, Ex. 1. To justify the breathtaking action, the Memo asserts, without citing any evidence, that during the Biden Administration the USRAP and USCIS potentially "prioritized expediency, quantity, and admissions over quality interviews and detailed screening and vetting." *Id.* The Memo was not public and there was no opportunity for notice and comment. Almost a year later,

the Adjustment of Status Hold has not been lifted, leaving in limbo, by DHS's own count, approximately 113,000 refugees with pending adjustment applications. ¶ 78. As a result, unadjusted refugees, who until the implementation of the One Big Beautiful Bill Act (also called "H.R.1") had access to federal benefits such as Medicaid, the Children's Health Insurance Program ("CHIP"), and the Supplemental Nutrition Assistance Program ("SNAP"), are losing crucial assistance for which they will not become eligible until they adjust. Dkt. 2, Ex. 12 (Sarah Krieger Decl. ¶¶ 6-12). [3] And unadjusted refugees who have been present in the United States for more than one year are vulnerable to a nationwide Refugee Detention Policy that targets them for arrest and detention merely because they have not been granted green cards, even if the delay in adjustment is entirely in the control of USCIS.[4]

***IFR.*** Defendants have now turned their attention to rapidly terminating refugee status. After 45 years of following a 30-day notice rule, DHS published the IFR without notice and comment or advance notice on October 14, 2026. The IFR slashes the time to respond to a NOIT from 30 days to 10 days, counting weekends and holidays, so that USCIS can ostensibly "expedite termination of refugee status." 91 Fed. Reg. at 65,077. A refugee who misses the deadline forfeits

---

[3] Unless otherwise indicated, all declarations and exhibits are attached to the Declaration of Erez Reuveni. Dkt. 2.

[4] The Refugee Detention Policy consists of (1) a one-sentence memorandum issued on December 18, 2025 by ICE purporting to rescind a 2010 ICE policy providing that a refugee's failure to adjust status was not a proper basis for detention (the "Refugee Rescission Memo"), Ex. 18, and (2) a memorandum issued on February 18, 2026, by Defendant Edlow and Todd Lyons titled "Detention of Refugees Who Have Failed to Adjust to Lawful Permanent Resident Status" (the "Refugee Detention Memo"), which establishes a new policy nationwide mandating the potentially indefinite detention of all unadjusted refugees. Ex. 19. On March 23, 2026, a court in this District stayed that policy under 5 U.S.C. § 705. *Jean A. v. Noem*, No. 3:26-cv-30031 (RGS), 2026 WL 805207, at *1 (D. Mass. Mar. 23, 2026). Defendants continue to defend the policy, which, combined with the Adjustment of Status Hold and Re-vetting Policy, places unadjusted refugees in an impossible situation: they cannot adjust their status because all adjustment applications are on hold, yet if they fail to adjust, they risk detention. ¶¶ 88-89.

the right to rebut the allegations in the NOIT. *Id.* at 65,085. DHS estimates that about 186,000 refugee cases admitted from fiscal year 2015 through fiscal year 2025 remain unadjusted and could be subject to the IFR. *Id.* at 65,088. The IFR went into effect upon publication, before any public input was considered. A refugee's status can only be terminated *before* the refugee adjusts, and DHS admits that it "typically reviews" the underlying refugee determination during the adjustment adjudication. 91 Fed. Reg. at 65,081. Combined with the Adjustment of Status Hold keeping refugees in unadjusted limbo, unadjusted refugees who are also subject to the Re-vetting Policy, are now exposed to an immediate risk of having their refugee status terminated in a matter of days under the IFR indefinitely. ¶¶ 99-102.

## III. Named Plaintiffs

Plaintiffs are Lida A., Abdi B., Julio C., and Firas D. (the "Individual Plaintiffs"), and Partnership for the Advancement of New Americans ("PANA"), Jewish Family Service of Western Massachusetts ("JFS-WMA"), International Institute of New England ("IINE"), African Communities Together ("ACT"), HIAS, Inc. ("HIAS"), and Refugee Council USA ("RCUSA") (the "Organizational Plaintiffs," and together with the Individual Plaintiffs, "Plaintiffs").

