**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPH B. EDLOW, et al.,<br><br>Defendants. | Civil Action No. 1:26-cv-14817-MJJ |

**RESPONDENTS' OPPOSITION TO PLAINTIFFS' MOTION FOR AN ADMINISTRATIVE STAY AND STAY OF AGENCY ACTION**

## INTRODUCTION

Plaintiffs' seek a Stay requiring that United States Citizenship and Immigration Services ("USCIS") provide adequate notice when terminating refugee status and resume processing, through final adjudication, the immigration benefit applications of certain class members. Plaintiffs' claim an interim final rule ("IFR") and the adoption of an adjudication hold policy are unlawful. They seek an order from this Court to Stay the application of the IFR and USCIS Memorandum ("USCIS Memo"), requesting that the Court order Defendants to halt the removal of the 30-day refugee termination notice and remove any adjudicatory hold on Plaintiffs cases.

Plaintiff's motion should be denied. First, Plaintiff's cannot show likelihood of success challenging the IFR. The IFR implements security measures responding to Presidential findings that identify systematic vetting deficiencies. Moreover, the Defendants followed the proper Administrative Procedure Act ("APA") notice-and-comment procedures. Exceptions exists to these procedures including for good cause and the foreign affairs function which the IFR appropriately detailed given the totality of the circumstances.

Second, in relation to the USCIS Memo which details the re-interview policy and adjustment of status hold, this Court lacks subject matter jurisdiction. The challenged memorandum is not "final agency action," which is a prerequisite to judicial review. Additionally, 8 U.S.C. § 1252(a)(2)(B) strips jurisdiction over discretionary benefits and decisions committed to agency discretion.

For both the IFR and USCIS Memo, Plaintiffs' cannot establish irreparable harm following implementation: the First Circuit requires harm that is "certain and great" and imminent. Economic difficulties or mere inconvenience do not meet this standard. A preliminary injunction cannot guarantee favorable adjudications; at most, it could compel erroneous or inaccurate adjudications before enhanced security measures are implemented, which is not in the public interest. Additionally, the equities favor Defendants. The Government and the public have compelling national security and public safety interests in thorough vetting before granting benefits, particularly where Presidential findings document systematic deficiencies preventing adequate verification.

**BACKGROUND**

On January 20, 2025, the President issued Executive order ("EO") 14163[1], Realigning the United States Refugee Admissions Program ("USRAP") until the admission of refugees aligns with the interest of the United States. ECF No. 1-4. This EO was to ensure public safety and national security were strongly considered in the administration of the USRAP. *Id.* During the

---

[1] The President also issued other Executive Orders and Proclamations in 2025 to include: EO 14161, Protecting the United States From Foreign Terrorist and Other national Security and Public Safety Threats; PP 10949, Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats; Presidential Proclamation (PP) 10998, Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States.

evaluation phase to make improvements to the EO, USCIS identified that from January 20, 2021, to February 20, 2025, the USRAP and USCIS potentially prioritized expediency, quantity, and admissions over quality interviews and detailed screening and vetting. *Id.* Given this concern and other detailed findings, on November 21, 2025, USCIS issued a memorandum directing a comprehensive review and a re-interview of all refugees admitted during January 20, 2021, to February 20, 2025. *Id.* The purpose of this memorandum is to ensure all principal refugees admitted[2] to the United States warranted a favorable exercise of discretion and met the definition of a refugee as describe in Immigration and Nationality Act ("INA") § 101(a)(42) at the time of admission and that all refugees are admissible to the United States. *Id.*

Thereafter and due to concerns with the integrity of the refugee program and the eligibility of refugee status of aliens admitted, USCIS implemented an Interim Final Rule on October 14, 2026, reducing the response period to a Notice of Intent to Terminate[3] ("NOIT") from thirty days to ten days. 91 Fed. Reg. 65,077. Through the IFR, DHS is amending 8 C.F.R. § 207.9 to change the 30-day notice-and-response period for aliens whose refugee status is terminated by USCIS to a 10-day notice and response period. *Id.* at 79. The purpose of the IFR is to protect U.S. interests and public safety, allowing USCIS to act quickly when the Department of Homeland Security ("DHS") determines that an alien did not meet the refugee definition and was not entitled to refugee

---

[2] To receive refugee status, an individual must meet the definition under INA § 101(a)(42). The refugee status of any alien (and of the spouse or child of the alien) may be terminated by the Attorney General pursuant to such regulations as the Attorney General may prescribe if the Attorney General determines that the alien was not in fact a refugee within the meaning of section 1101(a)(42) of this title at the time of the alien's admission. 8 U.S.C. § 1157(c)(4).

