**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, *et al.*,

*Plaintiffs*,

v.

JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services, *et al.*,

*Defendants*.

Case No. 1:26-cv-14817-MJJ

*Leave to file granted on November 19, 2026*

**REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705**

## TABLE OF CONTENTS


INTRODUCTION .......... 1

BACKGROUND .......... 1

ARGUMENT .......... 3

I. Defendants have forfeited opposition to many of Plaintiffs' arguments. .......... 3

II. Plaintiffs are likely to succeed on their IFR claims. .......... 4

A. No exception to notice-and-comment rulemaking applies. .......... 4

1. Defendants lacked good cause to skip notice and comment or to implement the IFR immediately. .......... 4

2. The foreign affairs exception does not apply. .......... 7

B. The IFR is arbitrary and capricious. .......... 8

III. Plaintiffs are likely to succeed on their November 2025 Memo claims. .......... 9

A. The Court has jurisdiction over Plaintiffs' claims. .......... 9

B. The Adjustment of Status Hold and Re-vetting Policy are final agency actions. .......... 11

C. The Adjustment of Status Hold and Re-vetting Policy are contrary to law. .......... 12

D. The Adjustment of Status Hold and Re-vetting Policy are legislative rules requiring notice and comment. .......... 14

1. The Adjustment of Status Hold and Re-vetting Policy are legislative, not interpretive, rules. .......... 14

2. The Adjustment of Status Hold and Re-vetting Policy are not procedural rules. .......... 16

3. The Adjustment of Status Hold and Re-vetting Policy are not general statements of policy. .......... 16

4. Defendants' failure to follow notice and comment was not harmless. .......... 17

IV. Plaintiffs are facing irreparable harm now. .......... 19

A. The IFR threatens the loss of refugee status without a meaningful opportunity to be heard. .......... 19

B. The Adjustment of Status Hold and Re-vetting Policy inflict ongoing harm that compounds the IFR's. .......... 21

C. Defendants' misplaced objection to pseudonyms does not alter this analysis. .......... 22

V. The balance of equities and the public interest favor a stay. .......... 23

CONCLUSION .......... 24

## INTRODUCTION

In their opening brief, Plaintiffs explained in detail why the Interim Final Rule ("IFR") and the Adjustment of Status Hold and the Re-vetting Policy are unlawful: among other things, they were promulgated without the notice and comment procedures required by the Administrative Procedure Act ("APA") and are arbitrary and capricious. And the Adjustment of Status Hold and the Re-vetting Policy exceed Defendants' authority under the Immigration and Nationality Act ("INA"). Defendants, despite having 18 days to respond to Plaintiffs' submission—nearly twice as much time as the IFR affords refugees to defend themselves from efforts to terminate their status—have failed to directly respond to nearly all of Plaintiffs' arguments. Instead of addressing Plaintiffs' arguments head on, Defendants gesture vaguely at perfunctory and unsupported "national security" and "public safety" concerns and largely rely on 8 U.S.C. § 1255, which has no relevance to refugee adjustment applications, while ignoring the controlling statutes in the refugee context, 8 U.S.C. §§ 1101(a)(42), 1157(c)(4), and 1159(a).

Defendants also fail to grapple with the immediate and significant harms Plaintiffs—a putative class of refugees resettled in this country and six local and national organizations that serve them—are suffering because of the IFR, the Adjustment of Status Hold, and the Re-vetting Policy. These include the imminent risk that more than 100,000 putative class members will lose their lawful status and attendant benefits, including work authorization and protection from detention and removal, without adequate process; the loss of food assistance and health benefits as a result of delays in adjustment; and the Organizational Plaintiffs' immediate need to restructure services, redirect personnel hours, and expend enormous human and financial resources to protect their clients and members. Because Plaintiffs have demonstrated their likelihood of success on the merits and significant, ongoing irreparable harms, the Court should stay the effective date of the IFR, the Adjustment of Status Hold, and the Re-vetting Policy, certify Plaintiffs' proposed Class, and enter their proposed order.

## BACKGROUND

While Plaintiffs' opening brief sets forth the statutory and regulatory framework governing

refugee admissions and adjustment of status, Plaintiffs reiterate key points here most relevant to Defendants' arguments and misunderstanding of the INA provisions relevant to refugees.

To further the United States' commitment to welcoming vulnerable individuals facing persecution, Congress designed a comprehensive system for refugee admissions, adjustment of status, and (in rare cases) termination. The U.S. Refugee Admissions Program ("USRAP") requires that refugees be vetted extensively before they arrive. Most are referred by the United Nations High Commissioner for Refugees ("UNHCR"), and the security screening that follows has typically taken 18 to 36 months or longer and involved multiple national security and law enforcement agencies. Decl. of Smita Rao Dazzo (Doc No. 2-3) ¶ 39.

Congress then set the path to permanent residence for refugees soon after their arrival. After one year in the United States, a refugee whose status has not been terminated is required to apply for adjustment of status and, if admissible, "*shall* ... be regarded as lawfully admitted to the United States for permanent residence" as of the date of arrival. 8 U.S.C. § 1159(a)(1)-(2) (emphasis added). U.S. Citizenship and Immigration Services ("USCIS") decides "on a case-by-case basis" whether an interview is needed and "*will* approve" the application of an admissible refugee. 8 C.F.R. § 209.1(d)-(e) (emphasis added). Unlike adjustment under § 1255(a), which involves other categories of immigrants and "may" be granted "in [the Secretary's] discretion," adjustment for refugees under § 1159(a) is mandatory. Doc No. 5 at 23 & n.9.

Congress provided one method for refugee status termination: if the Department of Homeland Security ("DHS") determines that the person "was not in fact a refugee" at the time of admission, and only "pursuant to such regulations as [DHS] may prescribe." 8 U.S.C. § 1157(c)(4). For 45 years, those regulations gave a refugee a written Notice of Intent to Terminate ("NOIT") and 30 days to respond. *Removing 30-Day Refugee Termination Notice*, 91 Fed. Reg. 65,077, 65,080 & n.21 (Oct. 14, 2026) (IFR); 8 C.F.R. § 207.9 (2025). Moreover, the government may terminate refugee status only until a refugee adjusts. 91 Fed. Reg. at 65,080. Unsurprisingly, given the extensive procedures refugees undergo to obtain their status, termination has been rare. *Id.* at 65,088 n.77 (conceding USCIS has terminated few refugee cases); Doc. No. 2-3 ¶ 34 (HIAS has

never had a single case of refugee termination, despite resettling over 21,000 refugees in the past five years).

Each challenged policy distorts a different part of the framework Congress crafted and together they create a system designed to strip thousands of refugees of lawful status. First, the Adjustment of Status Hold blocks adjustment indefinitely for refugees admitted between January 20, 2021, and February 20, 2025. Joseph B. Edlow, *Reinterview of Certain Refugees Admitted to the United States and an Immediate Hold on Certain Refugees with a Pending I-485 Application to Register Permanent Residence or Adjust Status* (Nov. 21, 2025), Doc No. 1-4 at 2-4 ("November 2025 Memo"). Second, the mass Re-vetting Policy provides a pretext to terminate refugee status en masse, *id.* at 1-2, through interviews scheduled on as little as two days' notice, Decl. of Allegra Marisol Drobnick (Doc No. 2-13) ¶ 6, with NOITs to follow, Decl. of Tracy Roy (Doc No. 2-11) ¶¶ 8, 16; *see* 91 Fed. Reg. at 65,083-84. Third, the IFR then cuts the refugee's time to respond to a NOIT from 30 days to 10 days. Refugees who miss the deadline—and any family members who were admitted as "derivative" refugees—lose their status by default. 91 Fed Reg. at 65,086; Doc No. 2-13 ¶ 8.