**Plaintiff Lida A.** was born in Afghanistan and fled for her life after the Taliban takeover. Ex. 7 (Lida A. Decl. ¶ 2). She completed her refugee processing at a U.S. military base in Qatar and was admitted to the United States with refugee status in January 2024, living in Massachusetts. *Id.* ¶¶ 3-4. Lida A submitted her medical examination in November 2024 and applied to adjust status in March 2024. *Id.* ¶ 6. Her application remains pending because of the Adjustment of Status Hold. *Id.* ¶ 6. The policies targeting refugees have caused her to suffer panic attacks, and she fears she will receive a NOIT without enough time to respond and be returned to Afghanistan, where her life would be in grave danger. *Id.* ¶¶ 9-10.

**Plaintiff Abdi B.** was born in and fled from Ethiopia after government agents arrested him and abused him physically and psychologically. Ex. 8 (Abdi B. Decl. ¶¶ 2, 4). He lived as a refugee in Egypt from 2015 until his admission to the United States in December 2024. *Id.* ¶¶ 3-4. He lives in Minnesota with his wife and two young children, one of whom is a U.S. citizen. *Id.* ¶ 3. In January 2026, during Operation PARRIS, he was detained without explanation, shackled, and transferred out of state where he was confined until a federal court ordered his release. *Id.* ¶¶ 7-10, 13. He has since applied to adjust status and completed biometrics in May 2026. *Id.* ¶ 11. His application remains pending. *Id.* ¶ 11. Abdi B. remains traumatized by his horrific detention, which also caused immense fear, stress, and uncertainty for his wife and young children. *Id.* ¶¶ 9, 13. His family lost SNAP benefits earlier this year.[5] He fears that his refugee status could be terminated within days under the IFR, resulting in him being sent back to Ethiopia, where he faces significant danger. *Id.* ¶ 13.

**Plaintiff Julio C.** fled discrimination and persecution in Colombia as a gay man living with HIV. Ex. 9 (Julio C. Decl. ¶¶ 1-2, 5). He lived in an LGBTQ+ shelter in Guatemala when he applied for resettlement. *Id.* ¶ 2. He was admitted to the United States as a refugee in January 2025. *Id.* ¶ 3. He applied to adjust status in May 2026 and completed biometrics in June 2026. *Id.* ¶ 5. His application remains pending with no movement. *Id.* ¶ 5 Since arriving, he has relied on Medicaid to obtain the medication he needs to manage his HIV, and the prospect of losing his health coverage terrifies him. *Id.* ¶ 4. He also fears that he would not have time to respond to a

---

[5] Unadjusted refugees have also lost eligibility for the Supplemental Nutrition Assistance Program (“SNAP”) and, as of October 1, 2026, Medicaid benefits, both of which they would regain upon becoming lawful permanent residents. *See* One Big Beautiful Bill Act, Pub. L. No. 119-21, §§ 10108, 71109, 71201, 71301 (2025).

NOIT under the IFR and would be removed to Colombia without any chance to explain the danger he faces. *Id.* ¶¶ 6-7.

**Plaintiff Firas D.** was born in Iraq and now lives in Texas, working full time. Ex. 10 (Firas D. Decl. ¶¶ 1-3, 7-8). As a gay man in Iraq, he was repeatedly beaten by a family member and, in November 2023, arrested because of his sexual orientation. *Id.* ¶ 4. He was admitted as a refugee in the United States in January 2025. *Id.* ¶ 6. He has since applied to adjust his status in January 2026 and completed his biometrics. *Id.* ¶ 9. His application remains pending. *Id.* ¶ 9. He would like to become a pilot but cannot enroll in flight school until his status has been adjudicated. *Id.* ¶ 12. After being stopped and questioned at an immigration checkpoint in June 2026, he fears arrest and detention if his work permit expires before his application is adjudicated. *Id.* ¶ 11. Similarly, he does not believe he could understand a NOIT, gather evidence, and respond within 10 days while working a full-time job, and he fears that he will be arrested, beaten tortured, or killed because he is gay if returned to Iraq. *Id.* ¶¶ 13-16.