[3] The NOIT gives an alien an opportunity to respond to the reasons for possible refugee status termination. 91 Fed. Reg. 65,080-81. If the refugee's status is terminated, the individual is then placed into removal proceedings with the opportunity to seek relief from removal. *Id.,* at 81.

status at the time of admission. *Id.* at 78. Specifically, to further restore the integrity of the refugee program and protect against risks to national security and public safety. *Id.* The IFR was implemented following investigations which revealed fraud, refugees later identified as members of armed groups or had concealed extremist affiliations, and refugees not entitled to immigration benefits. *Id.* at 78-83.

## LEGAL STANDARD

"The same standard that governs the issuance of a stay under § 705 is the standard that governs the issuance of a preliminary injunction." *California v. Kennedy,* No. 25-cv-12019-NMG, 2025 WL 2807729, at *3 (D. Mass. Oct. 1, 2025). Preliminary injunctive relief is extraordinary. *Maine Forest Prods. Council v. Cormier*, 51 F.4th 1, 5 (1st Cir. 2022). Plaintiffs must establish likelihood of success on merits, irreparable harm absent relief, favorable balance of equities, and that injunction serves the public interest. *Together Emps. v. Mass Gen. Brigham Inc*., 32 F.4th 82, 85 (1st Cir. 2022). Although the most important factor is "likelihood of success on the merits," *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020), irreparable harm is "a necessary threshold showing," *Charlesbank Equity Fund II v. Blinds To Go*, *Inc*., 370 F.3d 151, 162 (1st Cir. 2004); without it, the "remaining factors become matters of idle curiosity," *Doe v. Trustees of Dartmouth Coll*., 597 F. Supp. 3d 511, 513 (D.N.H. 2022). When the government opposes a request for injunctive relief, the balance of hardships and public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Under the Administrative Procedure Act (APA), a court may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A),(C). But APA review requires "final agency action," 5 U.S.C. § 704; action that (1) "mark[s] the consummation

of the agency's decisionmaking process" rather than being "tentative or interlocutory," and (2) determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The arbitrary-and-capricious standard "requires that agency action be reasonable and reasonably explained." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 98 (1st Cir. 2025).

In deciding these claims, courts will apply a "narrow and deferential scope of review" and may "not substitute [their] judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An *ultra vires* claim requires demonstrating the agency acted outside the bounds of authority delegated by Congress, *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013), determined using "traditional tools of statutory construction," *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024).

## ARGUMENT

### I. Plaintiffs' claims are not likely to succeed on the merits for the IFR.

#### A. Good cause exception applies to notice-and-comment procedure.

The APA provides that the notice-and-comment requirements do not apply where any agency "for good cause finds (and incorporates the finding and a brief statement of the reasons therefore in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(4)(B); *see also Nat'l Customs Brokers & Forwarders Ass'n of Am. v. United States*, 59 F.3d 1219, 1224 (Fed. Cir. 1995). Such is the case here. "[T]he APA specifically requires that when an agency relies on the good cause exception it must 'incorporate[ ] the finding and a brief statement of reasons therefor in the rules issued.'" *Levesque v. Block*, 723 F.2d 175, 179 (1st Cir. 1983).

Notice and comment in emergency situations or a delay caused by the notice-and-comment

procedure resulting in an immediate threat to public safety amplifies the impracticable portion of the good cause exception. *Jifry* v. *FAA,* 370 F.3d 1174, 1179 (D.C. Cir. 2004). Implementing an important agency function would be unrealistic if advanced notice and comment was required and in many circumstances, create an overall harm to all. *United States Steel Corp.* v. *United States Environmental Protection Agency,* 595 F.2d 207, 214 (5th Cir. 1979). Furthermore, requiring the notice-and-comment procedure would be contrary to the public interest. The purpose of the IFR is to benefit public safety, combat fraud, and assist with national security. 91 Fed. Reg. 65,077. However, giving advanced notice to individuals who were not properly vetted or can be a risk to national security would harm the interest of the public. *Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 95 (D.C. Cir. 2012).

Here, this is good cause to bypass the notice-and-comment procedure because it is impracticable and it allows USCIS to move quickly in their duties.[4] As detailed in EO 14161 and EO 14163, public safety and national security are of upmost importance. Safeguards and appropriate vetting are a necessity to ensure individuals are properly admitted into the United States and do not pose a threat to the safety and welfare of the nation. USCIS is not only ensuring national security is at the forefront, but that aliens do not receive benefits to include employment authorization, permanent legal status, etc., without being entitled to such.