## ARGUMENT

### I. Defendants have forfeited opposition to many of Plaintiffs' arguments.

Plaintiffs explained in their Stay Memorandum, Doc No. 5 at 25-26, that the Adjustment of Status Hold and Re-vetting Policy violate the *Accardi* doctrine as articulated in *U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). Defendants did not respond to any of these arguments and have forfeited any opposition to them. *See United States v. Pizarro-Berríos*, 448 F.3d 1, 5 (1st Cir. 2006) ("We have consistently held that, except in extraordinary circumstances, arguments not raised in a party's initial brief and instead raised for the first time at oral argument are considered waived"); *Bean v. NICE Sys., Inc.*, No. 23-cv-12394, 2025 WL 1248899, at *5 n.2, *9 n.7 (D. Mass. Apr. 30, 2025) (the "failure to address [an] argument waives any opposition to it").

In addition, Plaintiffs identified six ways in which the Adjustment of Status Hold and Re-vetting Policy are arbitrary and capricious. Doc No. 5 at 27-30. Defendants offered nothing in opposition except a single sentence incorporating inapposite arguments regarding the IFR. *See* Doc No. 50 at 10. Defendants have thus forfeited any argument on this issue. *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 61 n.17 (1st Cir. 1999) ("We have repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived."). Because Defendants have not defended the November 2025 Memo against Plaintiffs' arbitrary and capricious and *Accardi* challenges, the Court can and should stay those agency actions on this basis alone.

The remainder of Defendants' brief dismisses Plaintiffs' merits arguments without providing any substantive response other than rehashing statements made in the IFR and the November 2025 Memo. The Court should deem any arguments not made in Defendants' opposition forfeited. *See, e.g.*, *Liberty Mut. Ins. Co. v. Aftermath Servs. LLC*, No. 22-CV-11052-ADB, 2023 WL 5435878, at *4 (D. Mass. Aug. 23, 2023) (collecting cases) (explaining that a party's failure to respond to a specific argument means they it "has waived its objections to these arguments and these claims"); *Frady v. C. R. Bard, Inc.*, No. 1:19-CV-12549-ADB, 2020 WL 2079511, at *3 (D. Mass. Apr. 30, 2020) (similar, collecting cases).

## II. Plaintiffs are likely to succeed on their IFR claims.

Where Defendants do dispute Plaintiffs' arguments as to the IFR, they rely on justifications untethered from the relevant legal standard. Therefore, Plaintiffs are likely to succeed in showing that the IFR was required to go through notice and comment and is arbitrary and capricious.

### A. No exception to notice-and-comment rulemaking applies.

#### 1. Defendants lacked good cause to skip notice and comment or to implement the IFR immediately.

Defendants' justifications for invoking the "good cause" exception to notice-and-comment procedures do not come close to identifying the type of emergent circumstances required. Rather, Defendants gesture to a vague "national security and public safety" rationale and a general, purported desire to "protect the immigration system from fraud and exploitation." 91 Fed. Reg. at

65,086-87; Doc No. 50 at 6-7. But the exceptions to notice-and-comment requirements are not "'escape clauses' that may be arbitrarily utilized at the agency's whim," and are "limited to *emergency* situations." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (internal citations omitted) (emphasis added). Defendants point to no emergency here. Nor could they. The IFR seeks to upend an established 45-year rule that showed no signs of being defective; it provided refugees with 30 days to respond to a NOIT and resulted in very few terminations. Defendants' mere desire to destabilize refugee communities by reducing the time for refugees to respond and defend against the potential loss of immigration status is not the sort of emergency contemplated by the good cause exception. *Cf. Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (finding good cause where agency identified "imminent hazard to aircraft, persons, and property"); *Council of the S. Mountains, Inc. v. Donovan,* 653 F.2d 573, 581 (D.C. Cir. 1981) (finding good cause in "a special, possibly unique, case" of a rule of "life-saving importance" to mine workers). Moreover, "an agency asserting the 'serious harm' justification" must "explain why the harm caused by delay ... is unique in a way that warrants dispensing with notice and comment." *United States v. Reynolds*, 710 F.3d 498, 513-14 (3d Cir. 2013) (distinguishing *Jifry*). Defendants offer no such explanation; in fact, all the harm is borne by refugees. *Infra* at 19-20.

Crucially, Defendants' justification for evading notice-and-comment procedures—"streamlining" the process by which refugees will lose status, 91 Fed. Reg. at 65,080-81; Doc No. 50 at 6-7—does not match what the regulation does. Nowhere does the IFR shorten *adjudication* time for refugees alleged not to have met the refugee definition at admission and who respond to the NOITs. The only refugees whose terminations are guaranteed to occur more quickly as a result of the IFR are those unable to timely respond to the 10-day notice, because they will be terminated if they fail to respond. 91 Fed Reg. at 65,086; Doc No. 2-13 ¶ 8. But missing a tight deadline to respond to a NOIT—whether because of inability to understand, lack of available legal counsel, mailing delays, or a host of reasons that apply to a population that has faced unfathomable odds like violence and persecution, displacement, and uprooted lives—does not demonstrate that an individual failed to meet the definition of refugee years before, or engaged in fraud or

exploitation or are threats to public safety. It demonstrates only that the refugee was unable to respond in time.

Contrary to Defendants' suggestion, following notice-and-comment procedures would not allow those who purportedly "should have never been admitted to the United States as refugees to remain present longer than necessary." Doc No. 50 at 7. The IFR does not address the pace of removal of any individual alleged to have not met the definition of refugee. As the IFR acknowledges, terminated refugees will be placed in removal proceedings, where many will have defenses to removal and be eligible for other relief. 91 Fed. Reg. at 65,080-81; Doc No. 50 at 3 n.3. Perversely, the only so-called "efficiency" the IFR creates is to harm and cause chaos for refugees by stripping them and their families of status, work authorization, and the ability to support themselves while their cases proceed through the immigration courts. The IFR makes no effort to connect the loss of work authorization and family stability to the purported cause of "public safety."

Finally, Defendants are wrong to dismiss the harms caused by the immediate implementation of the IFR because those "affected by this rule have already entered the United States." Doc No. 50 at 7 n.5. Any of the 186,000 unadjusted refugees who entered the United States after 2015 is vulnerable to receiving a NOIT and must prepare to gather documents and obtain counsel to avoid catastrophic harm. And to address these emergencies, organizations serving refugees, already scrambling to address the mass Re-vetting Policy and the Adjustment of Status Hold, now must rush to inform their networks and their clients, divert capacity from other work, delay service to other clients, and postpone taking on new matters that fulfill grant requirements as a result of the IFR's immediate implementation. Decl. of John Slocum (Doc No. 2-6) ¶ 28; Doc No. 2-3 ¶ 24; Doc No. 5 at 20. Regardless, Defendants again point to no specific exigency regarding life, property or public safety. Doc No. 50 at 7-8. Given that fact, Defendants' delays in publishing the IFR, and the 45 years during which a thirty-day response time was in place, they cannot show good cause for immediate implementation of the rule.