The Individual Plaintiffs seek to represent the Class consisting of themselves and others similarly situated who are targeted by Defendants' policies.[6]

[6] Organizational Plaintiffs are also named Plaintiffs in this lawsuit; however, only the Individual Plaintiffs are seeking to represent the Class. The Organizational Plaintiffs are non-profit social service organizations whose core missions include serving resettled refugees. PANA advocates for the full economic, social, and civic inclusion of refugees and displaced people in the San Diego region, throughout California, and across the country through community organizing, civic engagement, and policy advocacy. Ex. 1 (PANA Decl.). JFS-WMA currently serves approximately 1,062 refugees who have not adjusted status, some of whom have even been waiting years for the government to adjudicate their applications. Ex. 5 (JFS-WMA Decl.). IINE's legal staff represents refugees, free of charge, throughout the adjustment process, and IINE currently serves approximately 860 refugees who have not adjusted status and are subject to Defendants' policies. Ex. 4 (IINE Decl.). ACT serves thousands of members across its chapters in New York, Virginia, Maryland, Pennsylvania, and the District of Columbia, and facilitates a national network of African leaders and African immigrant-serving organizations, providing a myriad of legal services including the assistance of status adjustment applications. Ex. 2 (ACT Decl.). HIAS is dedicated to ensuring that forcibly displaced people find welcome, safety, and freedom. Ex. 3

## LEGAL STANDARD

A party seeking class certification must satisfy Rule 23(a)'s requirements—numerosity, commonality, typicality, and adequacy—and one subsection of Rule 23(b). Fed. R. Civ. P. 23(a), (b). Under Rule 23(a), a class may be certified when: (i) the class is so "numerous that joinder of all members is impracticable"; (ii) there are common questions of law or fact; (iii) the class representatives' claims are typical of the class; and (iv) the representatives' representation of the class is adequate. Fed. R. Civ. P. 23(a); *see e.g.*, *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 138 (1st Cir. 2012).[7] Rule 23 "is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility." *In re Eaton Vance Corp. Sec. Litig.*, 220 F.R.D. 162, 170 (D. Mass. 2004).

Here, Individual Plaintiffs seek certification under Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The crux of Rule 23(b)(2) is the "indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).

## ARGUMENT

The Class satisfies Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy. Certification of the Class is proper under Rule 23(b)(2) because Individual Plaintiffs

---

(HIAS Decl.). RCUSA is the only national coalition devoted to assisting forcibly displaced people in the United States and serves as the coordinating body for the refugee-serving community. Ex. 6 (RCUSA Decl.).

[7] Unless indicated otherwise, all internal quotations and citations are omitted.

seek indivisible relief—a declaration that the Adjustment of Status Hold, the Re-vetting Policy, and the IFR are, *inter alia*, contrary to law, arbitrary and capricious, and procedurally defective; an injunction against their implementation; and vacatur of each pursuant to 5 U.S.C. § 706—that would resolve the claims of all class members in one stroke.

**I. The Proposed Class Meets the Requirements of Rule 23(a).**

**A. The Proposed Class Satisfies the Numerosity Requirement.**

Individual Plaintiffs meet the numerosity requirement, which requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The First Circuit recognizes that classes of 40 or more members satisfy the "low threshold" of numerosity, and that this requirement is further met when plaintiffs seek only injunctive or declaratory relief. *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009); *see DeRosa v. Massachusetts Bay Commuter Rail Co.*, 694 F. Supp. 2d 87, 98 (D. Mass. 2010) (noting that "[c]lasses of 40 or more have been found to be sufficiently numerous under Rule 23(a)(1)"); *Reid v. Donelan*, 297 F.R.D. 185, 189 (D. Mass. 2014) ("A plaintiff need not provide a precise number . . . ."). Further, a court may "draw reasonable inferences from the facts presented." *McCuin v. Sec'y of Health & Hum. Servs.*, 817 F.2d 161, 167 (1st Cir. 1987).

Here, numerosity is easily met. According to DHS itself, over 100,000 unadjusted refugees are targeted by the challenged policies. *See* 91 Fed. Reg. at 65,088 (identifying approximately 186,000 unadjusted refugee cases). DHS's own number dwarfs the First Circuit's "low threshold" of 40. *See Guerrero Orellana*, 808 F. Supp. 3d at 183, n.4 (noting that "joinder of all class members would be impracticable because the specific composition of the class is in constant flux as the government makes additional arrests and class members' removal proceedings conclude"); *Garcia-Rubiera*, 570 F.3d at 460. Further, Plaintiffs seek only declaratory and injunctive relief, which further relaxes this already low threshold. *See Reid*, 297 F.R.D. at 189 ("[T]he threshold