Streamlining the process to terminate refugee status in cases where the alien is determined to not have met the refugee definition at the time of admission to the United States is consistent with DHS's mission and responsibilities to ensure national security and public safety, and to protect

---

[4] DHS also understands the importance of public comments and this is being implemented as an Interim Final Rule with a request for public comment which allows for alteration or revision thereafter. 5 U.S.C. § 553.

the immigration system from fraud and exploitation. EO 14163; EO 14161. The Department of Homeland Security believes based on a review of prior refugee approvals and internal procedures, policies, and directives, that the lack of detailed refugee interviews and insufficient inquiry into critical matters such as inadmissibility or terrorism-related grounds, coupled with the prioritization of admission numbers over legally sufficient decisions have resulted in aliens receiving refugee status when they were not eligible. 91 Fed. Reg. 65,087. If DHS had to engage in advance notice-and-comment procedures, aliens who should have never been admitted to the United States as refugees to remain present longer than necessary, potentially putting at risk the safety and security of the United States and compromising the integrity of the U.S. immigration system.[5] *Id.*

**B. Foreign affairs excludes procedural requirement.**

APA's foreign-affairs exception would independently defeat Plaintiffs' claim. Section 553(a)(1) exempts matters "to the extent that there is involved . . . a military or foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). This exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country." *Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985). "The purpose of the [exception] was to allow more cautious and sensitive consideration of those matters which so affect relations with other Governments that, for example, public rule-making provisions would provoke definitely undesirable international consequences." *City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 201 (2d Cir. 2010). "[I]t would seem clear that the exception must be construed as applicable to most functions

[5] Furthermore, delaying the effective date under 5 U.S.C. § 553(d) is unnecessary as there is no need to give affected parties additional time to adjust their behavior before this final rule takes effect because DHS believes there are likely no behavioral adjustments to make. *Id.* The aliens who would be affected by this rule have already entered the United States. *Id.*

of the State Department[.]" *Attorney General's Manual on the Administrative Procedure Act* 27 (1947).

To be sure, "[c]ourts have specifically warned of the 'dangers of an expansive reading of the foreign affairs exception' in the immigration context." *Roe v. Mayorkas*, No. 22-cv-10808-ADB, 2023 WL 3466327, at *16 (D. Mass. May 12, 2023) (citation omitted). But the exception applies where public rulemaking would provoke "definitely undesirable international consequences" or implicate "quintessential foreign affairs functions such as diplomatic relations and the regulation of foreign missions." *Id.* (citations omitted).

That standard is satisfied here. With respect to refugee admissions, the relevant Departments must consider conditions within the specific countries, "the extent to which other countries will admit and assist" in resettlement, and "the impact of the participation of the United States in the resettlement of such refugees on the foreign policy interests of the United States". INA § 207; 8 U.S.C. 1157(e). Public notice-and-comment rulemaking on those measures would implicate quintessential foreign affairs functions and risk "undesirable international consequences"—namely, it could reveal sensitive screening or vetting rationales, impair relations with foreign governments by forcing public debate over country-specific risk judgments, and delay implementation of measures tied to ongoing external screening and vetting concerns. *Cf. Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008). This case therefore presents more than a rule that merely touches foreign affairs in some indirect way; the IFR concerns the conduct of adjustment applications and the United States' dealings with foreign nationals and foreign states in the resettlement context. Plaintiffs' notice-and-comment claim thus fails for this independent reason as well.

### C. IFR is not arbitrary and capricious.

The arbitrary and capricious standard is deferential. *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025). The APA requires agencies to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). Here, the agency explained the facts found and choices made, and that is all that is required.

The IFR cites particular facts to support the agency's decision that shortening the NOIT response period enables DHS to respond quickly to adverse findings.[6] Allowing a longer notice period could provide chances for individuals to evade enforcement or engage in activities against the public interest. In one case, a refugee was found to have participated in human rights abuses with the Liberian Armed Forces during the Liberian Civil War. 91 Fed. Reg. 65,078. In another case, a refugee was found to have misrepresented his involvement with the Oromo Liberation Front (OLF), an armed group in Ethiopia. *Id.* Social media checks indicated numerous pro-OLF activities and pro-OLF and radical violent rhetoric posted prior to his admission to the United States as a refugee. *Id.* In Operation PARRIS, USCIS determined in a number of cases the aliens did not meet the refugee definition at the time of admission. 91 Fed. Reg. 65,084. This was following the lax refugee processing during the Biden administration. *Id.*

---

[6] DHS has considered potential reliance interests regarding this IFR. DHS recognizes the difficulty aliens may face if their refugee status is terminated, but DHS believes the significant public safety, national security, and integrity benefits heavily outweigh any potential reliance interest and adverse impacts. 91 Fed. Reg. 65,088. Individuals still have the ability to respond to the NOIT. *Id.* This IFR does not remove the ability of aliens who legitimately qualify for refugee status to obtain employment authorization, permanent residency, and any other available benefits. *Id.*