**2. The foreign affairs exception does not apply.**

In invoking the foreign affairs exception, Defendants rehash their reasoning from the IFR but do not address Plaintiffs' arguments against it. *See* Doc No. 50 at 7-8. Specifically, Defendants rely on 8 U.S.C. § 1157(e)[1] to assert that refugee admissions require consideration of whether "other countries will admit and assist" in resettlement of refugees and "the impact of the participation of the United States in the resettlement of such refugees on the foreign policy interests of the United States," and that this could cause "undesirable international consequences" by "reveal[ing] sensitive screening or vetting rationales, impair[ing] relations with foreign governments by forcing public debate over country-specific risk judgments, and delay[ing] implementation of measures tied to ongoing external screening and vetting concerns." Doc No. 50 at 8. But that argument is unrelated to the stripping of status and work authorization of refugees already resettled in the United States, who have built new lives in local communities based on the USRAP's promise of permanency and stability; there are no international consequences to a rule that drastically shortens the time for resettled refugees to defend their status. *See* Doc No. 5 at 15-19. Moreover, even if the "undesirable consequences" test were appropriate—it is not, *see id.* at 19—Defendants fail to identify any evidence in the IFR showing that announcing a proposed rule and soliciting comments would somehow affect international relations. *Id.*; *see E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 776 (9th Cir. 2018) (evidence needed where "the connection between" foreign-policy consequences "and the immediate implementation of the Rule is not apparent"); *California v. Mullin*, 833 F. Supp. 3d 50, 78 (D. Mass. 2026) ("Defendants have not

[1] Defendants' reliance on § 1157(e) makes little sense, as that section addresses what information "designated Cabinet-level representatives of the President" are required to share through "appropriate consultation" with "with members of the Committees on the Judiciary of the Senate and of the House of Representatives" when assessing how many refugees to admit in any given year. *See* 8 U.S.C. § 1157(a)(1), (e). Regardless, as explained, the IFR does not address any of these issues, and instead involves implementation of a domestic statute—8 U.S.C. § 1157—through domestic means, and regulates only individuals within the United States. Doc No. 5 at 16; *see Amica Ctr. for Immigrant Rts. v. EOIR*, 822 F. Supp. 3d 119, 164 (D.D.C. 2026) (rejecting similar foreign affairs argument because "the [challenged] rules apply exclusively to proceedings: (1) taking place in the United States, (2) relating to individuals who are present here, and (3) applying U.S. law").

offered any evidence of the undesirable international consequences that would have flowed from complying with the APA's procedural requirements.").

**B. The IFR is arbitrary and capricious.**

The IFR is arbitrary and capricious because the agency did not consider important aspects of the problem, including reliance interests in the previous 30-day rule. Doc No. 5 at 21. Defendants' opposition brief repeats the same problem. Defendants insist that individuals "still have the ability to respond to the NOIT," Doc No. 50 at 9 n.6, but do not address the serious difficulties that low-income, limited-English-proficient refugees will have in reviewing a NOIT and finding legal counsel to help them gather documents, find interpreters, and mount a defense of their refugee status—and their lives in the United States—all within a 10-day window. Similarly, Defendants try to justify shortening the response window for all 186,000 unadjusted refugees by pointing to the examples of just two alleged bad actors and speculating about the "potential" risk of an unspecified "number" of refugees served NOITs through Operation PARRIS. Doc No. 50 at 9-10, citing 91 Fed. Reg. at 65,084. But Defendants fail to explain how requiring a NOIT response within 10 instead of 30 days would have helped in those situations. DHS concedes that it can initiate removal proceedings against noncitizens under "any applicable removal charge" without terminating their refugee status, which covers removable individuals with bona fide public safety concerns. 91 Fed. Reg. at 65,081 & n.27. And whether refugee status is terminated or not, removal proceedings typically take months, if not years, to resolve.[2]

Defendants invoke Presidential policies for increased vetting. Doc No. 50 at 10.[3] But "Presidential directives do not enable agencies to bypass" the APA's requirements. *Massachusetts v. Dep't of Educ.*, 828 F. Supp. 3d 198, 216 (D. Mass. 2026). The INA gives the agency, not the President, the authority to prescribe regulations governing refugee admissions and terminations. 8

---

[2] In July 2026, the average time immigration judges took to order removal varied from 308 to 1,076 days. TRAC Immigr., *Rising Completion Times in Immigration Court Despite Record Deportations* (Sept. 11, 2026), https://perma.cc/M848-XNED.

[3] Defendants cite Presidential Proclamation 10,998, which by its own terms does not apply to refugees who have "already been admitted to the United States." Proclamation 10,998, § 8(d).

U.S.C. §§ 1157(c)(1), (4), 1159(a)(1)(A). Thus, the "'usually applicable' arbitrary-and-capricious standard of the APA" applies. *New York v. Trump*, 811 F. Supp. 3d 215, 239 (D. Mass. 2025). Holding otherwise "would undermine the APA and 'shockingly allow Presidents to insulate any desired rulemaking from judicial review with the single stroke of an executive pen.'" *Id.* at 238 (quoting *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024)).

## III. Plaintiffs are likely to succeed on their November 2025 Memo claims.

Defendants' arguments in defense of the November 2025 Memo also fail. Plaintiffs are likely to succeed in showing that this Court has jurisdiction to review the November 2025 Memo under the APA, and that the Memo needed to undergo notice and comment.

### A. The Court has jurisdiction over Plaintiffs' claims.

Defendants erroneously contend that 8 U.S.C. § 1252(a)(2)(B) bars jurisdiction over Plaintiffs' challenge to the November 2025 Memo, Doc No. 50 at 14-15. Section 1252(a)(2)(B) does not apply to adjustment of status for refugees or asylees. Section 1252(a)(2)(B)(i) provides that "no court shall have jurisdiction to review ... any judgment regarding the granting of relief," among other things "under section ... 1255." And § 1255 governs adjustment applications for certain kinds of visa holders, not those who are refugees or asylees.[4] Rather, refugee adjustment applications are governed by 8 U.S.C. § 1159, and refugee terminations are governed by 8 U.S.C. §§ 1157 and 1101(a)(42). None of these provisions are mentioned in § 1252(a)(2)(B)(i). Even if § 1255 were somehow relevant (it is not), § 1252(a)(2)(B)(i) "bars review only over 'a single act of granting or denying an individual application for relief,'" and does not "preclude 'collateral actions challenging general policies and procedures.'" *Dorcas Int'l Inst. of R.I. v. USCIS*, 834 F. Supp. 3d 242, 276 (D.R.I. 2026) (collecting cases) (quoting *Nakka v. USCIS*, 111 F.4th 995, 1004, 1009 (9th Cir. 2024)); *accord Doe v. Trump*, No. 1:25-CV-13946-JEK, 2026 WL 1170971, at *8 (D. Mass. Apr. 30, 2026) (Kobick, J.) (holding that § 1252(a)(2)(B)(i)'s "text and context demonstrate that it does not extend to collateral attacks on agency policies and procedures").