may be relaxed when a party seeks only declaratory or injunctive relief, since the inclusion of future members increases the impracticability of joinder.”). In addition, joinder is impracticable because the proposed class members are dispersed across the country and lack resources to bring individual suits.[8] *See Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 259 (D. Mass. 2005) (“The difficulty that the size of the potential class poses for joinder is exacerbated by the geographical diversity of the class members, who are likely dispersed throughout the country.”); *In re Loestrin 24 Fe Antitrust Litig.*, No. 13-2472-WES-PAS, 2019 WL 3214257, at *8 (D.R.I. July 29, 2019) (explaining that district courts may consider “judicial economy, the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the geographic dispersion of class members ... and whether the claims are for injunctive relief or for damages” when determining if joinder is impracticable). As such, numerosity is satisfied.

### B. The Proposed Class Satisfies the Commonality Requirement.

Individual Plaintiffs meet the commonality requirement, which requires only that there be questions of law or fact common to the class. *See* Fed. R. Civ. P. 23(a)(2); *Garcia-Rubiera*, 570 F.3d at 460 (explaining commonality and typicality are “easily met” where there are “questions of law or fact common to the class”) (quoting Fed. R. Civ. P. 23(a)(2)). There need to only be one common issue to satisfy this requirement. *See Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376, 393 (D. Mass. 2024) (“Satisfying commonality is seen as a low bar because a single common legal or factual issue can suffice.”). Commonality is readily met where, as here, a defendant's widespread policy or practice affects all members of the Class. *See Matamoros v. Starbucks Corp.*, No. 08-10772-NMG, 2011 WL 2555760, at *2 (D. Mass. Feb. 8, 2011) (finding the question of

[8] Moreover, the “existence of future class members poses no obstacle to certification” in terms of standing because the future members of the class “will suffer an actual injury when they” join the class. *Guerrero Orellana*, 808 F. Supp. 3d at 182.

whether "Starbucks' company-wide policy" violates the law to satisfy the "low" commonality requirement); *see also Overka v. Am. Airlines, Inc.*, 265 F.R.D. 14, 18 (D. Mass. 2010) ("Where, as here, implementation of the common scheme is alleged, the commonality requirement usually is satisfied." (collecting cases)); *cf. Parent/Prof'l Advoc. League v. City of Springfield*, 934 F.3d 13, 31 (1st Cir. 2019) (denying commonality where plaintiffs failed to identify a uniform policy or practice driving the alleged harm). Proposed class members "do not have to share identical claims"; rather, this requirement turns on whether a question is capable of class-wide resolution, which is the case here. *See In re Volkswagen*, No. 1:07–md–1790–JLT, 2010 WL 3769259, at *2 (D. Mass. Sept. 22, 2010).

Here, Individual Plaintiffs and all Class Members' claims arise from the same three agency actions and impact the same population of unadjusted refugees: the Adjustment of Status Hold and Re-vetting Policy established by the Memo, and the IFR. Each of these agency actions affects every class member. The questions presented are therefore common to the proposed class and present shared legal and factual issues, including:

- Whether the Adjustment of Status Hold and the Re-vetting Policy exceed Defendants' statutory authority and are contrary to law;
- Whether the Adjustment of Status Hold, the Re-vetting Policy, and the IFR are arbitrary and capricious under the APA;
- Whether the Adjustment of Status Hold, the Re-vetting Policy, and the IFR are invalid because they are legislative rules and DHS did not go through notice and comment procedures before implementing them, violating the APA; and
- Whether the Adjustment of Status Hold and IFR violate the Fifth Amendment to the U.S. Constitution.

Courts in this District have found the commonality requirement met where, as here, class members face harm from the same unlawful government policy. In *Guerrero Orellana*, the named plaintiff sought to certify a proposed class of individuals subject to ICE's policy of detaining noncitizens who qualify as applicants for admission to mandatory detention during their removal proceedings. 808 F. Supp. 3d at 178. There, the court held that the proposed class, composed of "members [who] are all detained without a bond hearing pursuant to the *same allegedly unlawful government policy*[,]" met the commonality requirement by sharing "a common question capable of class-wide resolution." *Id.* at 184 (emphasis added). The court also rejected the government's argument that factual differences among class members defeated commonality, explaining that such differences had no bearing on "whether this interpretation of the statutory provisions is correct." *Id.* at 184; *see also Rolland v. Patrick*, No. 98–30208–KPN, 2008 WL 4104488, at *4 (D. Mass. Aug. 19, 2008) (explaining that individual differences among class members do not defeat commonality, which "refers to the defendants' conduct").