Furthermore, the IFR is not only consistent with the INA and supported by current events, but also with Presidential policies concerning increased vetting. PP 10949; EO 14163; EO 14161. "[A]s an agency under the direction of the executive branch, [defendants] must implement the President's policy directives to the extent permitted by law." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) (citing *Bldg. & Const. Trades Dep't. v. Allbaugh*, 295 F.3d 28, 32-33 (D.C. Cir. 2002). Multiple case reviews and operations detailed the lack of stringent review, lax in standards, and easily accessible green cards for individuals who did not fall within the definition of a refugee. 91 Fed. Reg. 65,083-84. Recent events revealed potential gaps or failures in how existing screening and vetting processes were implemented, prompting the agency to reassess whether those procedures were adequate and uniformly applied. The specific cases detailed above demonstrate that when credible evidence of national security or public safety concerns arises after a refugee's admission, USCIS may be unable to initiate removal proceedings until the termination process is complete. 91 Fed. Reg. 65,078. Therefore, reducing the response period to ten days after issuance of a NOIT allows USCIS to address such threats more quickly and effectively, restoring integrity to the immigration system. *Id.* For the reasons detailed above, the Defendants also argue the USCIS Memo, which details the need for ensuring that all principal refugees who are admitted meet the definition of a refugee and that all refugees do not pose a threat to national security and public safety, is not arbitrary and capricious. ECF No. 1-4 at 3.

## II. Plaintiff's claims are not likely to succeed on the merits for the re-interview and adjustment of status memo.

### A. The re-interview and adjustment of status memo is not contrary to law.

Where the Executive has determined that adjudication of immigration benefit applications must be temporarily halted to permit additional vetting and review in the interest of national security and public safety, courts have traditionally declined to interfere with that determination.

*See, e.g.*, *Kapoor v. Blinken*, No. 21-CV-01961-BLF, 2022 WL 181217, *6 (N.D. Cal. Jan. 20, 2022) (declining to order adjudication where "Defendant has presented substantial evidence that the COVID-19 pandemic has negatively impacted the NVC's ability to provide visa services"); *Sulaiman v. Mayorkas*, No. 8:24-CV-01733-FWS-KES, 2024 WL 5410126, *3 (C.D. Cal. Dec. 11, 2024) (remanding delayed adjudication to USCIS because of their expertise in investigating and fact-finding, especially where more information needs to be evaluated); *Iqbal v. Blinken*, No. 2:23-CV-01299-KJM-CSK, 2024 WL 3904959, at *9 (E.D. Cal. Aug. 22, 2024) (finding no unreasonable delay where COVID-19, the Taliban takeover of Kabul, and additional vetting necessitated additional time to adjudicate visa). This Court should not replace its judgment for that of the Executive in the national security realm to review such policies. *See, e.g., Dep't of the Navy v. Egan*, 484 U.S. 518, 529–30 (1988) ("[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."); *Trump v. Hawaii*, 585 U.S. 667, 686–87 (2018) ("[W]hen the President adopts "a preventive measure . . . in the context of international affairs and national security," he is "not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions."); *Ameziane v. Obama*, 699 F.3d 488, 494 (D.C. Cir. 2012) ("It is not within the role of the courts to second-guess executive judgments made in furtherance of" acquiring and exercising expertise of protecting national security by the executive.). The Court should find that foreign affairs decision-making culminating in the Policy Memoranda that Plaintiffs challenge here are related to national security and beyond its purview. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations" and "[s]uch matters are so exclusively entrusted to the political branches of government

as to be largely immune from judicial inquiry or interference."). Thus, the Court should decline to interfere in the Executive's decision to halt adjudication due proper vetting and to national security concerns.

Furthermore, temporarily pausing final adjudication of categories of applications is within the agency's discretion and statutory authority. Agencies frequently take temporary operational pauses or issue guidance to address emergent circumstances within their statutory authority, even if they have not done so in exactly the same form before. See, e.g., *Beshir*, 10 F.Supp.3d 165 (addressing 2008 adjudication hold policy to allow time for possible exemptions from terrorism-related inadmissibility grounds); *Alaska Indus. Dev. & Exp. Auth. v. Biden*, 685 F. Supp. 3d 813, 833 (D. Alaska 2023) (addressing moratorium suspending oil and gas leasing program pending ongoing environmental review).