---

[4] Several other forms of adjustment are also not covered by § 1255. *See, e.g.*, 8 U.S.C. §§ 1201, 1255(b), 1259.

Section 1252(a)(2)(B)(ii), which precludes jurisdiction over challenges to "any other decision or action ... the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security …," does not preclude review of the November 2025 Memo either. To start, Defendants erroneously rely on cases addressing whether § 1252(a)(2)(B)(ii) bars review over challenges to denials of adjustment of status applications under § 1255. Doc No. 50 at 15-17. But again, Plaintiffs' challenge does not involve § 1255. Moreover, while § 1255 provides that a noncitizen's status "may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe," 8 U.S.C. § 1255(a), § 1159 contains no such discretion. If a refugee otherwise qualifies to adjust their status, the government *must* grant them that status. *See* Doc No. 5 at 23-24; 8 U.S.C. § 1159(a)(2); 8 C.F.R. § 209.1(e). Therefore, a refugee's adjustment application cannot involve a "decision or action" that is "specified" to be at the "discretion" of Defendants.

To be sure, § 1157(c)(4) does accord Defendants discretion in deciding whether to *terminate* an individual refugee's status, but only if they are first found not to have been a refugee at the time of their initial admission. 8 U.S.C. § 1157(c)(4); *see Mukantagara v. Mullin*, --- F.4th ----, 2026 WL 2979742, at *3 (10th Cir. Oct. 5, 2026).[5] However, § 1157 does not authorize the blanket, indefinite freeze of refugee adjustment applications or re-vetting as contemplated by the November 2025 Memo. Doc No. 5 at 23-26.

Regardless, even if §§ 1101(a)(42), 1157, and 1159, alone, or in combination, afforded Defendants discretion to take individual actions with respect to adjudication freezes and re-vetting, that would still not support their jurisdictional argument. "As many courts have held, Section 1252(a)(2)(B)(ii)—much like Section 1252(a)(2)(B)(i)—bars judicial review of orders denying discretionary benefits in *individual cases*, but the statute does not foreclose categorical challenges to agency policies and procedures concerning the adjudication of those benefits." *Dorcas*, 834 F.

[5] Notably, the regulation implementing § 1157(c)(4) takes away that discretion, stating that the refugee status of any individual and their spouses and children "*will* be terminated by USCIS" if the individual "was not a refugee within the meaning of section 101(a)(42) of the Act at the time of admission." 8 C.F.R. § 207.9 (emphasis added).

Supp. 3d at 276 (emphasis in original) (citing eight cases, including in this District); *accord Roe v. Mayorkas*, No. 22-cv-10808-ADB, 2023 WL 3466327, at *8 (D. Mass. May 12, 2023) (§ 1252(a)(2)(B)(ii) does not reach "claims challenging the legality of policies and processes governing discretionary decisions under the INA," or challenges to "whether [the government] may suspend adjudications altogether").[6] Accordingly, the Court has jurisdiction over Plaintiffs' challenge to the November 2025 Memo.

**B. The Adjustment of Status Hold and Re-vetting Policy are final agency actions.**

Contrary to Defendants' arguments, the Adjustment of Status Hold and Re-vetting Policy are final agency actions reviewable under the APA, 5 U.S.C. § 704. To be considered "final," an action must: (1) "mark[] the 'consummation' of the agency's decisionmaking process" and (2) be one "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

Regarding the first prong, neither the Hold nor the Policy are tentative or interlocutory. Both are already in effect. Nov. 2025 Memo, Doc No. 1-4 at 2, 4 (hold "[e]ffective immediately"); Doc No. 2-13 ¶ 6 (describing clients "receiving 'Call-In' notices to appear for a 'Post-Admission Refugee Re-Verification'" and having multiple clients scheduled for interviews every week). Defendants argue the Adjustment of Hold is "temporary," Doc No. 50 at 13, but that does not make it non-final. Indeed, numerous courts have found that temporary moratoriums or suspensions of activities, including adjudication holds by USCIS, meet the first *Bennett* prong where the action

[6] Relying again on § 1255, Defendants cite multiple federal courts of appeals cases concerning USCIS's "visa retrogression policy." Doc No. 50 at 16-17. But these cases involve a USCIS regulation "specifying that an applicant is ineligible for adjustment of status" under § 1255 "'unless an immigrant visa is immediately available to him or her at the time the application is filed,' and that applications for permanent resident status 'shall not be approved until an immigrant visa number has been allocated by the Department of State.'" *Dorcas*, 834 F. Supp. 3d at 280 (quoting 8 C.F.R. §§ 245.1(g)(1), 245.2(a)(5)(ii)). These provisions do not apply to refugees, who are not subject to numerical limitations and visa availability. Also, these visa-retrogression cases involved individual adjudications, not policy challenges. *E.g.*, *Kale v. Alfonso-Royals*, 139 F.4th 329, 335 (4th Cir. 2025) (Section 1252(a)(2)(B)(ii) does not bar review of "high-level ... policy choices" leading to inaction, only individual "decisions" (internal quotation marks omitted)).

represents the agency's definitive position, even if the position might change in the future. *Dorcas*, 834 F. Supp. 3d at 290 (collecting cases); *New York*, 811 F. Supp. 3d at 233 (collecting additional cases). Moreover, here, the agency's "characterization of its action as 'temporary' rings hollow." *Doe*, 2026 WL 1170971, at *6. The Memo has been in effect for nearly a year. It states that the Hold "is in place until the USCIS Director lifts the hold in a subsequent memo," Doc No. 1-4 at 3, which has not happened. "As this appears to be an indefinite moratorium on applications" for adjustment of status, "the first prong of *Bennett* is satisfied." *Dorcas*, 834 F. Supp. 3d at 290–91 (quoting *Bowser v. Noem*, No. 26-CV-10382-AK, 2026 WL 555624, at *6 (D. Mass. Feb. 27, 2026)); *Doe*, 2026 WL 1170971, at *6.

As for Defendants' contention that adjustment of status applications are still in process, Plaintiffs are not challenging individual adjustment decisions but Defendants' blanket adjudication hold. Moreover, "to say that because no final adjudication of any application has been made means the [Memo is] not final agency action[] is entirely circular. No final adjudication has been made *because of* the hold." *Bowser*, 2026 WL 555624, at *5 (emphasis in original).

As to the second *Bennett* prong, the Memo unquestionably has "altered the legal status quo." *New York*, 811 F. Supp. 3d at 233. "[W]here an agency suspension of activity prevents an individual from moving forward, such that they are trapped without recourse due to the indefinite postponement of agency action, that can be enough to impose significant legal and practical consequences on the individual." *Dorcas*, 834 F. Supp. 3d at 291 (cleaned up) (citing *Connecticut v. Dep't of Interior*, 363 F. Supp. 3d 45, 60 (D.D.C. 2019)). Like other USCIS adjudication holds, the Memo "dictat[es] the actions of USCIS employees and affect[s] the rights of" refugees, placing them in "indefinite limbo with respect to their applications for ... permanent resident status ... affecting all manner of life plans." *Doe*, 2026 WL 1170971, at *7. That satisfies the second *Bennett* prong.