Because all issues presented derive from the same adoption and implementation of the Adjustment of Status Hold, the Re-vetting Policy, and the IFR, and do not depend on any proposed class member's individual circumstances, their resolution will determine the claims for each class member in a single stroke. Accordingly, Rule 23(a)(2)'s commonality requirement is met.

### C. The Proposed Class Satisfies the Typicality Requirement.

Typicality is satisfied here for largely the same reasons that commonality is satisfied. *See Dukes*, 564 U.S. at 349 n.5 (noting that commonality and typicality "tend to merge"); *Guerrero Orellana*, 808 F. Supp. 3d at 186 (holding typicality was satisfied "[f]or substantially the same reasons discussed in the context of commonality"). Individual Plaintiffs' claims are typical of the Class and arise from the same government action. Courts in this District recognize that typicality is "not highly demanding" because it requires only that named plaintiffs' claims "share the same

essential characteristics" as those of the class members. *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 26 (D. Mass. 2003) (quoting 5 Moore's Fed. Prac. § 23.24(4)); *see also Muniz v. XPO Last Mile, Inc.*, 342 F.R.D. 189, 197 (D. Mass. 2022) ("The typicality requirement, which tends to merge with the commonality requirement is not 'highly demanding because the claims only need to share the same essential characteristics, and need not be identical'" (quoting *Payne*, 216 F.R.D. at 24-25)); *Powers v. Receivables Performance Mgmt., LLC*, 801 F. Supp. 3d 17, 40 (D. Mass. 2025) (quoting *Payne*, 216 F.R.D. at 26). In other words, instead of demanding perfect symmetry, typicality is satisfied where the class representatives' injuries arise from the same events or course of conduct as those of the class members and their claims are likewise based on the same legal theories giving rise to class claims. *See Garcia-Rubiera*, 570 F.3d at 460 (holding that typicality was "easily met" where "Plaintiffs' claims arise from the same event or practice or course of conduct that gives rise to the claims of other class members, and are based on the same legal theory") (citation modified); *Gomes v. Acting Sec'y, D.H.S.*, 561 F. Supp. 3d 93, 101 (D.N.H. 2021) ("The representative plaintiff's claims and those of absent class members need not be identical; they need only 'share the same essential characteristics.'" (quoting *Ouadani v. Dynamex Operations E., LLC*, 405 F. Supp. 3d 149, 162 (D. Mass. 2019))).

Here, Individual Plaintiffs and members of the Class face the same injuries: the indefinite suspension of adjustment of status, exposure to categorical re-vetting, and the deprivation of a meaningful opportunity to respond to a NOIT before termination of refugee status. Additional harms shared by Individual Plaintiffs and members of the proposed class flow from these injuries and stem from the same government actions. *See Guerrero Orellana*, 808 F. Supp. 3d at 186 (finding typicality where the claims "arise from the same governmental policy" and the named plaintiff "presses the same statutory claim on behalf of himself and the class as a whole"); *Bowers*

*v. Russell*, 766 F. Supp. 3d 136, 148 (D. Mass. 2025) ("The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals.") (quoting *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 78 (D. Mass. 2005)).

The claims of the Class Representatives are typical of the proposed class and more than meet Rule 23(a)(3)'s low threshold. While differences can exist, each Individual Plaintiff is an unadjusted refugee with a pending adjustment application, is subject to the Adjustment of Status Hold, the Re-vetting Policy, and the IFR, and asserts the same claims as the class. *See Gomes v. Acting Sec'y, D.H.S.*, 561 F. Supp. 3d at 101 ("The representative plaintiff's claims and those of absent class members need not be identical; they need only 'share the same essential characteristics.'" (quoting *Ouadani v. Dynamex Operations E., LLC*, 405 F. Supp. 3d at 162)). Accordingly, the typicality requirement is met.