**B. The re-interview and adjustment of status memo is not final agency action.**

The USCIS Memo does not meet the prerequisites for APA review, because only actions made reviewable by statute and "final agency action for which there is no adequate remedy in a court" are reviewable under the APA. 5 U.S.C. § 704. Because the USCIS Memo is not final agency action, this court lacks statutory jurisdiction to grant preliminary injunctive relief. *Puerto Rico v. United States*, 490 F.3d 50, 70 (1st Cir. 2007) ("The issue of whether there was final agency action implicates the jurisdiction of the federal courts, and such final action is normally a prerequisite to judicial review… [T]he question of whether there has been final agency action is one that implicates statutory, rather than constitutional jurisdiction."). In this motion, Plaintiffs challenge the USCIS Memo, which specifically states the applications will be reviewed and applicants re-interviewed. ECF No. 1-4. Agency action is final only if it (1) marks

"consummation" of the agency's decisionmaking process and (2) determines rights or obligations or creates legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

A challenged action fails the first prong if it is "tentative or interlocutory" and does not express an agency's "unequivocal position." *Holistic Candlers v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012). Here, the USCIS Memo is temporary and pending applications for adjustment of status will be held until a further review is completed and a re-interview occurs. Thus, the USCIS Memo is not final agency action and is unreviewable by this court. *See Gem Cty. Mosquito Abatement Dist. v. EPA,* 398 F. Supp. 2d 1, 11 (D.D.C. 2005) (agency's interim guidance was not final agency action).

Further, the ongoing nature of USCIS's work demonstrates that the USCIS Memo does not constitute the consummation of decision-making. No plaintiff or class member alleges that their adjustment of status application has been denied. ECF No. 1, 5. USCIS continues processing applications while the hold is in place: review, scheduling and, conducting re-interviews where appropriate. ECF No. 1-4 at 3. These processes are individualized, case-specific, and must be completed before any adjustment of status application can proceed regardless of whether a hold is in place. This ongoing work confirms there has been no consummation of decision-making regarding applications subject to the USCIS Memo because USCIS has not reached any final determination on any affected application. Each individual's application for adjustment of status is still in process. This contrasts with cases where an agency made a definitive determination. *U.S. Army Corps of Engineers v. Hawkes Co*., 578 U.S. 590, 597 (2016) (agency determination final where issued "after extensive factfinding").

The USCIS Memo is also not final agency action because no rights or obligations flow from it. Instead, the memorandum and final adjudication holds pursuant to it are procedural and

merely "mark a midstream pause in an ongoing administrative process—one that remains open to further agency consideration." *Kewayfati v. Bondi*, 165 F.4th 342, 346 (5th Cir. 2026); *Am. Petroleum Inst. v. U.S. E.P.A.*, 216 F.3d 50 (D.C. Cir. 2000) ("A decision by an agency to defer taking action is not a final action reviewable by the court."). The administrative process *is* ongoing, both in terms of the memorandum itself and the individual benefit requests. There has been no "terminal event." *Salinas v. Railroad Retirement Board*, 592 U.S. 188, 194-95 (2021) (addressing statutory requirement of "final decision" similar to "final agency action"). And, to the extent any individual applicant can demonstrate unreasonable delay or withholding of agency action, the APA provides a remedy to compel adjudication of their individual application unless other review exclusions (such as those discussed just below) apply. *See* 5 U.S.C. § 706(1) (stating that a court may compel agency action "unlawfully withheld or unreasonably delayed"); *id.* § 701(a) (providing exclusions, including where statutes preclude review).

**C. Court lacks jurisdiction over plaintiffs' claims pursuant to 8 U.S.C. § 1252(a)(2)(B).**

Section 1252(a)(2)(B) provides: "[N]otwithstanding any other provision of law … no court shall have jurisdiction to review—(i) any judgment regarding the granting of relief under section … 1255 …, or (ii) any other decision or action … the authority for which is specified under this subchapter to be in the discretion of the [Secretary], other than the granting of relief under section 1158(a)." 8 U.S.C. § 1252(a)(2)(B). Adjustment of status is a discretionary benefit within § 1255, so § 1252(a)(2)(B)(i) bars judicial review of "any judgment regarding the granting of" adjustment of status under that statute. *See Guedes v. Mayorkas*, 123 F.4th 68, 70 (1st Cir. 2024).

In *Patel v. Garland*, 596 U.S. 328 (2022), the Supreme Court held that § 1252(a)(2)(B)(i) precludes judicial review of all determinations relating to adjustment of status, not just the ultimate

discretionary decision. The Court reasoned that the word "any" has "expansive meaning," indicating the bar applies to judgments "of whatever kind" under § 1255, "not just discretionary judgments or the last-in-time judgment." *Id*. at 338. And "regarding" "generally has a broadening effect, ensuring that the scope covers not only its subject but also matters relating to that subject." *Id*. at 339. Thus, the bar precludes jurisdiction over "all aspects" of the adjustment decision. *Zia v. Garland*, 112 F.4th 1194, 1200 (9th Cir. 2024) ("The [Supreme] Court made clear that § 1252(a)(2)(B)(i) applies to *all* aspects of the [agency's] decision regardless of whether underlying determinations are characterized as discretionary or factual . . . ."); *Abuzeid v. Mayorkas*, 62 F. 4th 578, 583-84 (D.C. Cir. 2023).