**C. The Adjustment of Status Hold and Re-vetting Policy are contrary to law.**

As previously explained, refugee status termination and adjustment adjudications are governed by three specific statutes: 8 U.S.C. §§ 1101(a)(42), 1157(c)(4), and 1159(a). *Supra* at 2-

3, 9-10; Doc No. 5 at 2-4, 23-26. Defendants do not address any of these statutes, or Plaintiffs' arguments, again forfeiting any argument that these statutes authorize their actions. Instead, Defendants gesture vaguely at "national security" and argue that the "Court should not replace its judgment for that of the Executive" on such matters. Doc No. 50 at 11. But "the agency's power to act is 'authoritatively prescribed by Congress'" and "'an agency literally has no power to act unless and until Congress confers power upon it.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (citations omitted). As Plaintiffs explained, Congress has not authorized either the Adjustment of Status Hold or the Re-vetting Policy laid out in the November 2025 Memo, Doc No. 5 at 23-26, and talismanic invocations of "national security" cannot somehow convert an absence of statutory authority into a grant where none otherwise exists.

Defendants rely on inapposite mandamus cases seeking to compel agency adjudication. Doc No. 50 at 11. But those cases do not address blanket, indefinite freezes of benefits adjudications. "[H]ad Congress intended to give USCIS [the] sweeping authority" to indefinitely freeze all adjudications, "it surely would have said so." *See Dorcas*, 834 F. Supp. 3d at 311 (cleaned up) (finding USCIS lacked authority to pause benefit adjudications, including adjustment applications arising under § 1255, where relevant statutory provisions did not expressly authorize such a pause); *Doe*, 2026 WL 1170971, at *15 (similar).

Defendants next contend that "temporarily pausing final adjudication of categories of applications is within the agency's discretion and statutory authority." Doc No. 50 at 12. But Defendants again identify no such authority, and there is none. Doc No. 5 at 23-26. Indeed, the agency has long understood its authority to pause adjudications to be limited to case-by-case determinations where an investigation is undertaken. *See* 8 C.F.R. § 103.2(b)(18); Doc No. 5 at 25-26 (discussing cases concluding § 103.2(b)(18) does not provide blanket authority to indefinitely withhold adjudication of an application). To the extent Defendants rely on an agency's inherent authority to reconsider prior adjudications, where, as here, Congress has explicitly laid out when and how reconsideration can occur, no reconsideration authority beyond what Congress authorized exists. Doc No. 5 at 25. Finally, Defendants do not contest that §§ 1157 and 1159 grant

authority to establish procedures to review refugee status grants for termination only by "regulation," or that the November 2025 Memo was not issued as a regulation, *see* 8 U.S.C. §§ 1157(c), 1159(a)(1), or that the Memo violates the *Accardi* doctrine for multiple reasons. Doc No. 5 at 25-26.

**D. The Adjustment of Status Hold and Re-vetting Policy are legislative rules requiring notice and comment.**

The Adjustment of Status Hold and Re-vetting Policy are legislative rules that are required to go through notice and comment procedures because they assign duties and impose obligations on refugees that are not already outlined in the law. Doc No. 5 at 26-27. Defendants invoke the narrow exceptions for interpretative rules, general statements of policy, and procedural rules, 5 U.S.C. § 553(b)(4)(A), but these exceptions do not apply.

**1. The Adjustment of Status Hold and Re-vetting Policy are legislative, not interpretive, rules.**

First, the Adjustment of Status Hold and the Re-vetting Policy are legislative, not interpretive, rules. "An interpretive rule is issued by an agency merely to advise the public of the agency's construction of the statutes and rules which it administers." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (internal quotation marks omitted). In contrast, a legislative rule is "one that 'creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself.'" *Id.* (quotation omitted). In *Azar,* the First Circuit followed a five-factor test for distinguishing between legislative and interpretive rules. Defendants fail to engage with these factors at all in their opposition, Doc No. 50 at 17-18, but each one demonstrates that the Hold and the Policy are legislative rules.

First, an examination of the "the words of the statute," *Azar*, 887 F.3d at 71, shows that the Hold and Policy are legislative because they exceed USCIS's authority under 8 U.S.C. §§ 1157 and 1159. Doc No. 5 at 23-26. And even if the statutory scheme gave USCIS the discretion to impose the adjudication hold and re-vetting policy, which it does not, in doing so USCIS would be exercising a policy judgment, which requires notice and comment rulemaking. *Azar*, 887 F.3d at 71. The second *Azar* factor also shows that the Hold and Policy are legislative rules because

USCIS does not rely on its interpretation of the governing statutes or regulations when explaining its reasons for adopting the November 2025 Memo. *Id*. at 72. Rather, the November 2025 Memo reflects a classic policy judgment, *id.*, purportedly justified only by USCIS's unsubstantiated belief that prior refugee admissions were the result of insufficient vetting. Doc No. 1-4 at 3.

Third, the Adjustment of Status Hold and Re-vetting Policy are legislative because they are "'inconsistent with another rule having the force of law.'" *Azar*, 887 F.3d at 73 (quoting *Warder v. Shalala*, 149 F.3d 73, 81 (1st Cir. 1998)). They conflict with (1) 8 C.F.R. § 209.1(e), which directs that USCIS "will approve" an adjustment application if the refugee is found to be admissible; (2) *id*. § 209.1(d), which explicitly provides for only "case-by-case" determinations on whether interviews are needed, and only to assess eligibility for adjustment of status, not to re-vet a refugee*;* and (3) *id*. § 103.2(b)(18), which authorizes withholding of adjudication for individual benefit requests not "a generally applicable policy withholding adjudication." *Doe*, 2026 WL 1170971, at *15 (citing 8 C.F.R. § 103.2(b)(18)). The fact that the Adjustment of Status Hold and Re-vetting Policy "alter or enlarge obligations imposed by a preexisting regulation," provides further confirmation that they are legislative rules subject to notice and comment. *Azar*, 887 F.3d at 73 (quoting *Aviators for Safe & Fairer Regul., Inc.* v. *FAA*, 221 F.3d 222, 226-27 (1st Cir. 2000) (alterations omitted)).

Finally, the fourth and fifth *Azar* factors, which consider where an agency's actions "fit within the statutory and regulatory scheme" broadly and other "pragmatic considerations," *id.*, confirm that the Adjustment of Status Hold and Re-vetting Policy are subject to notice and comment. In essence, the final *Azar* factors require the Court to ask, "how 'big of a deal' the regulation is." *New York v. DOJ*, 804 F. Supp. 3d 294, 317 (D.R.I. 2025). Both the Hold and the Policy are dramatic departures from agency practice that indefinitely deprive refugees of the benefits of permanent resident status while simultaneously seeking to strip them of their existing status without following proper procedures. That is a big deal, and the *Azar* framework does not allow an agency to take actions of such "considerable import" without first providing the public notice and an opportunity to provide comment. *Azar*, 887 F.3d at 74. Accordingly, all five *Azar*

factors confirm that the Adjustment of Status Hold and Re-vetting Policy are legislative rules that required notice and comment.