**D. The Proposed Class Representatives and Class Counsel Satisfy the Adequacy Requirement.**

The Individual Plaintiffs and their proposed Class Counsel satisfy Rule 23(a)(4) because they will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The First Circuit has articulated two requirements for adequacy: (i) the interests of the representative parties must not conflict with those of any of the class members; and (ii) the proposed counsel "is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985); *see Swack*, 230 F.R.D. at 265. As to the first prong, only a conflict that is "fundamental to the suit" will render the representative party inadequate. *Mantha*, 347 F.R.D. at 395 (explaining that "merely lacking identical interests is not enough for a representative party to be found inadequate"). As to the second prong, a showing that the proposed counsel is "qualified, experienced and able to vigorously conduct the proposed

litigation" is sufficient. *Andrews*, 780 F.2d at 130; *see Swack*, 230 F.R.D. at 267 (finding adequacy when "counsel has broad-based experience in complex litigation").

Here, the proposed Class Representatives seek the same declaratory and injunctive relief as all class members. Their interests are fully aligned with the class, and there is no conflict. Each representative has demonstrated a commitment to pursuing this case by coming forward and filing this suit despite the risks inherent in challenging Defendants' policies. Further, each Individual Plaintiff understands the responsibilities of class representation and is committed to serving in that role. *See* Ex. 7 (Lida A. Decl. ¶¶ 14-19); Ex. 8 (Abdi B. Decl. ¶¶ 16-20); Ex. 9 (Julio C. Decl. ¶¶ 8-12); Ex. 10 (Firas D. Decl. ¶¶ 19-24).

Further, Class Counsel is qualified, experienced, and able to conduct this litigation. Class Counsel includes attorneys from Democracy Forward Foundation ("DFF"), International Refugee Assistance Project ("IRAP"), and Allen Overy Shearman Sterling US LLP ("A&O Shearman"). This legal team brings decades of collective experience in litigating complex federal class actions on behalf of refugees and other noncitizens, as well as in immigration law, the APA, and constitutional law. Counsel have also demonstrated the ability to expend significant resources to investigate the claims and conduct the litigation. *See generally* Ex. 14 (Schwarz Decl.); Ex. 15 (Reuveni Decl.); Ex. 16 (Nathanson Decl.). Class Counsel is well-qualified and adequately resourced to represent the interests of the class and prepared to zealously represent Plaintiffs and all proposed class members throughout all stages of this litigation through trial. *See e.g.*, Ex. 14 (Schwarz Decl. ¶ 26); Ex. 15 (Reuveni Decl. ¶¶ 15-16); Ex. 16 (Nathanson Decl. ¶ 17).

The Court should therefore find that Rule 23(a)(4) is satisfied, and that Individual Plaintiffs are qualified to represent the Class. Similarly, the Court should appoint Individual Plaintiffs' undersigned counsel as Class Counsel under Rule 23(g).

## II. The Proposed Class Meets the Requirements of Rule 23(b)(2).

Finally, in addition to satisfying Rule 23(a)'s four requirements, this action qualifies for certification under Rule 23(b)(2) because it challenges whether Defendants "[have] acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).[9]

This case is well suited for Rule 23(b)(2) class certification. Defendants have adopted categorical policies that apply across the entire Class and, on their face do not require individualized treatment of class members, who are targeted only for their common trait of being lawfully admitted unadjusted refugees. Every Class Member faces the same threat—an indefinite bar on adjustment, categorical re-vetting, and termination of refugee status on 10 days' notice under the IFR—and seeks the same relief. *See Rolland v. Cellucci*, No. CIV A 98–30208–KPN, 1999 WL 34815562, at *9 (D. Mass. Feb. 2, 1999) ("As the First Circuit has explained, if injunctive or declaratory relief is appropriate with respect to the whole class, certification is proper.") (citing *Dionne v. Bouley*, 757 F.2d 1344, 1356 (1st Cir. 1985)); *see also McKenna v. First Horizon Home Loan Corp.*, 475 F.3d 418, 427 (1st Cir. 2007) ("A Rule 23(b)(2) class ordinarily is used when broad, class-wide injunctive or declaratory relief is appropriate."). Further, Plaintiffs and the Class do not seek monetary damages; they seek declaratory relief, injunctive

---

[9] While ascertainability is typically considered an implied requirement in Rule 23(b)(3) class actions, Individual Plaintiffs need not show ascertainability because that implied requirement "does not apply to classes seeking injunctive relief under Rule 23(b)(2)" where "notice to the members of a (b)(2) class is not required and the actual membership of the class need not therefore be precisely delimited." *Tassinari v. Salvation Army*, 349 F.R.D. 10, 32 n.17 (D. Mass. 2025) (citation modified).

relief, and vacatur of the Adjustment of Status Hold, the Re-vetting Policy, and the IFR under 5 U.S.C. § 706.