*Patel's* reasoning applies fully to pre-decision processing determinations. Decisions about when to adjudicate, what security procedures to complete, and whether investigations are sufficient all constitute "matters relating to" adjustment relief. *See Patel*, 596 U.S. at 339.[7] Each determination that an application requires further investigation, that security checks are incomplete, or that adjudication should be withheld pending resolution of security concerns constitutes a "judgment" regarding the granting of relief. *See id*.

Subsection (ii) of this provision also bars review of the plaintiffs' claims regarding a policy to delay adjudication of adjustment of status applications because such a policy is "any other decision or action" where "the authority for which is specified under this subchapter to be in the

[7] *See also, Garcia v. United States Citizenship & Immigr. Servs*., 146 F.4th 743, 758 (9th Cir. 2025) (Bress, J., concurring) ("This all-encompassing jurisdiction-stripping language [of 1252(a)(2)(B)(i)] does not permit collateral challenges to agency policies in federal district court concerning discretionary immigration relief like adjustment of status under § 1255.") (citations omitted).

discretion" of the Secretary. 8 U.S.C. § 1252(a)(2)(B)(ii). For adjustment, § 1255(a) provides status "may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe." 8 U.S.C. § 1255(a). This language confers broad discretion over not only whether to grant adjustment, but also how and when to adjudicate applications. Multiple courts of appeals have thus held that a USCIS policy to hold adjudications on adjustment of status applications pending visa availability was unreviewable under § 1252(a)(2)(B)(ii). *Kale v. Alfonso-Royals*, 139 F.4th Cir. 329, 335-36 (4th Cir. 2025) (USCIS policy to hold applications for adjustment of status in abeyance until visa number became available was not subject to judicial review); *Kanapuram v. USCIS*, 131 F.4th 1306, 1306-07 (11th Cir. 2025); *Thigulla v. Jaddou*, 94 F.4th 770, 775 (8th Cir. 2024); *Cheejati v. Blinken*, 106 F.4th 388, 394, 396 (5th Cir. 2024); *Geda v. Director of U.S. Citizenship and Immigration Servs.*, 126 F.4th 835, 843 (3d Cir. 2025) (whether and how to adjust foreign nationals' status was explicitly committed to Secretary of Homeland Security's discretion); *see also Nakka v. United States Citizenship & Immigr. Servs.*, 111 F.4th 995, 1007 & n.11 (9th Cir. 2024) ("'other decision or action' more broadly includes other types of agency decisions—including those that may not qualify as 'judgments'"); *Patel v. Jaddou*, 695 F.Supp.3d 158 (D. Mass. 2023), *aff'd on other grounds by Gupta v. Jaddou*, 118 F.4th 475, 487 (1st Cir. 2024); *Beshir v. Holder*, 10 F.Supp.3d 165 (D.D.C. 2014) (applying § 1252(a)(2)(B)(ii) to adjudication hold policy to reassess terrorism related exemptions from inadmissibility).

As *Kale* well explains, "8 U.S.C. § 1255 confers discretionary authority on USCIS to establish procedures for adjudicating adjustment applications, which constitutes an agency 'decision' or 'action.' As a result, a challenge to procedures chosen and implemented by USCIS 'cannot be reviewed by federal courts.'" 139 F.4th at 336 (quoting *Cheejati*, 106 F.4th at 394). Put

another way, "the decision to put [plaintiffs'] applications on hold and the inextricably intertwined process prescribed by the Secretary for reaching that decision" are both covered by § 1252(a)(2)(B)(ii)'s bar. *Geda*, 126 F.4th at 844 (internal quotations omitted). This consensus supports recognition that "granting the [Secretary] discretion to promulgate regulations governing the process of adjudication necessarily includes a grant of discretion over the pace of adjudication." *Beshir*, 10 F. Supp. 3d at 174. So too here. The USCIS Memo sets forth a policy for temporarily holding adjudication on a certain application until further background investigations can be completed for national security reasons. As multiple courts have held, adjudication hold policies in the adjustment of status context are unreviewable.

**D. Notice and comment was not required.**

Nor is the USCIS Memo a legislative rule required to undergo notice and comment. Notice and comment is required for legislative rules, but it is not required prior to issuance of "interpretive rules, general statements of policy, or rules of agency organization, procedure or practice." 5 U.S.C. § 553(b)(A). "[A] legislative rule (interchangeably called a substantive rule)" is "one that 'creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself.'" *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (quoting *La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992)).