**2. The Adjustment of Status Hold and Re-vetting Policy are not procedural rules.**

Defendants also try to invoke the exception for internal "agency organization, procedure, or practice," 5 U.S.C. § 553(b)(A), but the procedural exception is a "limited carveout ... intended for internal house-keeping measures organizing agency activities." *AFL-CIO v. NLRB*, 57 F.4th 1023, 1034 (D.C. Cir. 2023) (internal quotation marks and citations omitted). It does not cover rules that "alter the rights or interests of parties." *President's All. on Higher Educ. & Immigr. v. Noem*, 824 F. Supp. 3d 168, 202 (D. Mass. 2026) (internal quotation marks omitted). The Hold and Policy alter the rights and interests of refugees by preventing them from becoming lawful permanent residents and endangering their legal presence in the United States. They are therefore substantive, not procedural, rules. *See id.*; *Venezuelan Ass'n of Mass. v. USCIS*, 2026 WL 2255272, at *4 (D. Mass. Aug. 5, 2026) (rejection of asylum application for failure to pay an annual fee was not a procedural rule because it "affects the applicant's eligibility for immigration benefits and legal presence in the United States").[7]

**3. The Adjustment of Status Hold and Re-vetting Policy are not general statements of policy.**

The November 2025 Memo also does not qualify as a general statement of policy. Policy statements are "issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (internal quotation marks omitted). But Defendants have no discretion to impose an adjudication hold or re-vetting scheme because those actions are contrary to 8 U.S.C. §§ 1157 and 1159. 8 C.F.R. § 103.2(b)(18) also does not "confer authority to adopt a generally applicable policy

[7] Defendants rely on *Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 757-59 (9th Cir. 1992), but that case supports Plaintiffs' argument because the court found that the Department of Agriculture's change in voting procedures needed to go through notice and comment.

withholding adjudication" either. *Doe*, 2026 WL 1170971, at *15 (citing 8 C.F.R. § 103.2(b)(18)). Therefore, Defendants cannot be exercising their discretionary power in issuing the Memo.[8]

Even if Defendants did have discretion to impose an adjudication hold and a re-vetting scheme, which they do not, the November 2025 Memo is not a policy statement because it does not give USCIS adjudicators discretion in its terms. *CropLife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003) (a critical issue in distinguishing a legislative rule from a statement of policy is whether the agency action is binding or permits the exercise of discretion). Rather the Memo "directs USCIS personnel to hold all pending" adjustment applications filed by refugees who were admitted during the relevant time frame and says that all such refugees "will require review" and an "interview." Doc No. 1-4 at 2-3. "Any request to lift the hold for either litigation reasons or other extreme circumstances must be approved by the USCIS Director or Deputy Director." *Id.* at 2. The hold and re-vetting scheme are therefore binding on all adjudicators, leaving them no discretion to deviate from the requirements. *See Elec. Priv. Info. Ctr. v. DHS*, 653 F.3d 1, 7 (D.C. Cir. 2011) (agency action is not a general statement of policy if it "purport[s] to bind" those subject to it and is cast in "mandatory language" (internal quotation marks omitted)).

**4. Defendants' failure to follow notice and comment was not harmless.**

In a last-ditch effort to avoid notice and comment, Defendants argue that any failure to follow notice and comment procedures is harmless error, Doc No. 50 at 18, but this contention rests on an inaccurate factual and legal premise. Defendants claim the Adjustment of Status Hold and Re-vetting Policy followed a "Presidential directive," such that any consideration of public comments would not have led to a different outcome. Doc No. 50 at 18. But the November 2025 Memo does not rely on a Presidential directive.[9] Instead, it invokes vague notions of national

---

[8] Rather than arguing that Defendants are exercising their authority pursuant to 8 U.S.C. §§ 1157 and 1159, the relevant statutes at issue here, Defendants cite to three statutes that are irrelevant to the issues in this case: § 1255 (adjustment of status for certain noncitizens other than refugees), § 1446 (investigation of individuals who have applied for naturalization), and § 1105 (authority to cooperate with CIA and FBI for the purpose of exchanging information).

[9] While the November 2025 Memo does refer to Executive Order 14,163, Doc No. 1-4 at 2-3, that Executive Order addresses the admission of refugees from abroad, not the status of refugees once

security and public safety concerns, which are classic policy judgments. Doc No. 1-4 at 3-4. And regardless, "Presidential directives do not enable agencies to bypass" the APA's requirements. *Massachusetts*, 828 F. Supp. 3d at 216; *accord Levesque v. Block*, 723 F.2d 175, 184 (1st Cir. 1983) (exceptions to APA requirements limited to "statutory duties").

Defendants also are incorrect that notice and comment "would not alter the legal conclusion of the" Memo. Doc No. 50 at 18 (quoting *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 690 (D.C. Cir. 2023)). The only legal authority relied on in the November 2025 Memo is the definition of a refugee, 8 U.S.C. § 1101(a)(42), which speaks to whether a person has experienced or will experience persecution. That statute does not authorize, let alone compel, the Adjustment of Status Hold or the Re-vetting Policy. *Contra Ctr. for Biological Diversity*, 77 F.4th at 685 (notice and comment not required where agency's conclusion was compelled by the language of the governing statutes and binding circuit precedent, since no amount of procedure would have remedied the plaintiff's harm). Courts "have not been hospitable to … claims of harmless error in cases in which the government violated § 553 of the APA by failing to provide notice." *Id.* at 690 (internal quotation marks omitted). Here, following notice and comment procedures would have allowed Plaintiffs and other interested parties to comment on the impacts of the Hold and Policy, and for Defendants to consider them. Therefore, the harmless error rule does not apply. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109-10 (D.C. Cir. 2014) (expressing skepticism of harmless error rule where agency evades notice and comment requirements altogether).

Because no exceptions to the notice and comment requirement apply and Defendants failed to follow notice and comment, the adjudication hold and re-vetting policy are procedurally invalid.

---

they have been admitted to the United States, and the Memo does not argue that the Executive Order compels the Adjustment of Status Hold or the Re-vetting Policy.

## IV. Plaintiffs are facing irreparable harm now.

Defendants' argument that Plaintiffs have not established irreparable harm ignores the evidentiary record, which demonstrates that harm is not only likely but already occurring. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

### A. The IFR threatens the loss of refugee status without a meaningful opportunity to be heard.

Defendants insist that shortening the response period "does not mean termination of status." Doc No. 50 at 20. For a refugee who cannot respond in time, that is exactly what it means. The IFR sets no deadline for USCIS but a refugee who misses the deadline forfeits the right to respond, and "DHS will terminate his or her refugee status." 91 Fed. Reg. at 65,085; *see supra* at 3. There is no administrative appeal. *Id.* at 65,091.

Ten days is inadequate. A competent response takes 30 to 45 hours of legal work. Doc No. 2-11 ¶ 14. It requires the refugee's own records, yet none of the Freedom of Information Act (FOIA) requests that the Immigrant Law Center of Minnesota filed for clients facing NOITs drew a response within six weeks, and similar records requested from UNHCR took at least 10 days to arrive. *Id.* ¶ 11. Gathering and translating affidavits and documents from abroad is "logistically improbable" in 10 days. *Id.* ¶ 12. And refugees facing that deadline often work full-time, have limited English proficiency, and have no lawyer. Decl. of Firas D. (Doc No. 2-10) ¶ 15; Decl. of Julio C. (Doc No. 2-9) ¶ 4; Doc No. 2-3 ¶ 26; Decl. of Jeffrey D. Thielman (Doc No. 2-4) ¶ 22.