The "key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360.

The relief sought is inherently indivisible, as there is no way to grant relief to some Class Members and not others. Accordingly, Rule 23(b)(2) class certification is appropriate.

**CONCLUSION**

For all the foregoing reasons, Individual Plaintiffs respectfully request that the Court (i) certify the Class as defined above; (ii) appoint Individual Plaintiffs as Class Representatives; and (iii) appoint the undersigned counsel as Class Counsel.

Dated: October 26, 2026

By:
*/s/ Gideon J. Duke-Cohan*

Gideon J. Duke-Cohan (MA BBO# 716358)
**ALLEN OVERY SHEARMAN STERLING US LLP**
One Beacon Street
Boston, MA 02108
(212) 610-6353
gideon.duke-cohan@aoshearman.com

Hussein Elbakri* (NY Bar No. 5712666)
Guadalupe Aguirre* (NY Bar 5536107)
Kimberly Grano* (NY Bar No. 5858808)
Ghita Schwarz* (NY Bar No. 3030087)
Pedro Sepulveda* (NY Bar No. 6198550)

**INTERNATIONAL REFUGEE ASSISTANCE PROJECT**
One Battery Plaza, 33rd floor
New York, New York 10004
Telephone: (646) 939-9169
Facsimile: (516) 324-2267
helbakri@refugeerights.org
laguirre@refugeerights.org
kgrano@refugeerights.org
gschwarz@refugeerights.org
psepulveda@refugeerights.org

Dalia Fuleihan* (IL Bar No. 6335082)
**INTERNATIONAL REFUGEE ASSISTANCE PROJECT**
P.O. Box 47611
Chicago, IL 60647
Telephone: (646) 740-6271
Facsimile: (516) 324-2267
dfuleihan@refugeerights.org

Erez Reuveni (MA BBO No. 666769)
Jennie L. Kneedler* (DC Bar No. 500261)
Cynthia Liao* (DC Bar No. 90036947)
Steven Y. Bressler* (DC Bar No. 482492)
Robin F. Thurston* (DC Bar No. 1531399)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
ereuveni@democracyforward.org
jkneedler@democracyforward.org
cliao@democracyforward.org
sbressler@democracyforward.org
rthurston@democracyforward.org

John Nathanson (NY Bar No. 2630697)*
Andrew Tannenbaum (NY Bar No. 3940434)*
Leila Siddiky (NY Bar No. 5225164)*

**ALLEN OVERY SHEARMAN STERLING US LLP**
599 Lexington Avenue
New York, NY 10022
(212) 848-4000
john.nathanson@aoshearman.com
andrew.tannenbaum@aoshearman.com
leila.siddiky@aoshearman.com

Emily Westridge Black (TX Bar No. 24060815)*
**ALLEN OVERY SHEARMAN STERLING US LLP**
300 West 6th Street
Austin, TX 78701
(512) 647-1909
emily.westridgeblack@aoshearman.com

*Counsel for All Plaintiffs*
**Pro Hac Vice* Application Forthcoming

**CERTIFICATE OF SERVICE**

I certify that, on October 26, 2026, Plaintiffs' counsel caused the foregoing to be emailed to:

August Flentje
Deputy Director
U.S. Department of Justice, Civil Division, Office of Immigration Litigation
august.flentje@usdoj.gov

Papu Sandhu
Acting Senior Counsel for District Court Litigation
U.S. Department of Justice, Civil Division, Office of Immigration Litigation
Papu.Sandhu@usdoj.gov

Rayford Farquhar
Chief, Defensive Litigation, Civil Division
U.S. Attorney's Office for the District of Massachusetts
rayford.farquhar@usdoj.gov

Plaintiffs' counsel also caused the foregoing to be served on the U.S. Attorney's Office for the District of Massachusetts by courier and certified priority mail and to be served on Defendants and the Attorney General by certified priority mail.

*/s/ Gideon J. Duke-Cohan*
Gideon J. Duke-Cohan