Here, the USCIS Memo is a rule of agency procedure, not a legislative rule. It does not create any rights, assign any duties, or impose any obligations. Instead, it is a "general statement of policy" exempt from the notice and comment requirement. *See* 5 U.S.C. § 553(b)(A). That policy concerns agency practice and procedure and implements the agency's discretion under existing statutory security requirements—specifically 8 U.S.C. §§1105 (investigations), 1255

(adjustment of status eligibility), and 1446 (naturalization investigations)—and existing regulatory authority under 8 C.F.R. § 103.2(b)(18) (withholding adjudication during security investigations). The USCIS Memo does not create new substantive requirements or alter applicants' substantive rights; rather, it provides operational guidance on applying existing security mandates in light of Presidential findings documenting systematic vetting deficiencies. Instead, the USCIS memo is a "statement [ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979).

Alternatively, the USCIS Memo would qualify as a rule or statement of agency procedure also exempt from notice and comment rulemaking. *See* 5 U.S.C. § 553(b)(A). A "critical feature" of the procedural exception is that it "covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the partis present themselves or their viewpoints to the agency." *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000). That a procedural policy or rule may have some impact on benefits applicants does not make it a substantive rule. *Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 757 (9th Cir. 1992).

Furthermore, because the agency is following a Presidential directive, any consideration of public comments on additional security vetting would not have led to a different outcome, and thus any error is harmless. *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 690 (D.C. Cir. 2023) (error harmless if comments "would not alter the legal conclusion of the rule.").

## III. Plaintiffs' cannot establish irreparable harm.

Plaintiffs cannot carry their substantial burden of demonstrating irreparable harm. Irreparable harm is a "necessary threshold showing," *Charlesbank Equity Fund II, Ltd. P'ship*, 370 F.3d 151, 162 (1st Cir. 2004) and that harm must be "certain and great," *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262 (10th Cir.2004) – not speculative or unverified.

Regarding the IFR, there are multiple safeguards in place. By regulation, the response period begins either upon personal service of the NOIT directly to the alien or, if sent by mail, upon mailing of the NOIT. 91 Fed. Reg. 65,085. When calculating the response deadline, all days, including Saturdays, Sundays, and federal holidays, are counted. However, if the final day falls on a Saturday, Sunday, or federal holiday, the deadline is extended to the next business day. *Id.*

Per 8 CFR 103.8(b), if the notice is served by mail, three days are added to the response period, with service considered complete on the date the notice is mailed. *Id.* DHS's foremost priority is the safety and security of American citizens and residents. At the same time, DHS is committed to ensuring that refugees who receive a NOIT are afforded a meaningful opportunity to respond or provide a rebuttal.

To enhance mail service reliability and afford refugees the full response period, DHS will utilize express delivery service providers, which guarantee a three-day delivery window and offer tracking and confirmation of both the NOIT's departure from DHS custody and its delivery to the recipient. 91 Fed. Reg. 65,085. This approach ensures that refugees receive their NOIT promptly and can exercise their right to respond. *Id.* The NOIT will be dated on the day it is mailed, and the 10-day response period for the refugee will begin from that date. *Id.*

If the refugee wishes to request an opportunity to provide oral testimony in lieu of responding to each point or points in the NOIT, such a request would be considered a timely response by DHS. *Id.* As explained above, in accordance with 8 CFR 103.8(b), when a notice is served by mail, three additional days are added to the response period, with service considered complete on the date the notice is mailed. *Id.* Therefore, applicants who are mailed notices are afforded a total of 13 days to respond, accounting for this regulatory provision. *Id.*

DHS believes that reducing the NOIT response period from 30 days to 10 days maintains adequate procedural safeguards for aliens by affording them an opportunity to respond to the NOIT. *Id.* While also balancing the government's interests in national security and public safety and in protecting the integrity of the refugee program. This reduction in response time does not mean termination of status. The IFR does not entail detention. Requesting individuals to remain diligent to continue receiving immigration benefits is a not a request too great. Reducing the time to respond to the NOIT does not, in any way, create irreparable harm. One may argue inconvenience. For example, redirect personnel hours. ECF No. 5 at 33. However, when weighing the interest of the security of United States citizens and residents, the harm is not comparable.

Regarding the USCIS Memo, delay in final adjudication does not establish irreparable harm. Delay in application processing is routinely experienced across the immigration system at any given time. If delay alone constituted irreparable harm, every applicant whose case takes longer than desired could obtain preliminary relief. Courts have rejected this. *Khachutorov v. Britten*, 792 F. Supp. 3d 1106, 1116 (C.D. Cal. July 23, 2025); *Kurt v. Mayorkas*, No. 24-cv-02792-SK, 2024 WL 5161950, at *5 (N.D. Cal. Dec. 18, 2024). The First Circuit held that delay in administrative processing, without more, does not constitute irreparable harm. *Anversa v. Partners Healthcare Sys., Inc.*, 835 F.3d 167, 178 (1st Cir. 2016).