Defendants respond with a list of purported "safeguards": express delivery within three days, three added days for notices mailed through USPS for "a total of 13 days," and the option to request an interview. Doc No. 50 at 19-20. But the record refutes each one. For example, USCIS issued one NOIT on October 15, 2026, the day after the IFR took effect but before the administrative stay was entered. Doc No. 2-13 ¶ 7. It gave the refugee "ten (10) days from the date of this notice," not 13. *Id.* ¶ 8. It reached the refugee by courier on October 19, with four of those days gone and six left. *Id.* ¶¶ 7, 9. And it required any interview to be scheduled within the same 10 days. *Id.* ¶ 8. Defendants' safeguards appear only in the IFR's preamble; the regulation itself

gives a refugee 10 days to "present written or oral evidence." 91 Fed. Reg. at 65,091; *see* Doc No. 5 at 22 n.8. Nor is an interview, which can last hours and turn on faulty interpretation, a substitute for the documentary defense that a written response allows. Doc No. 2-11 ¶¶ 18-21, 26.

The consequences of a default are irreparable. Termination immediately ends work authorization, 91 Fed. Reg. at 65,081, and with it the ability to work at all, Doc No. 2-10 ¶ 10; Doc No. 2-3 ¶ 41. A principal refugee's spouse and children lose their status too, without a notice of their own. 8 C.F.R. § 207.9; Decl. of Maria Chavez (Doc No. 2-1) ¶ 19. The refugee is potentially placed in removal proceedings, Doc No. 50 at 3 n.3, exposed to detention, Doc No. 2-3 ¶ 28; Doc No. 2-4 ¶ 28, and ultimately faces return to the country he or she fled, Decl. of Lida A. (Doc No. 2-7) ¶ 9; Decl. of Abdi B. (Doc No. 2-8) ¶ 13; Doc No. 2-10 ¶ 16. Defendants' answer that refugees need only "remain diligent," Doc No. 50 at 20, misses the point. No amount of diligence produces a records response within 10 days or replaces 20 extra days to prepare a careful and thorough defense of one's status and livelihood in the U.S. And courts in this District recognize the loss of lawful status, work authorization, and protection from removal as irreparable. *Venezuelan Ass'n of Mass.*, 2026 WL 2255272, at *5; *Bowser*, 2026 WL 555624, at *9.

The IFR is also harming Organizational Plaintiffs now. Defendants wave that harm away as "inconvenience," Doc No. 50 at 20, but the record shows far more. Because of the immediate implementation of the IFR HIAS' Pro Bono team is developing a project to engage attorneys in providing pro bono counsel for refugees so that it can be prepared to respond to 10-day NOITs, diverting its team from existing clients and from matters its grants require. Doc No. 2-3 ¶ 24 (HIAS). It expects to accept only a fraction of the referrals it receives and to be drawn into removal defense that its grants do not fund. *Id.* ¶¶ 25-27, 30. Jewish Family Service of Western Massachusetts (JFS-WMA) has one staff member for more than 1,000 unadjusted refugee clients and would need ten. Decl. of Rabbi James Greene (Doc No. 2-5) ¶¶ 14, 22; *see also* Doc No. 2-4 ¶¶ 22-24 (IINE); Doc No. 2-6 ¶¶ 24, 28-29 (RCUSA); Doc No. 2-1 ¶ 16 (PANA). "Obstacles that unquestionably make it more difficult for the plaintiff to accomplish its primary mission provide

injury for purposes of irreparable harm." *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 322 (D. Mass. 2025) (cleaned up).

**B. The Adjustment of Status Hold and Re-vetting Policy inflict ongoing harm that compounds the IFR's.**

Defendants downplay the real harms caused by the November 2025 Memo as mere "[d]elay in application processing." Doc No. 50 at 20. But Plaintiffs do not complain that USCIS is slow. They challenge a policy that forbids adjudication altogether, and its consequence is the loss of food and medical care now. Unadjusted refugees have been losing SNAP benefits and, since October 1, 2026, are ineligible for Medicaid; a refugee who adjusts would regain eligibility and access to these basic needs immediately, but the Memo blocks refugees from adjusting. Decl. of Sarah Krieger (Doc No. 2-12) ¶¶ 8-9, 12. PANA Member 1 and her children lost Medicaid and food assistance, and she can no longer keep appointments with the specialists who treat her serious medical conditions. Doc No. 2-1 ¶ 18. Julio C. lost SNAP, works 12-hour days to meet his basic needs, and depends on Medicaid for his HIV medication. Doc No. 2-9 ¶ 4. JFS-WMA opened an emergency food pantry for refugee clients, and the loss of Medicaid moves its clients to emergency-only coverage that makes it harder to fill life-saving prescriptions like insulin. Doc No. 2-5 ¶¶ 11, 24-25.

Defendants' contrary arguments rest on mistakes of fact and law. They attribute any lapse in work authorization or benefits to "the temporary nature of parole." Doc No. 50 at 21. But Plaintiffs are not parolees. They were admitted as refugees under § 1157, their status is indefinite, and their work authorization is incident to that status. 91 Fed. Reg. at 65,080 & n.14 (citing 8 C.F.R. § 274a.12(a)(3)). Defendants next say the loss of benefits is "not attributable to the USCIS Memo." Doc No. 50 at 21. But Congress tied eligibility to lawful permanent resident status, and the Adjustment of Status Hold is what keeps Plaintiffs from attaining it. Defendants' lone First Circuit authority, an administrative-exhaustion case, says nothing about a policy that bars adjudication while applicants lose food and health coverage. *See Anversa v. Partners Healthcare Sys., Inc.*, 835 F.3d 167, 178 (1st Cir. 2016).

The policies also compound one another's harms. The Adjustment of Status Hold keeps refugees in the only status the IFR can reach, 91 Fed. Reg. at 65,080, and the Re-vetting Policy generates the NOITs, Doc No. 2-11 ¶¶ 8, 16. The wife and children of African Communities Together (ACT) Member 1 have adjusted; his own application remains pending, leaving him the sole member of his family exposed to termination on 10 days' notice and at risk of being separated from them. Decl. of Diana Konaté (Doc No. 2-2) ¶ 17. Abdi B. was detained for two weeks after appearing for an interview during Operation PARRIS, and his adjustment application has not moved since. Doc No. 2-8 ¶¶ 7-11.