Plaintiffs also assert that delays in adjudication will result in loss of work authorization and financial hardship. ECF No. 5 at 33 (Krieger Decl. ¶ 8, detailing Public Law 119-21, also known as the One Big Beautiful Bill Act of 2025). But delay, without more, does not constitute irreparable harm. *Anversa*, 835 F.3d at 178. And the risk that an individual's work authorization or financial assistance may lapse before adjudication of a discretionary benefit is not new and is not attributable to the USCIS Memo. It is a function of the temporary nature of parole and the well-documented processing times for immigration benefits.

Plaintiffs' use of pseudonyms for unidentified class members compounds their evidentiary burden. Irreparable harm must be concrete; that is, it "must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II, Ltd. P'ship,* 370 F.3d at 162. Without true identities, neither Defendants nor this court may verify: (1) whether claimed harms are real or hypothetical; (2) whether Plaintiffs remain employed or have alternate income; (3) whether professional setbacks result from the challenged policies or other factors; or (4) the accuracy of hardship claims. Plaintiffs ask this Court to grant extraordinary relief based on unverifiable allegations from unidentified parties. Plaintiffs have simply not established that a preliminary injunction would address any harm they allege. A preliminary injunction cannot guarantee favorable adjudications: it can only compel flawed adjudications before enhanced security vetting is complete. And, critically, if a flawed adjudication is compelled without completed security screening, the result will be for USCIS to deny the application or petition because to do otherwise would violate statute, regulation, policy, and the Presidential directive. The entire purpose of the IFR and USCIS Memo is to avoid this problem from reoccurring.

**IV. The balance of the equities favors the government.**

When the Government is a party, the balance of equities and public interest merge. *Nken v. Holder*, 556 U.S. 418,435 (2009); *Grant v. Trial Ct.*, 784 F. Supp. 3d 475, 490–91 (D. Mass. 2025). A preliminary injunction is an extraordinary remedy requiring careful balancing. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). The Government's interest in national security is "an urgent objective of the highest order." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010).

Courts must be particularly cautious about issuing injunctions that interfere with executive branch functions, especially in areas of national security and foreign affairs, and particularly those functions in furtherance of Presidential policy. Whenever a district court issues an injunction against the Executive Branch, the United States suffers a form of irreparable harm. The President is "a representative of the people" and holds "the mandate of the people to exercise his executive power." *Myers* v. *United States*, 272 U.S. 52, 123 (1926). The government has a substantial interest in carrying out the President's policies. Courts irreparably injure our democratic system when they forbid the government from effectuating those policies against anyone anywhere in the nation. *Cf. Maryland* v. *King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Those concerns escalate when, as here, the injunction undermines the Executive Branch's constitutional and statutory authority over immigration and the admission of aliens, thereby engaging in "unwarranted judicial interference in the conduct of foreign policy." *Kiobel* v. *Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013). Judicial inquiry into the national-security realm similarly intrudes "on the President's constitutional responsibilities in the area of foreign affairs." *Hawaii*, 585 U.S. at 704; *see also Egan*, 484 U.S. at 530. The requested relief would require resumption of adjudications under procedures that the Executive has determined inadequate to

address documented vetting deficiencies. This substitutes judicial judgment for executive expertise on matters where deference is appropriate. *Holder*, 561 U.S. at 33-34.

Plaintiffs', on the other hand, at most, must wait to have their applications adjudicated and undergo additional security checks to receive the immigration benefits they seek. They effectively ask the Court to require USCIS to adjudicate benefits with sufficient speed in order to received legal permanent resident status. But Congress did not structure the immigration system to guarantee work authorization or other benefits, and courts may not rewrite the statutory scheme through equitable relief. The national security concerns identified in the IFR and USCIS Memo outweigh any possible risk to Plaintiffs from the new processing procedure of a NOIT or delay in adjudication of pending benefit requests. And while that lack of diligence by a Plaintiff or delay in processing may result in an inconvenience or a period of time without assistance, that was always a risk, as adjudication of immigration benefits was never guaranteed on a particular schedule.

Dated: November 13, 2026

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: */s/ Vincent Engingro III*
Vincent Engingro III
Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Tel.: 617-748-3100
Email: Vincent.engingro@usdoj.gov

**CERTIFICATE OF SERVICE**

I, Vincent Engingro III, Assistant United States Attorney, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). Paper copies will be sent to those indicated as non-registered participants.

Dated: November 13, 2026

By: */s/ Vincent Engingro III*
Assistant United States Attorney