**C. Defendants' misplaced objection to pseudonyms does not alter this analysis.**

Defendants contend that Individual Plaintiffs' pseudonyms make their harms "unverifiable." Doc No. 50 at 21. The objection fails five times over. First, Plaintiffs sought leave to proceed pseudonymously and offered at the outset to disclose their identities to Defendants' counsel under a protective order, Doc No. 9 at 1 n.1, 9. Defendants never opposed that motion nor asked Plaintiffs for the identities of the Individual Plaintiffs. They cannot decline that offer and then fault Plaintiffs for it. Second, the declarations are sworn under 28 U.S.C. § 1746. They are evidence, not "conjecture, surmise, or a party's unsubstantiated fears," *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004), and Defendants cite no authority for discounting sworn testimony because a name is shielded from the public. Third, Plaintiffs' showing for purposes of irreparable harm does not depend on any individual's identity. It rests on nine named declarants, on DHS's own estimate that 186,000 unadjusted refugees are subject to the IFR, 91 Fed. Reg. at 65,088, on the IFR's forfeiture rule, and on a NOIT issued the day after the IFR that Defendants do not dispute. The matters Defendants say they cannot verify, such as whether a Plaintiff has "alternate income," Doc No. 50 at 21, have no bearing on the harms Plaintiffs assert. Fourth, to the extent Defendants contend pseudonyms somehow defeat class certification because the named plaintiffs are anonymous, courts in this circuit readily reject that

contention. *See, e.g.*, *Doe v. DHS*, No. 25-CV-12245-ADB, 2026 WL 880442 (D. Mass. Mar. 31, 2026); *Doe v. Noem*, No. 1:25-CV-10495-IT, 2026 WL 686483 (D. Mass. Mar. 11, 2026).[10]

**V. The balance of equities and the public interest favor a stay.**

Finally, Defendants' invocation of national security and their claim that any order against the Executive inflicts irreparable harm do not outweigh the serious harms to Plaintiffs. Doc No. 50 at 22-23.

Start with what a stay would actually do. It would restore the 30-day response period that Defendants followed for 45 years, including in 2026 as they re-vetted refugees and issued NOITs. 91 Fed. Reg. at 65,080 & n.21; Doc No. 2-11 ¶¶ 8, 11. Defendants identify no refugee who fled or caused harm during a 30-day response period. Because the IFR sets no deadline for USCIS, it gains Defendants 20 days at most, and only when a refugee defaults. *See supra* at 5-6. And DHS concedes that termination is "not a precondition" to removal proceedings if the government has a statutory basis for removal, which covers removable individuals with bona fide public safety concerns. 91 Fed. Reg. at 65,081, 65,085 & n.27. Nor would a stay of the Memo "compel flawed adjudications" or "guarantee favorable" ones. Doc No. 50 at 21. USCIS would remain free to do what its regulations already allow: interview an applicant, deny adjustment to a refugee who is inadmissible, and issue a NOIT with 30 days to respond. 8 C.F.R. §§ 103.2(b)(18), 207.9 (2025), 209.1(d)-(e). Defendants would lose only the power to act categorically and by default and to upend the lives of tens of thousands of refugees without adequate process. Tellingly, they point to no harm from the weeks in which the IFR has been administratively stayed.

Defendants' deference cases do not alter the balance. *Trump v. Hawaii* concerned the President's authority under 8 U.S.C. § 1182(f) to suspend the entry of noncitizens abroad, 585 U.S. 667, 684 (2018), not the treatment of people whom the United States had already vetted, admitted,

[10] Defendants also appear to contend that "unverifiable allegations" mean the relief Plaintiffs seek will not address their harms, because USCIS may have to deny refugee adjustment applications if it cannot conduct "enhanced security vetting." Doc No. 50 at 21. But Defendants again confuse § 1255—which affords them discretion—with § 1159, which *mandates* granting of adjustment to refugees so long as they are not inadmissible.

and placed on a statutory path to permanent residence. Even where national security is truly at stake, such concerns "do not warrant abdication of the judicial role." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010). Those concerns cannot supply authority Congress withheld. *See supra* at 13. And *Maryland v. King* concerned a statute duly enacted by a state legislature, not a rule that skipped the process Congress required. 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). "[T]here is generally no public interest in the perpetuation of unlawful agency action." *New York v. Kennedy*, 155 F.4th 67, 77 (1st Cir. 2025) (internal quotation marks omitted), yet that is exactly what Defendants assert.

Defendants' other response is to downplay the harms to Plaintiffs yet again. Defendants say Plaintiffs, "at most, must wait." Doc No. 50 at 23. But waiting is already costing refugees their health coverage and food assistance, and under the IFR it exposes each of them to losing, on 10 days' notice, the status that protects them from return to persecution. *See supra* at 18-21; Doc No. 2-7 ¶¶ 7-10; Doc No. 2-8 ¶¶ 12-13; Doc No. 2-9 ¶¶ 6-7; Doc No. 2-10 ¶¶ 11, 14-16. "[T]here is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 436 (2009). A stay protects that interest and costs Defendants nothing to which they are lawfully entitled.

## CONCLUSION

The Court should stay the Re-vetting Policy, Adjustment of Status Hold, and IFR pursuant to 5 U.S.C. § 705, certify the Class that Plaintiffs have proposed in their motion for class certification and extend the relief entered to that class, and enter the proposed order.

Dated: November 19, 2026

Respectfully submitted,

/s/ Erez Reuveni
Erez Reuveni (MA BBO No. 666769)
Jennie L. Kneedler* (DC Bar No. 500261)
Cynthia Liao* (DC Bar No. 90036947)
Steven Y. Bressler* (DC Bar No. 482492)
Robin F. Thurston* (DC Bar No. 1531399)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553

Hussein Elbakri* (NY Bar No. 5712666)
Guadalupe Aguirre* (NY Bar 5536107)
Kimberly Grano* (NY Bar No. 5858808)
Ghita Schwarz* (NY Bar No. 3030087)
Pedro Sepulveda* (NY Bar No. 6198550)
**INTERNATIONAL REFUGEE ASSISTANCE PROJECT**
One Battery Plaza, 33rd floor

New York, New York 10004
Telephone: (646) 939-9169
Facsimile: (516) 324-2267
helbakri@refugeerights.org
laguirre@refugeerights.org
kgrano@refugeerights.org
gschwarz@refugeerights.org
psepulveda@refugeerights.org

Dalia Fuleihan* (IL Bar No. 6335082)
**INTERNATIONAL REFUGEE ASSISTANCE PROJECT**
P.O. Box 47611
Chicago, IL 60647
Telephone: (646) 740-6271
Facsimile: (516) 324-2267
dfuleihan@refugeerights.org

Washington, DC 20043
Phone: (202) 448-9090
ereuveni@democracyforward.org
jkneedler@democracyforward.org
cliao@democracyforward.org
sbressler@democracyforward.org
rthurston@democracyforward.org

John Nathanson (NY Bar No. 2630697)*
Andrew Tannenbaum (NY Bar No. 3940434)*
Leila Siddiky (NY Bar No. 5225164)*
Bobbi Zahn (NY Bar No. 6000285)*
**ALLEN OVERY SHEARMAN STERLING US LLP**
599 Lexington Avenue
New York, NY 10022
212-848-4000
john.nathanson@aoshearman.com
andrew.tannenbaum@aoshearman.com
leila.siddiky@aoshearman.com
bobbi.zahn@aoshearman.com

Emily Westridge Black (TX Bar No. 24060815)*
**ALLEN OVERY SHEARMAN STERLING US LLP**
300 West 6th Street
Austin, TX 78701
512-647-1909
emily.westridgeblack@aoshearman.com

Gideon J. Duke-Cohan (MA BBO# 716358)
**ALLEN OVERY SHEARMAN STERLING US LLP**
One Beacon Street
Boston, MA 02108
212-610-6353
gideon.duke-cohan@aoshearman.com

*Counsel for All Plaintiffs*

* Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this November 19, 2026, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

/s/ Erez Reuveni
Erez Reuveni